APPEAL,CLOSED,JURY,TYPE−E

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: <u>1:19−cv−02855−TNM</u>

BOROCHOV et al v. ISLAMIC REPUBLIC OF IRAN et al
Assigned to: Judge Trevor N. McFadden
 Cases:  1:20−cv−03027−RDM
        1:20−cv−00651−TNM
Cause: 28:1605A Foreign Sovereign Immunities Act

Date Filed: 09/24/2019
Date Terminated: 03/04/2022
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**<u>Plaintiff</u>**

**NATANEL CHAIM MARK**
*Individually and as Representative of the Estate of Michael Mark*
*TERMINATED: 12/22/2019*

represented by **Robert Joseph Tolchin**
THE BERKMAN LAW OFFICE, LLC
111 Livingston Street
Suite 1928
Brooklyn, NY 11201
(718) 855−3627
Fax: (718) 504−4943
Email: rtolchin@berkmanlaw.com
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**CHAVA RACHEL MARK**
*Individually and as personal representative of TBM, RLM and EBM, minors*
*TERMINATED: 12/22/2019*

represented by **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**YISKA MARK**
*Individually and as Representative of the Estate of David Shlomo Mark*
*TERMINATED: 12/22/2019*

represented by **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**SHIRA HODAIA MARK CHARIF**
*TERMINATED: 12/22/2019*

represented by **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**YEHOSHUA MORDECHAI MARK**
*TERMINATED: 12/22/2019*

represented by **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

represented by

**MIRYAM MARK**
*TERMINATED: 12/22/2019*

**Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ORIT MARK**
*TERMINATED: 12/22/2019*

represented by **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PDAYA MENACHEM MARK**
*TERMINATED: 12/22/2019*

represented by **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AYELET HASHACHAR BATT**
*TERMINATED: 12/22/2019*

represented by **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ARYEH BATT**
*TERMINATED: 12/22/2019*

represented by **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ELISHEVA HIRSCHFELD**
*TERMINATED: 12/22/2019*

represented by **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ELI M BOROCHOV**

represented by **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RONEN STEVEN BOROCHOV**

represented by **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DEVORA SUE BOROCHOV**

represented by **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SHARI MAYER BOROCHOV**

represented by **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOSEF S. BOROCHOV**                     represented by **Robert Joseph Tolchin**
                                          (See above for address)
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**SHIRA NECHAMA BOROCHOV**                represented by **Robert Joseph Tolchin**
                                          (See above for address)
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ABRAHAM M. BOROCHOV**                   represented by **Robert Joseph Tolchin**
                                          (See above for address)
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**YOAV GOLAN**                            represented by **Robert Joseph Tolchin**
                                          (See above for address)
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROTEM SHOSHANA GOLAN**                  represented by **Robert Joseph Tolchin**
                                          (See above for address)
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**RAPHAEL GOLAN**                         represented by **Robert Joseph Tolchin**
                                          (See above for address)
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**YEHUDIT GOLAN**                         represented by **Robert Joseph Tolchin**
                                          (See above for address)
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**MATAN G. GOLAN**                        represented by **Robert Joseph Tolchin**
                                          (See above for address)
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**YAEL GOLAN INBAR**                      represented by **Robert Joseph Tolchin**
                                          (See above for address)
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**NADAV GOLAN**                           represented by

**Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SHAI FISHFEDER**                    represented by  **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EFRAT FISHFEDER**                   represented by  **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**OHAD FISHFEDER**                    represented by  **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**OMER FISHFEDER**                    represented by  **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SHIRI FISHFEDER**                   represented by  **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CICI JACOBSON**                     represented by  **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EDDY JACOBSON**                     represented by  **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHAIM GOLDWATER**                   represented by  **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ESTHER GOLDWATER**                  represented by  **Robert Joseph Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SHMUEL GORFINKLE**                              represented by **Robert Joseph Tolchin**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**SARA GORFINKLE**                               represented by **Robert Joseph Tolchin**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ESTHER FISHFEDER**                             represented by **Robert Joseph Tolchin**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**DAVID FISHFEDER**                              represented by **Robert Joseph Tolchin**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**AVI BATT**                                     represented by **Robert Joseph Tolchin**
*TERMINATED: 12/22/2019*                                         (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*


V.

**Defendant**

**ISLAMIC REPUBLIC OF IRAN**

**Defendant**

**IRANIAN MINISTRY OF
INFORMATION AND SECURITY**
*TERMINATED: 12/22/2019*

**Defendant**

**SYRIAN ARAB REPUBLIC**

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 09/24/2019 | 1 | | COMPLAINT against All Defendants with Jury Demand ( Filing fee $ 400 receipt number 0090−6394453) filed by EDDY JACOBSON, CHAIM GOLDWATER, RAPHAEL GOLAN, ORIT MARK, SHAI FISHFEDER, CHAVA RACHEL MARK, SHIRA NECHAMA BOROCHOV, NATANEL CHAIM MARK, ABRAHAM M BOROCHOV, SHIRI FISHFEDER, JOSEF S BOROCHOV, NADAV GOLAN, EFRAT FISHFEDER, OHAD FISHFEDER, ROTEM SHOSHANA GOLAN, DEVORA SUE BOROCHOV, YAEL |

| | | |
|---|---|---|
| | | GOLAN INBAR, ARYEH BATT, CICI JACOBSON, SHMUEL GORFINKLE, ELISHEVA HIRSCHFELD, YEHUDIT GOLAN, RONEN STEVEN BOROCHOV, MATAN G GOLAN, OMER FISHFEDER, MIRYAM MARK, YISKA MARK, SARA GORFINKLE, AYELET HASHACHAR BATT, ELI M BOROCHOV, SHARI MAYER BOROCHOV, PDAYA MENACHEM MARK, DAVID FISHFEDER, SHIRA HODAIA MARK CHARIF, ESTHER GOLDWATER, ESTHER FISHFEDER, YOAV GOLAN, YEHOSHUA MORDECHAI MARK. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons)(Tolchin, Robert) (Entered: 09/24/2019) |
| 09/26/2019 | | Case Assigned to Judge Trevor N. McFadden. (zeg) (Entered: 09/26/2019) |
| 09/26/2019 | 2 | STANDING ORDER Establishing Procedures for Cases Before Judge Trevor N. McFadden. The parties are hereby ORDERED to read and comply with the directives in the attached standing order. Signed by Judge Trevor N. McFadden on 09/26/2019. (lctnm2) (Entered: 09/26/2019) |
| 09/27/2019 | 3 | SUMMONS (3) Issued Electronically as to IRANIAN MINISTRY OF INFORMATION AND SECURITY, ISLAMIC REPUBLIC OF IRAN, THE SYRIAN ARAB REPUBLIC. (Attachment: # 1 Notice and Consent)(zeg) (Entered: 09/27/2019) |
| 11/25/2019 | | MINUTE ORDER. Plaintiffs filed their Complaint in this action on September 24, 2019. As of the date of this Order, the public docket reflects that Plaintiffs have yet to effect service of process. It is hereby ORDERED that, by no later than December 23, 2019, Plaintiffs must effect service in compliance with 28 U.S.C. 1608, or establish good cause for the failure to do so. Failure to comply may result in dismissal of this case. SO ORDERED. Signed by Judge Trevor N. McFadden on 11/25/2019. (lctnm2) (Entered: 11/25/2019) |
| 11/25/2019 | | Set/Reset Deadlines: Plaintiff's time to effectuate service due by 12/23/2019. (hmc) (Entered: 11/25/2019) |
| 12/19/2019 | 4 | NOTICE of Voluntary Dismissal re NETANEL CHAIM MARK, individually and as representative of the Estate of Michael Mark; CHAVA RACHEL MARK, individually and as personal representative of TBM, RLM, and EBM; YISKA MARK, individually and as representative of the Estate of Shlomo Mark; SHIRA HODAIA MARK CHARIF; YEHOSHUA MORDECHAI MARK; MIRYAM MARK; ORIT MARK; PDAYA MENACHEM MARK; AYELET HASHACHAR BATT; ARYEH BATT; AVI BATT; and ELISHEVA HIRSCHFELD . *Case remains active on behalf of remaining plaintiffs.* (Tolchin, Robert) (Entered: 12/19/2019) |
| 12/19/2019 | 5 | RESPONSE TO ORDER OF THE COURT re Order,, filed by ARYEH BATT, AVI BATT, AYELET HASHACHAR BATT, ABRAHAM M BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, ELISHEVA HIRSCHFELD, CICI JACOBSON, EDDY JACOBSON, CHAVA RACHEL |

| | | |
|---|---|---|
| | | MARK, MIRYAM MARK, NATANEL CHAIM MARK, ORIT MARK, PDAYA MENACHEM MARK, YEHOSHUA MORDECHAI MARK, YISKA MARK, SHIRA HODAIA MARK CHARIF. (Tolchin, Robert) (Entered: 12/19/2019) |
| 12/20/2019 | | MINUTE ORDER. Upon consideration of the <u>4</u> Notice of Voluntary Dismissal, it is hereby ORDERED that all claims of the following Plaintiffs are dismissed without prejudice: Natanel Chaim Mark; Chava Rachel Mark; Yiska Mark; Shira Hodaia Mark Charif; Yehoshua Mordechai Mark; Miryam Mark; Orit Mark; Pdaya Menachem Mark; Ayelet Hashachar Batt; Aryeh Batt; Avi Batt; and Elisheva Hirschfeld. This order shall have no effect on the remaining Plaintiffs. SO ORDERED. Signed by Judge Trevor N. McFadden on 12/20/2019. (lctnm2) (Entered: 12/20/2019) |
| 12/20/2019 | | VACATED PURSUANT TO MINUTE ORDER ENTERED ON 1/31/2020.....MINUTE ORDER. Upon consideration of Plaintiffs' <u>5</u> Response, it is hereby ORDERED that, by no later than January 31, 2020, Plaintiffs must effect service in compliance with 28 U.S.C. 1608, or establish good cause for the failure to do so. Failure to comply may result in dismissal of this case. SO ORDERED. Signed by Judge Trevor N. McFadden on 12/20/2019. (lctnm2) Modified on 1/31/2020 (hmc). (Entered: 12/20/2019) |
| 12/22/2019 | <u>6</u> | AMENDED COMPLAINT against ISLAMIC REPUBLIC OF IRAN, THE SYRIAN ARAB REPUBLIC with Jury Demand filed by EDDY JACOBSON, CHAIM GOLDWATER, RAPHAEL GOLAN, SHAI FISHFEDER, SHIRA NECHAMA BOROCHOV, ABRAHAM M BOROCHOV, SHIRI FISHFEDER, JOSEF S BOROCHOV, EFRAT FISHFEDER, NADAV GOLAN, OHAD FISHFEDER, ROTEM SHOSHANA GOLAN, DEVORA SUE BOROCHOV, YAEL GOLAN INBAR, CICI JACOBSON, SHMUEL GORFINKLE, YEHUDIT GOLAN, RONEN STEVEN BOROCHOV, MATAN G GOLAN, OMER FISHFEDER, SARA GORFINKLE, ELI M BOROCHOV, SHARI MAYER BOROCHOV, DAVID FISHFEDER, ESTHER GOLDWATER, ESTHER FISHFEDER, YOAV GOLAN.(Tolchin, Robert) (Entered: 12/22/2019) |
| 12/23/2019 | | Set/Reset Deadlines: Plaintiff's time to effectuate service due by 1/31/2020. (hmc) (Entered: 12/23/2019) |
| 01/12/2020 | <u>7</u> | AFFIDAVIT REQUESTING FOREIGN MAILING re <u>2</u> Order, <u>6</u> Amended Complaint,, <u>3</u> Summons Issued Electronically by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Attachments: # <u>1</u> Supplement)(Tolchin, Robert) (Main Document 7 replaced on 1/21/2020) (ztd).. Modified on 1/21/2020 (ztd). (Entered: 01/12/2020) |
| 01/15/2020 | <u>8</u> | AFFIDAVIT REQUESTING FOREIGN MAILING re <u>6</u> Amended Complaint,, <u>3</u> Summons Issued Electronically by ABRAHAM M. BOROCHOV, DEVORA |

| | | |
|---|---|---|
| | | SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Attachments: # 1 Supplement)(Tolchin, Robert) . (Main Document 8 replaced on 1/21/2020) (ztd). (Entered: 01/15/2020) |
| 01/15/2020 | | ENTERED IN ERROR. . . . .NOTICE OF CORRECTED DOCKET ENTRY: re 8 Affidavit Requesting Foreign Mailing,, was entered in error as is a duplicate of docket entry 7 . (ztd). Modified on 1/21/2020 (ztd). (Entered: 01/21/2020) |
| 01/27/2020 | 9 | AFFIDAVIT REQUESTING FOREIGN MAILING by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Tolchin, Robert) (Entered: 01/27/2020) |
| 01/28/2020 | 10 | AFFIDAVIT REQUESTING FOREIGN MAILING by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, ELISHEVA HIRSCHFELD, CICI JACOBSON, EDDY JACOBSON. (Tolchin, Robert) (Entered: 01/28/2020) |
| 01/28/2020 | 11 | AFFIDAVIT REQUESTING FOREIGN MAILING by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Attachments: # 1 Supplement)(Tolchin, Robert) (Entered: 01/28/2020) |
| 01/30/2020 | 12 | STATUS REPORT by ABRAHAM M. BOROCHOV, DEVORA SUE |

| | | |
|---|---|---|
| | | BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Tolchin, Robert) (Entered: 01/30/2020) |
| 01/31/2020 | | MINUTE ORDER. Upon consideration of Plaintiffs' 12 Status Report, it is hereby ORDERED that the Court's second Minute Order of December 20, 2019, requiring service by January 31, 2020, is hereby VACATED. It is further ORDERED that Plaintiffs shall file a Status Report on or before March 31, 2020. The status report should update the Court on the status of service of process. SO ORDERED. Signed by Judge Trevor N. McFadden on 1/31/2020. (lctnm2) (Entered: 01/31/2020) |
| 01/31/2020 | | Set/Reset Deadlines: Joint Status Report due by 3/31/2020. (hmc) (Entered: 01/31/2020) |
| 03/31/2020 | 13 | STATUS REPORT by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Tolchin, Robert) (Entered: 03/31/2020) |
| 03/31/2020 | | MINUTE ORDER. Upon consideration of Plaintiffs' 13 Status Report, it is hereby ORDERED that Plaintiffs shall file a further Status Report on or before July 1, 2020. The report should update the Court on the status of service of process. If Plaintiffs receive proof of service before July 1, 2020, then they shall promptly file it. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/31/2020. (lctnm2) (Entered: 03/31/2020) |
| 03/31/2020 | | Set/Reset Deadlines: Plaintiff's Status Report due by 7/1/2020. (hmc) (Entered: 03/31/2020) |
| 06/30/2020 | 14 | STATUS REPORT by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Tolchin, Robert) (Entered: 06/30/2020) |
| 07/01/2020 | | |

| | | |
|---|---|---|
| | | MINUTE ORDER. Upon consideration of Plaintiffs' 14 Status Report, it is hereby ORDERED that Plaintiffs shall file a further Status Report on or before October 1, 2020. The report should update the Court on the status of service of process. If Plaintiffs receive proof of service before October 1, 2020, then they shall promptly file it. SO ORDERED. Signed by Judge Trevor N. McFadden on 7/1/2020. (lctnm2) (Entered: 07/01/2020) |
| 07/01/2020 | | Set/Reset Deadlines: Plaintiffs' Status Report due by 10/1/2020. (hmc) (Entered: 07/01/2020) |
| 09/18/2020 | 15 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to ISLAMIC REPUBLIC OF IRAN served on 8/19/2020, answer due 10/18/2020. (Delivered under diplomatic note NO. 1143−IE. Original mailed back to counsel). (eg) (Entered: 09/18/2020) |
| 09/30/2020 | 16 | STATUS REPORT by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Tolchin, Robert) (Entered: 09/30/2020) |
| 10/01/2020 | | MINUTE ORDER. Upon consideration of Plaintiffs' 16 Status Report, it is hereby ORDERED that Plaintiffs shall file a further Status Report on or before December 1, 2020. The report should update the Court on the status of service of process of Defendant Syrian Arab Republic. If Plaintiffs receive proof of service before December 1, 2020, then they shall promptly file it. SO ORDERED. Signed by Judge Trevor N. McFadden on 10/1/2020. (lctnm2) (Entered: 10/01/2020) |
| 10/01/2020 | | Set/Reset Deadlines: Plaintiffs' Status Report due by 12/1/2020. (ztg) (Entered: 10/01/2020) |
| 10/16/2020 | 18 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to SYRIAN ARAB REPUBLIC on 8/10/2020, answer due 10/9/2020. (Delivered under diplomatic note NO. 1276/2020. Original was mailed back to counsel). (Attachment: # 1 Envelope recieved)(eg) Modified served/due date on 12/30/2020 (eg). (Entered: 12/04/2020) |
| 12/01/2020 | 17 | STATUS REPORT by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Tolchin, Robert) (Entered: 12/01/2020) |
| 12/02/2020 | | |

| | | |
|---|---|---|
| | | MINUTE ORDER. Upon consideration of Plaintiffs' <u>17</u> Status Report, it is hereby ORDERED that Plaintiffs shall file a further Status Report on or before January 5, 2021. The report should update the Court on the status of service of process of Defendant Syrian Arab Republic. If proof of service becomes available before January 5, 2021, then it shall promptly be filed. SO ORDERED. Signed by Judge Trevor N. McFadden on 12/2/2020. (lctnm2) (Entered: 12/02/2020) |
| 12/02/2020 | | Set/Reset Deadlines: Joint Status Report due by 1/5/2021. (hmc) (Entered: 12/02/2020) |
| 01/04/2021 | <u>19</u> | STATUS REPORT by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Tolchin, Robert) (Entered: 01/04/2021) |
| 02/01/2021 | | MINUTE ORDER TO SHOW CAUSE. Defendant Syrian Arab Republic was served on August 10, 2020, *see* Return of Service, ECF No. 18, and Defendant Islamic Republic of Iran was served on August 19, 2020, *see* Return of Service, ECF No. 15. The time for the Defendants to file a response to the Complaint expired on October 9, 2020 and on October 19, 2020, respectively. *See* 28 U.S.C. § 1608(d) (granting 60 days after service is complete). Plaintiffs have since failed to move for an entry of default. It is hereby ORDERED that the Plaintiffs shall, by February 8, 2021, SHOW CAUSE as to why the claims against the Defendants should not be dismissed for failure to prosecute. This Show Cause Order may be fulfilled by invoking the appropriate procedures for entry of default. Failure to comply with this Order may result in dismissal of this action, without further notice, for failure to prosecute. *See* LCvR 83.23. SO ORDERED. Signed by Judge Trevor N. McFadden on 2/1/2021. (lctnm2) (Entered: 02/01/2021) |
| 02/01/2021 | | Set/Reset Deadlines: Plaintiffs' response to the Court's Show Cause Order due by 2/8/2021. (hmc) (Entered: 02/01/2021) |
| 02/02/2021 | <u>20</u> | AFFIDAVIT FOR DEFAULT *against Defemdant Islamic Republic of Iran* by ARYEH BATT, AVI BATT, AYELET HASHACHAR BATT, ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, ELISHEVA HIRSCHFELD, CICI JACOBSON, EDDY JACOBSON. (Tolchin, Robert) (Entered: 02/02/2021) |
| 02/02/2021 | <u>21</u> | |

| | | | |
|---|---|---|---|
| | | | AFFIDAVIT FOR DEFAULT *against Defendant the Syrian Arab Republic* by ARYEH BATT, AVI BATT, AYELET HASHACHAR BATT, ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, ELISHEVA HIRSCHFELD, CICI JACOBSON, EDDY JACOBSON. (Tolchin, Robert) (Entered: 02/02/2021) |
| 02/02/2021 | 22 | | RESPONSE TO ORDER TO SHOW CAUSE by EDDY JACOBSON, CHAIM GOLDWATER, RAPHAEL GOLAN, SHAI FISHFEDER, SHIRA NECHAMA BOROCHOV, ABRAHAM M. BOROCHOV, SHIRI FISHFEDER, JOSEF S. BOROCHOV, NADAV GOLAN, EFRAT FISHFEDER, OHAD FISHFEDER, ROTEM SHOSHANA GOLAN, DEVORA SUE BOROCHOV, YAEL GOLAN INBAR, AVI BATT, ARYEH BATT, CICI JACOBSON, SHMUEL GORFINKLE, ELISHEVA HIRSCHFELD, YEHUDIT GOLAN, RONEN STEVEN BOROCHOV, MATAN G. GOLAN, OMER FISHFEDER, SARA GORFINKLE, AYELET HASHACHAR BATT, ELI M BOROCHOV, SHARI MAYER BOROCHOV, DAVID FISHFEDER, ESTHER GOLDWATER, ESTHER FISHFEDER, YOAV GOLAN filed by EDDY JACOBSON, CHAIM GOLDWATER, RAPHAEL GOLAN, SHAI FISHFEDER, SHIRA NECHAMA BOROCHOV, ABRAHAM M. BOROCHOV, SHIRI FISHFEDER, JOSEF S. BOROCHOV, NADAV GOLAN, EFRAT FISHFEDER, OHAD FISHFEDER, ROTEM SHOSHANA GOLAN, DEVORA SUE BOROCHOV, YAEL GOLAN INBAR, AVI BATT, ARYEH BATT, CICI JACOBSON, SHMUEL GORFINKLE, ELISHEVA HIRSCHFELD, YEHUDIT GOLAN, RONEN STEVEN BOROCHOV, MATAN G. GOLAN, OMER FISHFEDER, SARA GORFINKLE, AYELET HASHACHAR BATT, ELI M BOROCHOV, SHARI MAYER BOROCHOV, DAVID FISHFEDER, ESTHER GOLDWATER, ESTHER FISHFEDER, YOAV GOLAN. (Tolchin, Robert) (Entered: 02/02/2021) |
| 02/05/2021 | 23 | | Clerk's ENTRY OF DEFAULT as to SYRIAN ARAB REPUBLIC (eg) (Entered: 02/05/2021) |
| 02/05/2021 | 24 | | Clerk's ENTRY OF DEFAULT as to ISLAMIC REPUBLIC OF IRAN (eg) (Entered: 02/05/2021) |
| 02/08/2021 | 25 | | Unopposed MOTION to Seal Case *to the extent of permitting plaintiffs to file their passports and similar documents under seal* by ARYEH BATT, AVI BATT, AYELET HASHACHAR BATT, ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER |

| | | |
|---|---|---|
| | | GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, ELISHEVA HIRSCHFELD, CICI JACOBSON, EDDY JACOBSON. (Attachments: # 1 Text of Proposed Order)(Tolchin, Robert) (Entered: 02/08/2021) |
| 02/08/2021 | | MINUTE ORDER granting the Plaintiffs' 25 Motion to File Certain Documents Under Seal. The Plaintiffs shall file passports and other citizenship documents under seal. SO ORDERED. Signed by Judge Trevor N. McFadden on 2/8/2021. (lctnm2) (Entered: 02/08/2021) |
| 02/08/2021 | 26 | Unopposed MOTION to Amend/Correct *complaint* by ARYEH BATT, AVI BATT, AYELET HASHACHAR BATT, ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, ELISHEVA HIRSCHFELD, CICI JACOBSON, EDDY JACOBSON. (Attachments: # 1 Text of Proposed Order, # 2 Errata Proposed amended complaint)(Tolchin, Robert) (Entered: 02/08/2021) |
| 02/10/2021 | | MINUTE ORDER granting the Plaintiffs' 26 Motion to Amend/Correct Complaint. The Plaintiffs shall file their amended complaint on the docket. It is further ordered that the Plaintiffs shall, on or before February 17, 2021, inform the Court whether they believe the amended complaint must be served on the Defendants. *See, e.g.*, *Shoham v. Islamic Republic of Iran*, 922 F. Supp. 2d 44, 47 (D.D.C. 2013) ("Where a plaintiff serves a complaint on a foreign state defendant under the FSIA, the foreign state defaults, and then the plaintiff files an amended complaint, service of the new complaint is only necessary if the changes are 'substantial.'"). SO ORDERED. Signed by Judge Trevor N. McFadden on 2/10/2021. (lctnm2) (Entered: 02/10/2021) |
| 02/16/2021 | 27 | AMENDED COMPLAINT against All Defendants with Jury Demand filed by EDDY JACOBSON, CHAIM GOLDWATER, RAPHAEL GOLAN, SHAI FISHFEDER, SHIRA NECHAMA BOROCHOV, ABRAHAM M. BOROCHOV, SHIRI FISHFEDER, JOSEF S. BOROCHOV, NADAV GOLAN, EFRAT FISHFEDER, OHAD FISHFEDER, ROTEM SHOSHANA GOLAN, DEVORA SUE BOROCHOV, YAEL GOLAN INBAR, AVI BATT, ARYEH BATT, CICI JACOBSON, SHMUEL GORFINKLE, ELISHEVA HIRSCHFELD, YEHUDIT GOLAN, RONEN STEVEN BOROCHOV, MATAN G. GOLAN, OMER FISHFEDER, SARA GORFINKLE, AYELET HASHACHAR BATT, ELI M BOROCHOV, SHARI MAYER BOROCHOV, DAVID FISHFEDER, ESTHER GOLDWATER, ESTHER FISHFEDER, YOAV GOLAN.(Tolchin, Robert) (Entered: 02/16/2021) |
| 02/16/2021 | 28 | RESPONSE TO ORDER OF THE COURT re Order on Motion to Amend/Correct,,, filed by ARYEH BATT, AVI BATT, AYELET HASHACHAR BATT, ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER |

| | | |
|---|---|---|
| | | FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, ELISHEVA HIRSCHFELD, CICI JACOBSON, EDDY JACOBSON. (Tolchin, Robert) (Entered: 02/16/2021) |
| 02/18/2021 | 29 | ORDER. Upon consideration of the Plaintiffs' 28 Response, it is hereby ordered that the Plaintiffs do not need to serve their 27 Amended Complaint on the Defendants. It is further ordered that the Plaintiffs shall appear for a telephonic status conference on February 25 at 3:00 p.m., before Judge McFadden. The Plaintiffs shall be prepared to discuss their plan for moving for default judgment and how they intend to prove liability. Dial−in details will be sent to counsel. See attached Order for details. Signed by Judge Trevor N. McFadden on 2/18/2021. (lctnm2) (Entered: 02/18/2021) |
| 02/19/2021 | | Set/Reset Hearings: Telephonic Status Conference set for 2/25/2021 at 3:00 PM before Judge Trevor N. McFadden. (hmc) (Entered: 02/19/2021) |
| 02/25/2021 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Telephonic Status Conference held on 2/25/2021. Plaintiff's liability phase submission due by 4/9/2021. (Court Reporter: Crystal Pilgrim.) (hmc) (Entered: 02/25/2021) |
| 03/12/2021 | 30 | SEALED DOCUMENT filed by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON(This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit A− US Passport of Eli Borochov, # 2 Exhibit B− US Passport of Josef Borochov, # 3 Exhibit C− US Passport of Devora Borochov, # 4 Exhibit D− US Passport of Ronen Borochov, # 5 Exhibit E− US Passport of Shari Mayer, # 6 Exhibit F− US Passport of Avraham Borochov, # 7 Exhibit G− US Passport of Shira Borochov, # 8 Exhibit H− US Passport of Yehudit Green−Golan, # 9 Exhibit I− US Passport of Matan Golan, # 10 Exhibit J− US Passport of Yoav Golan)(Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 31 | DECLARATION by DEVORA SUE BOROCHOV. (Attachments: # 1 Exhibit A)(Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 32 | DECLARATION by ELI M BOROCHOV. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 33 | DECLARATION by ABRAHAM M. BOROCHOV. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 34 | |

| | | DECLARATION by JOSEF S. BOROCHOV. (Tolchin, Robert) (Entered: 03/12/2021) |
|---|---|---|
| 03/12/2021 | 35 | DECLARATION by RONEN STEVEN BOROCHOV. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 36 | DECLARATION by SHARI MAYER BOROCHOV. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 37 | DECLARATION by SHIRA NECHAMA BOROCHOV. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 38 | DECLARATION by YOAV GOLAN. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 39 | DECLARATION by EFRAT FISHFEDER. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 40 | DECLARATION by OHAD FISHFEDER. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 41 | DECLARATION by OMER FISHFEDER. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 42 | DECLARATION by SHIRI FISHFEDER. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 43 | DECLARATION by MATAN G. GOLAN. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 44 | DECLARATION by NADAV GOLAN. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 45 | DECLARATION by RAPHAEL GOLAN. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 46 | DECLARATION by ROTEM SHOSHANA GOLAN. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 47 | DECLARATION by YAEL GOLAN INBAR. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 48 | DECLARATION by YEHUDIT GOLAN. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 49 | DECLARATION by SHAI FISHFEDER. (Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 50 | DECLARATION by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV. (Attachments: # 1 Exhibit Curriculum Vitae, # 2 Exhibit Report re Avraham Borochov, # 3 Exhibit Report re Devorah Borochov, # 4 Exhibit Report re Eli Borochov, # 5 Exhibit Report re Josef Borochov, # 6 Exhibit Report re Ronen Borochov, # 7 Exhibit Report re Shari Borochov, # 8 Exhibit Report re Shira Borochov)(Tolchin, Robert) (Entered: 03/12/2021) |
| 03/12/2021 | 51 | |

|  |  |  |  |
|---|---|---|---|
|  |  |  | DECLARATION by EFRAT FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR. (Attachments: # 1 Exhibit Curriculum Vitae, # 2 Exhibit Report re Efrat Fishfeder, # 3 Exhibit Report re Matan Golan, # 4 Exhibit Report re Nadav Golan, # 5 Exhibit Report re Ohad Fishfeder, # 6 Exhibit Report re Omer Fishfeder, # 7 Exhibit Report re Rafael Golan, # 8 Exhibit Report re Rotem Golan, # 9 Exhibit Report re Shai Fishfeder, # 10 Exhibit Report re Shiri Fishfeder, # 11 Exhibit Report re Yael Golan Inbar, # 12 Exhibit Report re Yehudit Golan, # 13 Exhibit Report re Yoav Golan)(Tolchin, Robert) (Entered: 03/12/2021) |
| 03/24/2021 | 52 |  | DECLARATION by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Tolchin, Robert) (Entered: 03/24/2021) |
| 03/24/2021 | 53 |  | DECLARATION *of Dr Alan Friedman* by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Tolchin, Robert) (Entered: 03/24/2021) |
| 03/24/2021 | 54 |  | DECLARATION *of Plaintiff's expert Aryeh Spitzen* by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Tolchin, Robert) (Entered: 03/24/2021) |
| 04/09/2021 | 55 |  | Unopposed MOTION for Default Judgment by ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI |

| | | |
|---|---|---|
| | | FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, CICI JACOBSON, EDDY JACOBSON. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Text of Proposed Order Proposed findings of fact and conclusions of law)(Tolchin, Robert) Modified event on 4/16/2021 (znmw). (Entered: 04/09/2021) |
| 01/11/2022 | | MINUTE ORDER. Due to the termination of parties, including the lead Plaintiff, the Court requests that the Clerk of Court change the case caption to reflect the active Plaintiffs. The new case caption would be *Borochov, et al. v. Islamic Republic of Iran, et al.* The Clerk may contact the Court if another caption is more appropriate. SO ORDERED. Signed by Judge Trevor N. McFadden on 1/11/22. (lctnm2) (Entered: 01/11/2022) |
| 01/18/2022 | 56 | ORDER directing Plaintiffs to show cause why the Court should not dismiss claims by Israeli Plaintiffs for their failure to provide sufficient information. See attached Order for details. Signed by Judge Trevor N. McFadden on 1/18/22. (lctnm2) (Entered: 01/18/2022) |
| 01/20/2022 | | Set/Reset Deadlines: Plaintiff's response due by 2/17/2022. (hmc) (Entered: 01/20/2022) |
| 02/17/2022 | 57 | RESPONSE TO ORDER TO SHOW CAUSE re 56 Order filed by ARYEH BATT, AVI BATT, AYELET HASHACHAR BATT, ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, ELISHEVA HIRSCHFELD, CICI JACOBSON, EDDY JACOBSON, CHAVA RACHEL MARK, MIRYAM MARK, NATANEL CHAIM MARK, ORIT MARK, PDAYA MENACHEM MARK, YEHOSHUA MORDECHAI MARK, YISKA MARK, SHIRA HODAIA MARK CHARIF. (Tolchin, Robert) (Entered: 02/17/2022) |
| 03/04/2022 | 58 | MEMORANDUM OPINION re Plaintiffs' 55 Motion for Default Judgment. Signed by Judge Trevor N. McFadden on 3/4/22. (lctnm2). (Entered: 03/04/2022) |
| 03/04/2022 | 59 | ORDER. For the reasons stated in the 58 Memorandum Opinion, Plaintiffs' 55 Motion for Default Judgment is GRANTED IN PART and DENIED IN PART. See attached Order for details. Signed by Judge Trevor N. McFadden on 3/4/22. (lctnm2) (Entered: 03/04/2022) |
| 03/31/2022 | 60 | MOTION to Alter Judgment as to 59 Order on Motion for Default Judgment, 58 Memorandum & Opinion , MOTION for New Trial , MOTION for Reconsideration re 59 Order on Motion for Default Judgment, 58 Memorandum & Opinion , MOTION to Amend/Correct 59 Order on Motion for Default Judgment, 58 Memorandum & Opinion by ARYEH BATT, AVI BATT, |

| | | | |
|---|---|---|---|
| | | | AYELET HASHACHAR BATT, ABRAHAM M. BOROCHOV, DEVORA SUE BOROCHOV, ELI M BOROCHOV, JOSEF S. BOROCHOV, RONEN STEVEN BOROCHOV, SHARI MAYER BOROCHOV, SHIRA NECHAMA BOROCHOV, DAVID FISHFEDER, EFRAT FISHFEDER, ESTHER FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, MATAN G. GOLAN, NADAV GOLAN, RAPHAEL GOLAN, ROTEM SHOSHANA GOLAN, YEHUDIT GOLAN, YOAV GOLAN, YAEL GOLAN INBAR, CHAIM GOLDWATER, ESTHER GOLDWATER, SARA GORFINKLE, SHMUEL GORFINKLE, ELISHEVA HIRSCHFELD, CICI JACOBSON, EDDY JACOBSON, CHAVA RACHEL MARK. (Attachments: # 1 Declaration Expert Declaration of Dr. Boaz Shnoor)(Tolchin, Robert) (Entered: 03/31/2022) |
| 04/13/2022 | 61 | | ORDER denying 60 Motion to Alter Judgment, Motion for New Trial, Motion for Reconsideration, and Motion to Amend/Correct. See attached Order for details. Signed by Judge Trevor N. McFadden on 4/13/22. (lctnm2) (Entered: 04/13/2022) |
| 04/20/2022 | 62 | | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 61 Order on Motion to Alter Judgment, Order on Motion for New Trial, Order on Motion for Reconsideration, Order on Motion to Amend/Correct, 59 Order on Motion for Default Judgment, 58 Memorandum & Opinion by SHARI MAYER BOROCHOV, EFRAT FISHFEDER, OHAD FISHFEDER, OMER FISHFEDER, SHAI FISHFEDER, SHIRI FISHFEDER, NADAV GOLAN, RAPHAEL GOLAN, YAEL GOLAN INBAR. Filing fee $ 505, receipt number ADCDC−9185426. Fee Status: Fee Paid. Parties have been notified. (Attachments: # 1 Exhibit A − Memorandum opinion dated 3−4−22 (Dkt. 58), # 2 Exhibit B − Order dated 3−4−22 (Dkt 59), # 3 Exhibit C − Order dated 4−13−22 (Dkt. 61))(Tolchin, Robert) (Entered: 04/20/2022) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

----------------------------------------------------------------------- X

ELI M. BOROCHOV; RONEN STEVEN BOROCHOV;
DEVORA SUE BOROCHOV; SHARI MAYER
BOROCHOV; JOSEF S. BOROCHOV; SHIRA
NECHAMA BOROCHOV; AVRAHAM M.
BOROCHOV; YOAV GOLAN; ROTEM SHOSHANA
GOLAN; RAPHAEL GOLAN; YEHUDIT GOLAN;
MATAN G. GOLAN; YAEL GOLAN INBAR; NADAV
GOLAN; SHAI FISHFEDER; EFRAT FISHFEDER;
OHAD FISHFEDER; OMER FISHFEDER; SHIRI
FISHFEDER; CICI JACOBSON; EDDY JACOBSON;
CHAIM GOLDWATER; ESTHER GOLDWATER;
SHMUEL GORFINKLE; SARA GORFINKLE;
ESTHER FISHFEDER; and DAVID FISHFEDER,

Case no:
19-cv-2855 (TNM)

**NOTICE OF APPEAL**

        Plaintiffs,

        -against-

THE ISLAMIC REPUBLIC OF IRAN; and THE
SYRIAN ARAB REPUBLIC

        Defendants.

----------------------------------------------------------------------- X

NOTICE IS HEREBY GIVEN that Plaintiffs Shari Borochov, Raphael Golan, Nadav

Golan, Yael Inbar, Shai Fishfeder, Efrat Fishfeder, Ohad Fishfeder, Omer Fishfeder, and Shiri

Fishfeder hereby appeal to the United States Court of Appeals for the District of Columbia Circuit

from the Memorandum Opinion of Hon. Trevor McFadden, District Judge, dated March 4, 2022

(Dkt. 58) (Exhibit A), the Order of Hon. Trevor McFadden, District Judge, dated March 4, 2022

(Dkt. 59) (Exhibit B), and the Order of Hon. Trevor McFadden, District Judge, dated April 13,

2022 (Dkt. 61) (Exhibit C) denying Plaintiffs' Motion to Alter Judgment, Motion for a New Trial,

Motion for Reconsideration, and Motion to Amend/Correct. This appeal will raise for review the refusal by the District Court to enter a damages award for these appealing Plaintiffs, as well as all issues as are contained in the record.

Dated:    Brooklyn, New York
          April 20, 2022

                                        Respectfully submitted,

                                        THE BERKMAN LAW OFFICE, LLC
                                        *Attorneys for Plaintiffs*

                                        by: _____
                                             Robert J. Tolchin

                                        111 Livingston Street, Suite 1928
                                        Brooklyn, New York 11201
                                        718-855-3627
                                        rtolchin@berkmanlaw.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ELI M. BOROCHOV, *et al.*,**

        Plaintiffs,

        v.

**ISLAMIC REPUBLIC OF IRAN, *et al.*,**

        Defendants.

Case No. 1:19-cv-02855 (TNM)

---

## MEMORANDUM OPINION

This action for compensatory and punitive damages arises under the terrorism exception to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605A. It concerns two 2015 terrorist attacks in Israel perpetrated by Hamas. Nineteen Plaintiffs—some U.S. citizens, some Israeli—sue the States of Iran and Syria (together, the States) for injuries suffered by the victims of the attacks and the emotional injuries suffered by the victims' immediate families. Plaintiffs allege that the States provided material support and resources to Hamas.

The States did not respond or appear, and Plaintiffs now move for default judgment. The Court finds that Plaintiffs successfully established personal and subject matter jurisdiction under 28 U.S.C. § 1605A. They have also proved that the States are liable under federal and Israeli law. The U.S. Plaintiffs have supported their request for compensatory and punitive damages. The Israeli Plaintiffs have not. The Court thus will grant in part and deny in part the motion for default judgment.

### I. BACKGROUND

The terrorist attacks at issue occurred in Israel in 2015. *See* Amended Compl. (Compl.) ¶¶ 53, 67, ECF No. 6. Plaintiffs allege that Hamas, an Islamic organization committed to the

"destruction of the State of Israel," *id.* ¶ 30, perpetrated the attacks with "material support and resources" from the States, *id.* ¶ 2.

The Foreign Sovereign Immunities Act (FSIA) generally immunizes foreign sovereigns from suits in federal courts, but "that grant of immunity is subject to a number of exceptions." *Mohammadi v. Islamic Repub. of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015). Once an exception applies, the foreign state loses its immunity. *See Bell Helicopter Textron, Inc. v. Islamic Repub. of Iran*, 734 F.3d 1175, 1182–83 (D.C. Cir. 2013). One such exception, known as the "terrorism exception," waives sovereign immunity for countries providing material support to terrorist organizations. *See* 28 U.S.C. § 1605A. Plaintiffs bring their case under this exception. *See* Compl. ¶¶ 28–29.

Because Iran and Syria did not respond, Plaintiffs move for default judgment. *See* Plaintiffs' Mot. for Default J. (Pls.' Mot.), ECF No. 55-1. Entry of default judgment is "not automatic." *Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). Before the Court can enter default judgment, Plaintiffs must establish subject matter jurisdiction and personal jurisdiction. *See Jerez v. Repub. of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void."). Section 1605A provides a mechanism for Plaintiffs to show both types of jurisdiction over a non-responsive sovereign.

The Court's analysis thus focuses on whether Plaintiffs have properly pled all elements of a claim under § 1605A. To do so, Plaintiffs must show that the States supported the terrorist groups responsible for the attacks at issue. Plaintiffs have submitted expert declarations to make those showings. *See* Expert Reports of Rael Strous, ECF Nos. 50, 51; Expert Declaration of Dr. Alan Friedman (Friedman Decl.), ECF No. 53; Expert Declaration of Arieh Spitzen (Spitzen Decl.), ECF No. 54. Plaintiffs also rely on expert declarations from an earlier case in this

district.  *See* Declaration of Benedetta Berti (Berti Decl.), ECF No. 29, *Force v. Islamic Repub. of Iran*, No. 16-cv-1468 (D.D.C.); Declaration of Dr. Marius Deeb (Deeb Decl.), ECF No. 30, *Force v. Islamic Repub. of Iran*, No. 16-cv-1468 (D.D.C.); Declaration of Patrick Clawson (Clawson Decl.), ECF No. 32, *Force v. Islamic Repub. of Iran*, No. 16-cv-1468 (D.D.C.).[1]

The Court assesses this evidence and makes findings of fact before proceeding to findings of law.  *See Selig v. Islamic Repub. of Iran*, — F. Supp. 3d —, No. 19-cv-2889 (TNM), 2021 WL 5446870, at *1 (D.D.C. Nov. 22, 2021) (accepting expert declarations as sufficient to meet plaintiffs' evidentiary burden).

## II.  FINDINGS OF FACT

### A.  Hamas

Members of the Muslim Brotherhood founded Hamas in 1987–88.  *See* Berti Decl. ¶ 11. Hamas intends to liberate Palestine through jihad and to "create an Islamic state" in Israel.  Deeb Decl. ¶ 11.  Hamas advocates "direct and indirect attacks" on Israeli civilians and military personnel to advance these goals.  Berti Decl. ¶ 11.  In the years since Hamas's founding, those attacks have come as kidnappings, rocket attacks, and other bombings.  *See generally id.* ¶¶ 15–16.

Hamas combines its military and terror activities with political and social efforts.  *See* Spietzen Decl. ¶ 25.  Hamas has even achieved political success, winning in 2006 a plurality of seats in the Palestinian parliament.  *See id.* ¶ 28.  One year later, Hamas seized power in the Gaza Strip, a Palestinian-majority area in the southwest of Israel.  *See id.*  Beyond that political

---

[1]  The Court can review evidence considered in a previous decision with no re-presentment of that evidence.  *See Lee v. Islamic Repub. of Iran*, 518 F. Supp. 3d 475, 480 (D.D.C. 2021).  The Court still must reach its "own[ ] independent findings of fact." *Id.*  The Court here has independently reviewed these *Force* declarations.  The Court has also reviewed the qualifications of Plaintiffs' experts and is satisfied that each is qualified to offer the opinions discussed below.

3

influence, Hamas seeks to dominate Palestinian society through several social institutions and ostensibly charitable bodies.  *See id.* ¶ 29.  Dr. Spietzen testifies that these efforts allow Hamas to appear reliable to Palestinians, thereby encouraging more of them to support Hamas's activities, including ones focused on terrorism.  *See id.* ¶ 29–30.

### B.  Syrian Support for Hamas

Hamas's leadership resided in Syria from about 2000–2012.  *See* Deeb Decl. ¶ 22. Although that residency predates the attacks here, Plaintiffs' experts assert that Hamas would not have the capacity for such attacks without Syria's support.  *See* Berti Decl. ¶ 50 ("[W]ithout the support of a prominent Arab state like Syria to lend it legitimacy, [Hamas] would be more isolated and unable to grow, develop, expand, and solidify itself as a major player on the Palestinian political and military scene, as Hamas has done.").  The experts identify four ways in which Syria supported Hamas.

*First,* safe haven.  The organization moved its political headquarters to Damascus in 2000, *see id.* ¶ 25, and Syria's support gave Hamas a "public platform," *id.* ¶ 26.  Hamas's leaders, all designated as terrorists by the United States, could freely meet in Damascus.  *See id.* ¶ 34.  By hosting Hamas, Syria gave it "symbolic validation, political support, [and] legitimacy" through which Hamas could boost its credibility and stature.  *Id.* ¶ 37.

*Second*, an operational base.  Hamas used the friendly confines of Damascus to orchestrate military efforts on the ground in Israel.  Hamas carried out its most lethal suicide bombings through Syrian operatives, *see id.* ¶ 41, and Hamas's top military commander even moved to Damascus, *see id.* ¶ 42.  Dr. Berti confirms that Hamas's political leaders in Gaza needed approval from Damascus before they could ratify an Israeli offer for a prisoner exchange. *See id.* ¶ 43.  Instructions for various attacks in Israel also came directly from Damascus.  *See*

4

Deeb Decl. ¶ 15.  The Syrian government did nothing to "forcefully or systematically" crack

down on Hamas's military planning.  Berti Decl. ¶ 44.  Indeed, Syria once offered aid "as an

incentive" for *more* suicide attacks in Israel.  *Id.* ¶ 45.

     *Third*, a political hub.  Through Syria's generosity, Damascus became Hamas's

"diplomatic and public relations base."  *Id.* ¶ 47.  Hamas used that base to organize political

events and to influence Palestinian politics.  *See id.*  In Damascus, Hamas hosted strategic

discussions with other Palestinian factions, and those discussions often allowed greater

coordination between the groups' activities in Israel.  *See id.* ¶ 48.  This political visibility made

Hamas more popular and influential.  *See id.* ¶ 50.

     *Fourth*, equipment, funding, and logistical support.  Plaintiffs' experts provide less detail

on this point but assert that Iran routed weapons shipments to Hamas through Syria.  *See id.* ¶ 53.

And the Jordanian government claimed that some Hamas weapons originated in Syria.  *See id.*

¶ 54.  Syria also provided training grounds where Hamas fighters learned "essential tactical

skills" for future attacks.  *Id.* ¶ 55; *see* Deeb Decl. ¶ 19.  Plaintiffs' experts conclude that the

"tactical know-how" learned during Syria's protection allowed Hamas to "transform itself into a

leading terrorist group with solid infrastructure and the power" to disrupt the Israeli-Palestinian

peace process.  Deeb Decl. ¶ 23.

     Based on the above unrebutted expert testimony, the Court finds that Syria provided

material support in the form of operational freedom, political legitimacy, protection, and training

to Hamas.  Although that support apparently ended before the attacks at issue, the expert

testimony confirms that without it, Hamas could not have undertaken these attacks.  On identical

evidence, Judge Moss reached the same conclusion.  *See Force v. Islamic Repub. of Iran*, 464 F.

Supp. 3d 323, 367–68 (D.D.C. 2020).

### C. Iranian Support for Hamas

Plaintiffs rely on Dr. Patrick Clawson to make their case against Iran. As he explains, the U.S. State Department has long known that Iran uses its intelligence services "to facilitate and conduct terrorist attacks." Clawson Decl. ¶ 25. Supporting terrorist groups "is an official policy of the Iranian government." *Id.* ¶ 26. Those groups include "anti-Israel terrorism of all sorts," and Iran has supported Hamas for the past 30 years. *Id.* ¶¶ 28, 30.

Dr. Clawson discusses three specific ways Iran supports Hamas. *First*, financially. Starting in the 1990s, Iran paid Hamas "millions of dollars," allowing Hamas to establish front businesses. *Id.* ¶ 38. After Hamas won a plurality in the Palestinian parliament, Iran pledged $250 million to the group. *See id.* ¶ 42. Hamas publicly acknowledged this financial support when its political chairman in 2012 thanked Iran for "arms and funding." *Id.* ¶ 56. And even during low periods in the Iran-Hamas relationship, Iran gave suitcases of money directly to Hamas operatives in Gaza. *See id.* ¶ 60.

*Second*, through weapons. In 2008, Secretary of State Condoleeza Rice said that "Hamas is being armed and it's very clear that they are being armed, in part, by the Iranians." *Id.* ¶ 45. Earlier that year, Israeli investigators learned that a mortar shell fired by Hamas had been manufactured in Iran and that Iran had provided input into the design of other Hamas rockets. *See id.* ¶ 47. And according to Dr. Clawson, Iran smuggles weapons to Hamas through tunnels on the Egypt-Gaza border and sometimes via the Mediterranean Sea. *See id.* ¶¶ 50–52. Israel has intercepted some of those shipments. *See id.* ¶ 53. As with Iran's financial donations, Hamas has publicly acknowledged Iran's weapons support. A representative for Hamas's military thanked Iran in 2014 for "providing it with rockets and anti-tank missiles." *Id.* ¶ 59.

6

*Third*, by training Hamas soldiers over many years. As early as 1996, Hamas operatives received training in Iran before they bombed a bus in Jerusalem. *See id.* ¶ 35. And since 2003, the State Department has annually reported to Congress that Hamas receives training from Iran. *See id.* ¶ 27. Dr. Clawson excerpts a British article claiming 150 members of Hamas's military wing had "passed through training in Tehran, where they stud[ied] for between 45 days and six months at a closed military base[ ]" under Iranian supervision. *Id.* ¶ 46.

Based on this information, Dr. Clawson concludes that Iran provided material support to Hamas during the 2008–2017 timeframe. After assessing his testimony, the Court agrees. Iran provided money, weapons, and training to Hamas for decades. And Iran gave support during the period when the attacks at issue took place.

### D. The Attacks

On a November afternoon in 2015, Akram and Nasr Badawi nested a rifle in a window overlooking the courtyard of the Cave of the Patriarchs[2] in Hebron, Israel. *See* Spietzen Decl. ¶ 71. The brothers had been members of a four-man Hamas cell since 2015 and had specifically obtained a rifle for the ensuing attack. *See id.* ¶ 94. They admitted later that they intended to kill Jews. *See id.* ¶ 73. Nasr was the lookout, Akram was the sniper.[3] *See id.* ¶ 71. At around 4 p.m., Akram fired multiple shots. *See id.* ¶ 71.

He hit two people. *See* Friedman Decl., Ex. B at 1, ECF No. 53-2.[4] One bullet struck Plaintiff Eli Borochov in the groin as he walked to the Cave. *See id.*; Declaration of Eli

---

[2] Tradition says the Cave holds the graves of many Old Testament figures, and thus many Jews and Muslims pray there. *Id.* n.25.

[3] Because this case involves multiple persons with shared family names, the Court will introduce individuals by first and last name and afterward refer to them by first name only.

[4] All page citations refer to the pagination generated by the Court's CM/ECF system and all exhibit numbers refer to the numbered attachments to the CM/ECF filings.

Borochov ¶ 2 (Eli Decl.), ECF No. 32.  Eli had traveled to Israel from his home in New York.  *See* Eli Decl. ¶ 2.  His father and brother accompanied him that day to the Cave.  *See id*.  Emergency personnel evacuated Eli to a nearby hospital, where he underwent immediate surgery.  *See* Friedman Decl., Ex. B at 1.  Surgery went well, and the hospital discharged him two days later.  *Id.*  But as a result of his injuries, Eli could not walk for two months.  *See id.*  According to the Complaint, nobody died in the attack.[5]

Law enforcement arrested Akram and Nasr at the scene.  Once Israeli authorities publicized the arrest—something they did not do until almost a year later—an official Hamas website identified the brothers as members of Hamas's terrorist wing.  *See* Spietzen Decl. ¶ 113.  The Court thus agrees with Dr. Spietzen that Hamas conducted the attack.

One month after the attack in Hebron, on the anniversary of Hamas's founding, *see id.* ¶ 119, Abd al-Mushin Shaher Hasouna drove from Hebron to Jerusalem, *see id.* ¶ 121.  The night before, he told his mother that he would "intercede for her in[ ] Paradise."  *Id.* ¶ 124.  Hasouna raced his car into a bus stop in central Jerusalem, ramming 14 people.  *See id.* ¶ 119, 122.  An onlooker saw the attack, drew his own firearm, and shot Hasouna before he could do more damage.  *See id.* ¶ 119.  That action probably saved lives; Hasouna had an axe in his car and likely intended to use it against the crowd.  *See id.* ¶ 126.

Among the injured were Yoav Golan, a U.S. citizen living in Israel, and his wife, Rotem.  *See* Compl. ¶ 9–10.  The car's impact hurled them into the bus stop's glass wall.  *See* Declaration of Yoav Golan ¶ 6 (Yoav Decl.), ECF No. 38.  Yoav felt sharp pain in his shoulder and in his leg.  *See id.*  ¶¶ 12, 14.  The fall had dislocated and fractured his shoulder, and he had a crush

---

[5] Israeli media reports of the attack similarly do not discuss any deaths.  *See* Judah Ari Gross, *Hebron brothers get life in prison for sniper spree*, The Times of Israel (Nov. 12, 2017, 7:18 PM), https://www.timesofisrael.com/hebron-brothers-get-life-in-prison-for-sniper-spree.

injury on his leg from where the car had struck him. *See id.* ¶¶ 16, 19. Although released from the hospital the next day, Yoav could not walk for a month and was confined to a wheelchair. *See id.* ¶ 24. Rotem suffered cuts on her legs, requiring stitches, and sprained a ligament in her knee. *See* Declaration of Rotem Golan ¶ 20 (Rotem Decl.), ECF No. 46. Because of her injuries, Rotem could neither drive for a month nor attend school for two months. *See id.* ¶ 28. Both Yoav and Rotem also suffered mental and emotional injuries from the attack. *See id.* ¶¶ 29–64; Yoav Decl. ¶¶ 24, 42–54, 58, 60–63. Plaintiffs suggest that only Hasouna died in the incident.[6]

The next day, Hamas websites praised Hasouna. *See* Spietzen Decl. ¶ 128. Online forums and radio stations connected to Hamas called him a "son of the Hamas movement." *Id.* Hamas's radio station published a poster calling Hasouna "one of the sons of the Islamic resistance movement Hamas, whose heroic operation, carried out on the 28th anniversary of the founding of the resistance movement, has ensured the continuation of resistance." *Id.* ¶ 130. Given these actions, the Court finds that Yoav and Rotem suffered their injuries at Hamas's hands.

Eli and his family sue for physical and emotional injuries from the attack. Ditto for Yoav, Rotem, and their immediate families.[7] The latter group contains both U.S. and Israeli nationals.

---

[6] Israeli news sources likewise mention no other deaths. *See Fourteen injured in Jerusalem car-ramming attack*, i24 News (Dec. 14, 2015, 3:52 PM), https://www.i24news.tv/en/news/israel/diplomacy-defense/95622-151214-at-least-9-people-injured-in-car-ramming-attack-in-jerusalem.

[7] The Complaint lists as Plaintiffs Yoav's and Rotem's grandparents, *see* Compl. ¶¶ 20–27, but Plaintiffs' Proposed Order disclaims any pursuit of those claims, *see* Proposed Findings of Fact and Conclusion of Law (Proposed Order) at 1, ECF No. 55-4. The identity of Plaintiffs matters not to the Court's analysis, but the Court assumes based on that proposed language that the grandparents have abandoned their claims.

### III. LEGAL STANDARDS

Under Federal Rule of Civil Procedure 55(b)(2), a court may enter default judgment when a party applies for it. But entry of a default judgment "is not automatic." *Mwani*, 417 F.3d at 6. A court must assure itself of its subject matter jurisdiction, *see Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996), and of its personal jurisdiction over an absent defendant, *see Mwani*, 417 F.3d at 6–7.

Extra procedures govern entry of default when the defendant is a sovereign state. The FSIA "affords the sole basis for obtaining jurisdiction over a foreign state in United States courts." *Mohammadi*, 782 F.3d at 13. The FSIA generally immunizes foreign states, but that grant of immunity "is subject to a number of exceptions." *Id.* at 14. Relevant here is the so-called terrorism exception found in 28 U.S.C. § 1605A. Section 1605A confers subject matter jurisdiction, recognizes a federal cause of action against foreign states subject to the exception, and addresses personal jurisdiction by specifying procedures that a plaintiff must follow to effect service on a foreign state. *See Schwartz v. Islamic Repub. of Iran*, No. 18-cv-1349 (RDM), 2020 WL 7042842 at *9 (D.D.C. Nov. 30, 2020).

Different standards of proof govern federal courts' personal jurisdiction and subject matter jurisdiction inquiries. Plaintiffs need only make a "prima facie showing" of personal jurisdiction. *Mwani*, 417 F.3d at 6–7. But for a court to exercise subject matter jurisdiction, plaintiffs must "establish[] [their] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The statute does not specify what constitutes "evidence satisfactory to the court," so courts determine "how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Dem. People's Repub. of Korea*, 774 F.3d 1044, 1046–51 (D.C. Cir. 2014). The evidence must consist of "admissible testimony in accordance with the Federal Rules of

10

Evidence," *id.* at 1049 (cleaned up), and it must be sufficient for a court to come to the "logical

conclusion" that the defendant is responsible for the plaintiffs' injuries, *id.* at 1051.

## IV.  ANALYSIS

The Court's analysis proceeds as follows:  First, the Court will determine whether it has

subject matter jurisdiction.  Then the Court considers whether it has personal jurisdiction over

the States.  Next, the Court evaluates whether Plaintiffs have pled a federal cause of action and

whether they have proven a theory or theories of liability.  Finally, the Court assesses Plaintiffs'

claims for monetary damages.

### A.  Subject Matter Jurisdiction

To invoke the terrorism exception, Plaintiffs must make two threshold showings.  *First*,

the claimant or victim must be a U.S. national, a U.S. servicemember, or a U.S. government

employee.  *See* 28 U.S.C. § 1605A(a)(2)(A)(ii).  Plaintiffs easily meet the requirement because

two direct victims of the attacks, Eli and Yoav, are U.S. citizens.  *See* Compl. ¶¶ 4, 9.  True,

some Plaintiffs are not U.S. nationals.  But "this fact is non-consequential" for jurisdictional

purposes because some *victims* are U.S. nationals.  *Force*, 464 F. Supp. 3d at 369.

*Second*, the State Department must have designated the foreign government as a state

sponsor of terrorism at the time of the attack and when Plaintiffs filed their lawsuit.  *See* 28

U.S.C. § 1605A(a)(2)(A)(i).  Plaintiffs again easily clear this hurdle:  The State Department has

designated Syria and Iran as state sponsors of terrorism since 1979 and 1984, respectively.  *See*

Dep't of State, Bureau of Counterterrorism, *State Sponsors of Terrorism* (last accessed Feb. 4,

2022), https://www.state.gov/state-sponsors-of-terrorism.

Once past those thresholds, Plaintiffs must show that their claims fit within the terrorism

exception's narrow waiver of sovereign immunity.  The waiver contains five requirements:

> [1] money damages are sought against a foreign state [2] for personal injury or death [3] that was caused by [4] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [5] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  The Complaint establishes the first two requirements.  Plaintiffs seek money damages, *see* Compl. ¶ 136(a)-(b), for suffering after the attacks in Israel, *see id.* ¶¶ 94–97.  The Court's analysis thus focuses on the latter three requirements, though in a different sequence.

*The States provided Hamas with "material support" to carry out the attacks.*  Recall the resources that Iran and Syria supplied to Hamas.  *See supra* II.B, II.C.  Syria gave Hamas a safe base from which to organize its terrorist and diplomatic activities.  Iran gave Hamas money, weapons, and training for Hamas fighters.  Plaintiffs have thus provided evidence "satisfactory to the court," 28 U.S.C. § 1608(e), that the States materially supported Hamas and that this support came from the States' officials and agents "while acting within the scope of [their] office, employment, or agency," *id.* § 1605A(a)(1).

*The States gave material support "for" an extrajudicial killing.*  The definition of "extrajudicial killing" comes from the Torture Victim Protection Act of 1991 (TVPA), which defines the term as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  *See* 28 U.S.C. § 1350 note.

Plaintiffs assume that the attacks were "an act of extrajudicial killing" because the attackers "deliberated" killing people, even though they ultimately failed to do so.  *See* Pls.' Mot. at 15–16.  They offer paltry support for this assertion, citing only one case in which terrorists *did* kill someone.  *See id.* at 16 (citing *Campuzano v. Islamic Repub. of Iran*, 281 F. Supp. 2d 258,

12

270–71 (D.D.C. 2003)).  And Plaintiffs do not suggest that the attacks were acts of torture, aircraft sabotage, or hostage taking.  The Court therefore must decide (without briefing) whether support for an attack that killed nobody can still qualify as support for an extrajudicial killing.

The Court begins, as it must, with the text of the definition for an extrajudicial killing. *See Jackson v. Modly*, 949 F.3d 763, 768 (D.C. Cir. 2020).  The definition refers to a "killing." That word denotes a fatality.  *See Killing*, Black's Law Dictionary (11th ed. 2019) ("The act of causing the end of an animate thing's life.").  Other courts agree.  In *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 840 (D.C. Cir. 2009), the D.C. Circuit found that the assassination of an Iranian citizen in France "clearly qualifies as an extrajudicial killing."  The Eleventh Circuit likewise reads the TVPA to require, "at a minimum," some act "that takes another's life." *Mamani v. Sanchez Bustamante*, 968 F.3d 1216, 1233 (11th Cir. 2020).  Thus, an attack cannot be a "killing," deliberated or otherwise, if nobody dies.[8]

Nor does the text suggest that the definition's limitation to a "deliberated killing" includes an "attempted killing."  That suggestion defies the usual meanings of "deliberated" and "attempted."[9]  A deliberated action is one in which the actor "consider[s] or discuss[es] [it] carefully."  *Deliberate*, Am. Heritage Dictionary 227 (3d ed. 1994).  An attempted action, on the other hand, is one where the actor "make[s] an effort to do" that action.  *Id.* at 54.  Thus, the adjectives "deliberated" and "attempted" speak to different aspects of an act.  Whether an act is

---

[8]  True, a bystander shot and killed Hasouna after he rammed into the bus stop.  That would constitute a "killing."  But Plaintiffs do not allege that Hasouna's death suffices, and it is hard to see how anyone "deliberated" his death.  In any event, Hasouna's actions, not his death, "cause[d]" the injuries to Yoav and Rotem.  28 U.S.C. § 1605A(a)(1).  Thus, a suit premised on Hasouna's death as an extrajudicial killing would fail to meet the exception's plain terms.

[9]  "Deliberated" and "attempted" are the past participle forms of the verbs "to deliberate" and "to attempt."  The Court therefore cites definitions for those verbs.

13

deliberated depends on the consideration given to it ahead of time. *See Mamani v. Berzain*, 654 F.3d 1148, 1155 (11th Cir. 2011) (defining "deliberate" under the TVPA as "undertaken with studied consideration and purpose"). Whether an act is attempted turns on efforts made by the actor to accomplish the act. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 107 (2007) ("'[A]ttempt' as used in common parlance connote[s] action rather than mere intent . . . .").

A deliberated killing would appear to be a murder accomplished with what the common law described as "malice aforethought," while an attempted killing is an inchoate crime. The Court therefore cannot include attempted killings in the phrase "deliberated killings" without being unfaithful to the statutory text. This the Court will not do. *See Star Athletica, LLC v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017) ("We thus begin and end our inquiry with the text, giving each word its ordinary, contemporary, [and] common meaning.") (cleaned up).[10] The Court must respectfully disagree with other judges in this district who have held that attempted killings fall within the TVPA's definition of an extrajudicial killing. *See, e.g.*, *Lee*, 518 F. Supp. 3d at 491; *Gill v. Islamic Repub. of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017).

That said, those decisions also present another, more compelling textual argument that ultimately saves Plaintiffs. *See, e.g.*, *Karcher v. Islamic Repub. of Iran*, 396 F. Supp. 3d 12, 57 (D.D.C. 2019). The FSIA waives sovereign immunity for injuries caused by "material support

---

[10]  More, *Owens v. Republic of Sudan* militates against interpreting "deliberated killing" to include attempted killings. 864 F.3d 751, 770 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Repub. of Sudan*, 140 S. Ct. 1601 (2020). There, the Circuit read the TVPA's definition to "contain[ ] three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Id.* at 770. The Court has already explained why a "killing" requires a fatality. Thus, an attempted killing that, by definition, causes no deaths would not meet the Circuit's first element, even if it were a "deliberated" action under the second element.

14

*for*" an extrajudicial killing. 28 U.S.C. § 1605A(a)(1) (emphasis added). The word "for" matters.

As used in the provision, "for" "indicate[s] the object or purpose of an action or activity." *For,* Am. Heritage Dictionary 329 (3d ed. 1994). One dresses "for" dinner or studies "for" an exam even if the dinner or exam never occurs. Thus, a foreign state's support with the object or purpose of an extrajudicial killing constitutes support "for such an act" under the statute. 28 U.S.C. § 1605A(a)(1); *accord Force*, 464 F. Supp. 3d at 360–61. And support with that intention or objective can therefore cause "personal injury," even if a resulting attack is not deadly. 28 U.S.C. § 1605A(a)(1). This interpretation faithfully considers Congress's inclusion of "for" in the statute and abides by the D.C. Circuit's guidance to "interpret [the FSIA's] ambiguities flexibly and capaciously." *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 (D.C. Cir. 2013).

Plaintiffs have sufficiently alleged that the States supported Hamas with that objective. Syria has long sought to "derail any [Israeli-Palestinian] peace process or negotiations that it considers unfavorably." Berti Decl. ¶ 21. Dr. Deeb testifies that Syria continued to give Hamas a base in Damascus even as Hamas kidnapped Israelis. *See* Deeb Decl. ¶ 21a. Israeli newspapers reported that Syria offered aid in 2002 for Hamas to resume suicide bombings against Israel. *See* Berti Decl. ¶ 45. And Syria facilitated advantageous political meetings between Hamas and foreign leaders, *see id.* ¶ 47 (the Iranian president), and granted Hamas a presence in Lebanon, where Syria held de facto control for years, *see id.* ¶ 46. The Court finds that Syria supplied this aid with the objective of furthering Hamas's activities, which included "deliberated killings" not sanctioned by applicable law. 28 U.S.C. 1350 note. Syria could not have provided its support without that awareness.

15

As to Iran, Plaintiffs' evidence is even stronger. An Iranian ambassador publicly promised to compensate families of those who died attacking Israelis. *See* Clawson Decl. ¶ 28. According to Dr. Clawson, Iran also "paid generously for results" in the form of bombings in Israel. *Id.* ¶ 38. And Iran manufactured weapons for Hamas, with Hamas leadership's public thanks. *See id.* ¶¶ 47, 56. Finally, Iran publicly supported Hamas during a rash of kidnappings and bombings that it conducted in 2014. *See id.* ¶ 58. Plaintiffs' evidence thus shows that Iran knew of Hamas's violent activities, yet still provided support.

And the evidence shows that the Hamas operatives intended the attacks here to be deadly. In Nasr's statement to Israeli police, he said that "the purpose of the gunfire was to kill a Jew." Spietzen Decl. ¶ 73. Akram likewise told police that the shooting's purpose "was to murder and injure Israelis as revenge for the deaths of" Palestinian martyrs. *Id.* The two brothers clearly contemplated a killing when they entered that room overlooking the Cave.

So too for Hasouna. Israeli investigators found no sign that Hasouna braked before barreling into the bus stop. *See* Spietzen Decl. ¶ 122. He sped into a crowd, an action that any driver knows could be lethal. *Accord Sines v. Kessler*, 324 F. Supp. 3d 765, 796 (W.D. Va. 2018) (reviewing statements from alleged coconspirators discussing the possibility that a car could run over and kill counterprotestors at the 2017 Unite the Right rally in Charlottesville). That Hasouna's car only injured others was luck, not intentional. And even if he planned only to injure with his car, Hasouna brought an axe for use afterwards, *see id.* ¶ 120, probably to imitate the "ramming and stabbing" attacks that occurred widely across Israel in 2014–15, *id.* ¶ 120 n.82. These facts, particularly when combined with Hasouna's pre-attack promise to intercede for his mother in Paradise, *see id.* ¶ 124, show that Hasouna planned to kill those gathered at the bus stop. And he was willing to die doing so.

16

In sum, Hamas undertook both attacks with an intent to kill and with material support from the States. Thus, the States gave material support for an extrajudicial killing.

*The States' support to Hamas caused Plaintiffs' injuries.* The FSIA requires Plaintiffs to show proximate cause, meaning "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Owens*, 864 F.3d at 794 (cleaned up). To establish a "reasonable connection," Plaintiffs must show both that "the defendant's actions [were] a substantial factor in the sequence of events that led to [their] injury" and that their injury "must have been reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Id.* (cleaned up).

As to Syria, Dr. Deeb concludes that Syrian support "enabled [Hamas] to transform itself" from a fledgling cell to a terror group "with a solid infrastructure and the power to wreak devastation against Israel." Deeb Decl. ¶ 23. He also concludes that Syrian support "is directly responsible for the Hamas terrorist attacks we see today." *Id.* ¶ 24. Dr. Berti likewise testifies that "without the support of a prominent Arab state like Syria to lend it legitimacy, [Hamas] would be more isolated and unable to" solidify itself as a major player. Berti Decl. ¶ 50. Plaintiffs have thus persuaded the Court that Syrian support was key to the attacks at issue.

As for Iran, Dr. Clawson discusses the "substantial financial and military support" given to Hamas. Clawson Decl. ¶ 34. This included "advanced weapons" for attacks in Israel, *id.* ¶ 50, and direct infusions of cash, *see id.* ¶ 48. Hamas has publicly acknowledged Iran's assistance to Hamas's efforts. *See id.* ¶ 59. The Court is persuaded that Iranian support was instrumental to the attacks in Hebron and Jerusalem.

The Court also finds that these attacks caused reasonably foreseeable suffering. Hamas has a long history of planning and conducting attacks in Israel. Dr. Spietzen describes a wave of

17

such attacks in 2015–16, which corresponded to the two attacks.  *See* Spietzen Decl. ¶¶ 52–69.  Although Syria's support predates these attacks, Syria gave Hamas safe haven during previous years of similar attacks.  Syria knew then about Hamas's efforts.  *See, e.g.*, Deeb Decl. ¶ 21a.  Iran likewise supported Hamas during 2008–2017, *see* Clawson Decl. ¶ 61, and it did so with full awareness of how Hamas used that support.

For these reasons, the Court finds that the terrorism exception applies and that the States have no sovereign immunity.  This case falls therefore within the Court's subject matter jurisdiction.  *See* 28 U.S.C. §§ 1330(a), 1605A(a)(1).

### B.  Personal Jurisdiction

A court has personal jurisdiction over a foreign state when it has subject matter jurisdiction and the plaintiff has made service as required in 28 U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b).

Section 1608 "provides four methods of service in descending order of preference." *Barot v. Emb. of the Repub. of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).  The first is "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision."  28 U.S.C. § 1608(a)(1).  The second is "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents."  *Id.* § 1608(a)(2).  Next, a plaintiff can effect service "by sending a copy of the summons and complaint and a notice of suit . . . by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned."  *Id.* § 1608(a)(3).  And finally, if none of the first three methods works, a plaintiff can serve the documents through the Department of State.  *Id.* § 1608(a)(4).

18

Here, neither Iran nor Syria made a special arrangement, nor are they party to an international convention on the service of judicial documents.  *See Braun v. Islamic Repub. of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).  Plaintiffs next attempted an international mailing by the Clerk of Court, but the Clerk was unable to effect service.  *See* Status Report at 2–3, ECF No. 12.  So Plaintiffs requested the State Department to complete service under § 1608(a)(4).  *See id.* at 3.  This last route was ultimately successful.  According to letters from the Department, it served Iran, *see* ECF No. 15, and Syria, *see* ECF No. 18, by diplomatic note.

Because the Court has subject matter jurisdiction and Plaintiffs made proper service, the Court has personal jurisdiction over the States.

### C.  Causes of Action

The FSIA creates a private cause of action against foreign state sponsors of terrorism liable for "personal injury or death."  *See* 28 U.S.C. § 1605A(c).  The elements of this cause of action overlap with the terrorism exception to sovereign immunity, so the Court's subject matter jurisdiction analysis shows that the exception's cause of action is available here.  *See Foley v. Syrian Arab Repub.*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017).

But that availability does not extend to all Plaintiffs.  Only U.S. nationals, U.S. servicemembers, employees of the U.S. Government, or their legal representative may bring claims under the federal cause of action.  *See* 28 U.S.C. § 1605A(c)(1)-(3).  Ten Plaintiffs are U.S. citizens—Eli and his family; Yoav; Yoav's mother, Yehudit Golan; and Yoav's brother, Matan Golan (collectively, U.S. Plaintiffs).  *See* Compl. ¶¶ 4–9. 12–13.  Based on their citizenship, these Plaintiffs may use the cause of action found in § 1605A(c).

The other nine Plaintiffs (collectively, Israeli Plaintiffs) are Israeli citizens.  *See id.* ¶¶ 10–11, 13–19.  Recall that the presence of foreign plaintiffs does not deprive the Court of

jurisdiction over their claims because the victims of the attacks were U.S. nationals, as required by § 1605A(a)(2)(A)(ii)(I).  *Accord Thuneibat v. Syrian Arab Repub.*, 167 F. Supp. 3d 22, 35 (D.D.C. 2016).  But Israeli Plaintiffs cannot proceed under § 1605A's cause of action.  Instead, they may "pursue claims under applicable state or foreign law."  *Fraenkel v. Islamic Repub. of Iran, et al.*, 892 F.3d 348, 353 (D.C. Cir. 2018) (cleaned up).  For their claims, the Court must conduct a choice-of-law analysis.  *See Oveissi*, 573 F.3d at 841.

The Court will analyze the States' liability first to U.S. Plaintiffs and then to Israeli Plaintiffs.

### 1.  U.S. Plaintiffs

Although the FSIA provides a private cause of action, it does not provide the substantive basis for Plaintiffs' claims.  *See Selig*, 2021 WL 5446870, at *12.  Plaintiffs must instead "prove a theory of liability" to justify holding the States liable.  *Roth v. Islamic Repub. of Iran*, 78 F. Supp. 3d 379, 399 (D.D.C. 2015).  When adjudicating those theories, the Court cannot "fashion a complete body of law."  *Bettis v. Islamic Repub. of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003).  Instead, the Court relies "on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises."  *Fraenkel*, 892 F.3d at 353.

### a.  Battery

As survivors of the attacks, Eli and Yoav allege that the States committed battery.  The States are liable for battery if they (1) acted "intending to cause a harmful or offensive contact with . . ., or an imminent apprehension of such a contact" by those attacked and (2) "a harmful contact" with those attacked "directly or indirectly result[ed]."  Restatement (Second) of Torts § 13; *see Roth*, 78 F. Supp. 3d at 400.  Harmful contact occurs when "any physical impairment" or "physical pain or illness" results from an incident.  Restatement (Second) of Torts § 15.

20

Iran and Syria supported Hamas with the intent to cause harmful contact; "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear." *Valore v. Islamic Repub. of Iran*, 700 F. Supp. 2d 52, 77 (D.D.C. 2010). And Eli and Yoav suffered physical harm. Eli suffered a gunshot wound that required immediate surgery, *see* Friedman Decl., Ex. B at 1, and he testified to the "excruciating pain" that the wound caused him, *see* Eli Decl. ¶ 7. Yoav suffered a fractured shoulder and a crushed leg. *See* Yoav Decl. ¶¶ 16–19. So Eli and Yoav have shown the States' liability under the FSIA for battery and for the physical injuries resulting from that battery.

### b. Assault

Eli's father, Ronen, and brother, Josef, were also present for the Hebron shooting. *See* Declaration of Josef Barachov (Josef Decl.) ¶ 5, ECF No. 34; Declaration of Ronen Barachov (Ronen Decl.) ¶¶ 4–5, ECF No. 35. They assert that Iran and Syria committed an assault, causing them "fear and apprehension of death." Compl. ¶ 112. The States are liable for assault if, when they provided material support and resources for the attack, (1) they acted "intending to cause a harmful or offensive contact with" or an imminent apprehension of such a contact by Ronen and Josef; and (2) Ronen and Josef were "put in such imminent apprehension." *Akins v. Islamic Repub. of Iran*, 332 F. Supp. 3d 1, 35–36 (D.D.C. 2018) (quoting Restatement (Second) of Torts § 21(1)).

As discussed above, the States supported Hamas with the intent to cause harmful contact and the immediate apprehension of that contact. Acts of terrorism are "intended to harm and to terrify by instilling fear of further harm." *Murphy v. Islamic Repub. of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010). And both men feared further harm after the attack. Josef told Dr. Strous that the entire attack was "extremely frightening" and that, for the next months, he grew scared

whenever he saw workers in buildings.  Strous Expert Report on Josef Borochov at 2, ECF No.

50-5.  "He thought they were snipers in windows waiting to target him."  *Id.*  Ronen similarly

"freaked out" from shock and felt "immense fear, terror, agitation, dread, and distress"

immediately following the shooting.  Strous Expert Report on Ronen Borochov at 2, ECF No.

50-6.  For months afterwards, Ronen would think "about what could have happened" and

suffered severe anxiety as a result.  *Id.* at 3.

     Plaintiffs have accordingly shown that the States are liable to Rotem and Josef for

assault.

### c. Solatium/Intentional Infliction of Emotional Distress

     All U.S. family members sue for "loss of solatium," *see* Compl. ¶¶ 95, 97, which is "the

mental anguish, bereavement, and grief" experienced by those with a close relationship to the

victim.  *Est. of Hirshfeld v. Islamic Repub. of Iran*, 330 F. Supp. 3d 107, 140 (D.D.C. 2018)

(cleaned up).  Under the FSIA, a solatium claim "is indistinguishable" from an intentional

infliction of emotional distress (IIED) claim.  *Id.*  Courts apply the Restatement (Second) of

Torts to these claims.  *See, e.g.*, *Abedini*, 422 F. Supp. 3d at 133.

     The States are liable for IIED if they "by extreme and outrageous conduct intentionally or

recklessly cause[ ] severe emotional distress to another."  Restatement (Second) of Torts § 46(1).

The Restatement permits recovery by (1) members of the victim's immediate family (2) who

were present at the time of the conduct.  *See id.* § 46(2); *Est. of Hirshfeld*, 330 F. Supp. 3d at

141.

     Here, the States provided material support to Hamas with the understanding and intent

that Hamas would carry out attacks in Israel.  Those acts of terrorism "are inherently extreme

and outrageous."  *Abedini*, 422 F. Supp. 3d at 135.  And because of the outrageousness of an act

22

of terrorism, courts have waived the Restatement's presence requirement for family members so long as they "suffer[ ] mental anguish and trauma as a result of" the attack.  *Cohen v. Islamic Repub. of* Iran, 238 F. Supp. 3d 71, 85 (D.D.C. 2017); *see also Est. of Hirshfeld*, 330 F. Supp. 3d at 141.  Thus, all family members can recover for IIED regardless of their presence at the attack.[11]  *Accord Akins*, 332 F. Supp. 3d at 37–38.  The Court has reviewed the declarations submitted by each U.S. family member and is persuaded that all of them suffered "severe emotional distress" from the injuries suffered by Eli and Yoav.  Restatement (Second) of Torts § 46(2).

The U.S. Plaintiffs have thus established Iran's and Syria's liability under the federal private right of action for their solatium claims.

### 2. Israeli Plaintiffs

Now consider the nine Israeli Plaintiffs—all family members of Yoav and Rotem.  They bring various state-law claims against the States.[12]  Recall that they can rely only on state tort law to supply the requisite cause of action.  That approach requires the Court to first determine "which jurisdiction's substantive law to apply."  *Oveissi*, 573 F.3d at 841.  For that

---

[11]  This includes Ronen and Josef, despite their successful assault allegation.  They suffered psychological injuries from being present for the shooting that wounded Eli.  The Court's assault analysis above accounts for those injuries.  Solatium damages, on the other hand, compensates Ronen and Josef for their grief at seeing Eli shot and at seeing him struggle over the next months.  *See Braun*, 228 F. Supp. 3d at 85–86 (awarding damages for assault and solatium to parents who were present for terrorist attack that killed their child).

[12]  According to the Complaint, the U.S. Plaintiffs also bring these claims.  But U.S. Plaintiffs have already shown liability for their injuries under the federal cause of action.  These state law claims thus provide no "additional right to recover."  *Force*, 464 F. Supp. 3d at 371; *see also Barry v. Islamic Repub. of Iran*, 410 F. Supp. 3d 161, 178 n.8 (D.D.C. 2019) (declining to consider a state-law claim arising from same predicate acts when plaintiff had shown liability under the federal cause of action).

determination, the Court applies choice-of-law rules from its forum, the District of Columbia. *See id.*[13]

### a. Choice of Law

The District combines a "governmental interest analysis" with a "most significant relationship test." *W.A. v. Islamic Repub. of Iran*, 427 F. Supp. 3d 117, 139 (D.D.C. 2019). Under the first analysis, "the Court evaluates the governmental policies underlying the applicable laws and determines which jurisdiction's policy would be most advanced by having its law applied" to the case. *Id.* (cleaned up). Under the second portion—the most significant relationship test—the Court must consider four factors from the Restatement (Second) of Conflict of Laws: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the parties' domicile, residence, and nationality; and (4) "the place where the relationship, if any, between the parties is centered." *Id.* (quoting Restatement (Second) of Conflict of Laws § 145(2)).

Here, two sources of law could apply: D.C. law as law of the forum state, or Israeli law as law of Plaintiffs' domiciles and law where the attacks occurred. Plaintiffs contend that Israeli law is the better fit. *See* Proposed Order at 69. The Court agrees.

Israel has a strong interest in "both deterring attacks within its sovereign borders and ensuring compensation for injuries to its domiciliaries." *Oveissi*, 573 F.3d at 842. Here, both attacks occurred in Israel, and all nine Israeli Plaintiffs live there. The interest of the United States is slight by comparison. No evidence suggests that any victim "was targeted because of

---

[13] Recently, the Supreme Court heard arguments in *Cassirer v. Thyssen-Bornemisza Collection Foundation*, No. 20-1566 (U.S., *cert. granted* Sep. 30, 2021), to decide what choice-of-law rules govern in FSIA cases. Because no opinion in that case has been yet issued, this Court abides by current D.C. Circuit precedent and applies the forum's choice-of-law rules.

[their] relationship to the United States government." *W.A.*, 427 F. Supp. 3d at 139; *see also Est. of Doe v. Islamic Repub. of Iran*, 808 F. Supp. 2d 1, 22 (D.D.C. 2011) (applying domestic law to claims arising from terrorist attack "on a United States embassy and diplomatic personnel"). The governmental interest analysis favors application of Israeli law.

So does the most significant relationship test. The injury occurred in Israel; the conduct causing the injury occurred in Israel, the Palestinian territories, Iran, and Syria; all Israeli Plaintiffs are Israeli citizens; and no legal relationship exists between them and either the States or Hamas. *Accord Force*, 464 F. Supp. 3d at 373–74 (applying Israeli law for claims by non-U.S. plaintiffs arising from attacks in Israel). The Court will accordingly apply Israeli law to the claims of Israeli Plaintiffs.

### b. Liability Under Israeli Law

When applying foreign law, the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. Plaintiffs here rely on declarations from two professors of Israeli law: (1) Dr. Boaz Shnoor, *see* Declaration of Boaz Shnoor (Shnoor Decl.), ECF No. 34, *Force v. Islamic Repub. of Iran*, No. 16-cv-1468 (D.D.C.); and (2) Israel Gilead, *see* Declaration of Prof. Israel Gilead (Gilead Decl.), ECF No. 56-2, *Henkin v. Islamic Repub. of Iran*, No. 19-cv-1184 (D.D.C.). The Court considers physical injuries and then emotional injuries.

### i. Physical Injuries

Among the Israeli Plaintiffs, only Rotem suffered physical injuries. But the Complaint does not explain her theory of liability. Counts II and III allege battery and assault, *see* Compl. ¶¶ 103–15, but under Israeli law those torts require *direct* harm or attempted harm by a defendant, *see* Shnoor Decl. ¶¶ 26, 28. Dr. Shnoor himself analyzes assault and battery as

25

applied to Hasouna, the direct tortfeasor, not to Iran and Syria.  *See id.* ¶ 31 ("[T]here is not a doubt in my mind that any Israeli court would have found *the Hamas terrorists*, sponsored and supported by the Defendants, liable for . . . battery and assault under Article 23 of the CWO.") (emphasis added).  So Rotem could not succeed against *the States* for those torts.

To remedy this and other deficiencies, the Court asked Plaintiffs to provide more information about their theory of liability.  *See* Show Cause Order, ECF No. 56.  Plaintiffs responded that they had shown that the States "aided and abetted Hamas's tortious acts" under Israeli law.  *See* Show Cause Response at 12, ECF No. 57.  This theory follows the Complaint: Count VII alleges that the States aided and abetted Hamas's "acts of international terrorism, extrajudicial killing[,] and personal injury."  *See* Compl. ¶ 129.

According to Plaintiffs' experts, Article 12 of Israel's Civil Wrongs Ordinance (CWO) holds liable "anyone who helps another or encourages him to perform a civil wrong" as if the helper had "committed the wrong himself."  Shnoor Decl. ¶ 45; *see also* Gilead Decl. ¶ 36 (noting that the "first requirement" for aiding and abetting liability is a primary tortfeasor).  Dr. Shnoor reports that Israeli courts impose aiding and abetting liability if a defendant's actions "significantly contributed to the tortious actions of the direct tortfeasor."  *Id.* ¶ 46.  The Court has already determined that the States' actions significantly contributed to the attackers' efforts.  *See supra* IV.A.  The only remaining question is whether those efforts were "tortious."  Shnoor Decl. ¶ 46.

They were for Rotem's physical injuries.  Battery under Israeli law requires that a defendant (1) knowingly (2) use force (3) against the body of another (4) without that person's consent.  *See* Shnoor Decl. ¶ 28.  Hasouna drove his car into Rotem's body, throwing her against a glass wall at the bus stop.  *See* Rotem Decl. ¶ 5.  He thus used force against her body without

26

her consent.  And he did so knowingly.  He chose the anniversary of Hamas's founding as the date for the attack and brought with him an axe painted in a green shade associated with Hamas.  *See id.* ¶¶ 125–26.  These actions show planning of the attack and support an inference that Hasouna knowingly rammed Rotem with his car.

Thus, Hasouna committed a battery against Rotem.  And the States, through their material support to Hamas, significantly contributed to that battery.  The States are thus liable under Israeli law for aiding and abetting a battery.[14]  *See* Shnoor Decl. ¶ 46.  Rotem may recover for her physical injuries.

### ii. Emotional Injuries

All other Israeli Plaintiffs seek recovery for their emotional damages (essentially, for solatium) resulting from the attack on Yoav and Rotem.  Based on Plaintiffs' aiding and abetting theory in their Show Cause Response, the Court follows a similar approach as for Rotem's battery.  The Court will first analyze whether Hamas committed an underlying tort and then whether the States aided and abetted that tort.

First, the underlying tort.  Plaintiffs insist that the Court should analyze Hamas's actions under the Israeli tort of negligence.  But the word negligence never appears in the Complaint.  Even so, Plaintiffs' experts have established that Israeli negligence covers both negligent and intentional acts.  *See* Shnoor Decl. ¶ 13; Gilead Decl. ¶ 25.  And the Complaint includes allegations of multiple intentional actions, including intentional infliction of emotional distress and civil conspiracy.  *See* Compl. ¶¶ 116–20; 125–27.  The Court also notes Judge Lamberth's

---

[14]  The Court need not analyze whether Rotem has successfully alleged aiding and abetting of an assault.  Her successful battery pleading assures her of recovery for her injuries.  *See Braun*, 228 F. Supp. 3d at 80 ("[R]ecovery for the same injury under more than one theory of liability is forbidden.") (citing *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976)).

27

opinion in *Henkin v. Islamic Republic of Iran*, no. 10-cv-1184 (RCL), 2021 WL 2914036 (D.D.C. Jul. 12, 2021). The plaintiffs there likewise did not separately allege negligence but included many of the same claims as Plaintiffs here. *See id.* at *3. Yet Judge Lamberth analyzed whether Israeli negligence law applied. *See id.* at *8. The Court will follow his example. *See also Est. of Botvin v. Islamic Repub. of Iran*, 873 F. Supp. 2d 232, 242–43 (D.D.C. 2012) (determining that terrorists committed negligence and that foreign state sponsors aided and abetted that negligence).

Articles 35–36 of the CWO set forth the tort of negligence. *See* Shnoor Decl. ¶ 13. It consists of four elements: (1) duty of care; (2) breach of that duty; (3) causation; and (4) harm. *See id.* ¶ 15.

The Court has little difficulty concluding that Hamas's actions amounted to negligence. A duty of care under Israeli law arises "whenever a reasonable person could have foreseen" that their conduct "could cause the harm alleged." *Id.* ¶ 17. Hasouna could have reasonably foreseen that driving a car into a crowded bus stop would physically harm those bystanders and emotionally damage their family members. So a duty arose. And Hasouna breached that duty. A breach occurs when the party with the duty fails to take "reasonable precautionary measures." *Id.* Far from taking precautionary measures, Hasouna never braked as he drove into the bus stop. *See* Spietzen Decl. ¶ 122. Under Israeli law, he breached his duty.

The causation element requires "both causation in fact and legal causation (proximate cause)." Shnoor Decl. ¶ 20. "Cause in fact is generally determined in Israel according to the 'but for' test." *Id.* ¶ 21. And legal causation is met "[i]f a reasonable person could have foreseen that harm of the kind that happened might happen." *Id.* ¶ 22. Hasouna's actions fulfill both types of causation. His vehicular rampage was the but for cause of Rotem and Yoav's injuries.

28

Without his choice to ram into the bus stop, they would not be hurt, and their families would not have suffered.  And as discussed in the duty element, Hasouna could have reasonably foreseen that driving a car into a crowded bus stop would cause those injuries.

Finally, the CWO defines harm as "loss of life, or loss of, or detriment to, any property, comfort, bodily welfare, reputation, or other similar loss or detriment."  Shnoor Decl. ¶ 23.  That definition of harm includes emotional and psychological damages.  Israeli Plaintiffs' own declarations and Dr. Strous's reports attest to the mental and emotional harms suffered because of Yoav's and Rotem's injuries.  The Court thus concludes that Israeli Plaintiffs have adequately alleged harm and that Hamas committed Israeli negligence.

Plaintiffs also show that the States aided and abetted that negligence.  That analysis is largely set forth above.  The Court has already determined that the States' actions significantly contributed to Hamas's efforts, which in turn caused Hasouna's attack.  *See supra* IV.A.  The States knew of Hamas's violent intentions and "nonetheless provided support in spite of them." *Est. of Botvin*, 873 F. Supp. 2d at 242.  And the States' funding and support coincided with and allowed Hamas to conduct terrorist attacks, "including the [bus stop attack] at issue here." *Id.* The material support from the States thus "significantly contributed" to Hamas's negligence. Shnoor Decl. ¶ 46.  The States are therefore liable for aiding and abetting that tort.  Israeli Plaintiffs may recover for their emotional injuries from the attack on Yoav and Rotem.

### D.  Individual Damages

The Court moves next to damages.  To obtain damages in an FSIA suit, "a plaintiff must prove that the consequences of the defendants' acts were reasonably certain to occur, and he must prove the amount of damages by a reasonable estimate."  *Abedini*, 422 F. Supp. 3d at 136 (cleaned up).  Recall that physical injuries and emotional suffering were a foreseeable result of

29

the States' actions.  *See supra* IV.A.  So the Court must determine whether each Plaintiff's claim

for damages is supported by a "reasonable estimate."  *Abedini*, 422 F. Supp. 3d at 136.

### 1.  U.S. Plaintiffs

Assessing damages "is an imperfect science."  *Goldstein v. Islamic Repub. of Iran*, 383 F.

Supp. 3d 15, 19 (D.D.C. 2019).  No amount of money can compensate a victim and his family

for suffering after a terrorist attack.  "In the interest of fairness, however, courts strive to

maintain consistency of awards" between plaintiffs in comparable situations.  *Id.*  To achieve

consistency, courts in this district have adopted standard amounts for each type of plaintiff.

Those figures originate from *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229

(D.D.C. 2006).  *Heiser* is a useful reference point, "not binding precedent."  *Fraenkel*, 892 F.3d

at 351.  Courts vary from these standards depending on the facts of each case.  *See Selig*, 2021

WL 5446870, at *13 (collecting cases); *see also Fraenkel*, 892 F.3d at 361 ("District Court

judges invariably must exercise discretion in determining damages awards under the FSIA.").

Thus, the Court will treat them as a guide only.

The relevant standards for damages are as follows.  For pain and suffering, courts

generally assume that "persons suffering substantial injuries in terrorist attacks" should receive

$5 million in damages.  *Barry*, 410 F. Supp. 3d at 180; *see Cohen v. Islamic Repub. of Iran*, 268

F. Supp. 3d 19, 24 (D.D.C. 2017).  Substantial injuries include "compound fractures, severe flesh

wounds, and wounds and scars from shrapnel, as well as lasting and severe psychological pain."

*Valore*, 700 F. Supp. 2d at 84 (cleaned up).  Victims who suffer "severe emotional injury

accompanied by relatively minor physical injuries" receive $1.5–$3 million.  *Barry*, 410 F. Supp.

3d at 180 (cleaned up).  Awarding damages for physical injuries "assumes severe psychological

injuries."  *Id.* (cleaned up).

For solatium damages, the standard amount "depends in part on the nature of the relationship between the family member and the victim, and the severity of the pain suffered by the family member." *Bathiard v. Islamic Repub. of Iran*, 2020 WL 1975672 at *5 (D.D.C. Apr. 24, 2020) (cleaned up). When the victim suffers a nonfatal injury, courts have applied a framework under which "[s]pouses receive $4 million, parents receive $2.5 million, and siblings receive $1.25 million." *Moradi v. Islamic Repub. of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015); *see Cohen*, 268 F. Supp. 3d at 26.

The Court will apply this framework to the U.S. Plaintiffs, starting with Eli's family and then moving to Yoav's.

*Eli Borochov.* Eli seeks $5 million in pain and suffering. *See* Proposed Order at 76. The Court has already referenced Eli's injuries. After striking his thigh, the bullet traveled into his genital area before exiting his body. *See* Friedman Decl. Ex. B at 1. As a "serious flesh wound," the damage to Eli's leg and genitals constitutes a "substantial" physical injury. *Braun*, 228 F. Supp. 3d at 84. The wound caused "excruciating pain" that did not dissipate as medics transported Eli to the hospital. Eli Decl. ¶ 7. And the months after surgery were not easy. Eli's stitches often came apart, requiring replacements and more pain. *See id.* ¶ 32. Eli developed a limp, which caused him back pain. *See id.* ¶ 35. Adding to his discomfort, the area around Eli's wound is often sensitive, making it hard to sit down or sleep. *See id.* ¶ 40–42. Eli missed three months of college because of his injuries, *see id.* ¶ 45, and he feels anxious in large crowds, *see id.* ¶ 47. Because Eli suffered "substantial injuries" in the shooting, the Court will award him $5 million in keeping with the *Heiser* framework.

*Ronen Borochov.* Ronen seeks $1.5 million in pain and suffering. *See* Proposed Order at 76. Once he saw Eli shot on the ground, Ronen went into a "state of shock." Ronen Decl. ¶ 15.

31

He reported to Dr. Strous that he felt "immense fear, terror, agitation, dread, and distress." Strous Expert Report on Ronen Borochov at 2. He felt "helpless" as emergency responders transported Eli to the hospital, Ronen Decl. ¶ 22, and Ronen was "shaking and agitated" from the stress of seeing his son in an ambulance, Strous Expert Report on Ronen Borochov at 2. After the attack, Ronen could not sleep for months and calmed himself by eating. *See id.* at 3. Dr. Strous diagnosed Ronen as suffering from post-traumatic stress disorder because of the shooting. Strous Expert Report on Ronen Borochov at 6.

The Court will award Ronen $1 million for his pain and suffering. To be clear, Ronen experienced no physical injury. True, some cases grant $1.5 million for those who, like him, suffer only emotional injuries. *See Valore*, 700 F. Supp. 2d at 84–85. But those cases are not binding on this Court, and they compensate emotional experiences more traumatic than Ronen's. *See id.* (awarding $1.5 million to victim who saw up close the back of a man's head shot off and had the leg of a dead body detach in his arms). Ronen's experience, while painful, does not merit the same damage award. *See Fraenkel*, 892 F.3d at 362 ("[D]ifferent plaintiffs (even under [the] FSIA) will prove different facts that may well (and should) result in different damage awards.") (cleaned up).

Ronen also seeks solatium damages. *See* Proposed Order at 92. Once he and Eli returned to the United States, Ronen "was consumed with thoughts of Eli's physical and emotional injuries." Ronen Decl. ¶ 36. Ronen's sleep woes during that time stemmed from nightmares about losing a child. *See id.* ¶ 40. He cut his work hours considerably so that he could take Eli to various doctors' appointments. Strous Expert Report on Ronen Borochov at 3. According to Dr. Strous, Ronen needed about a year to return to his pre-attack level of activity and function. *See id.* Ronen is much more nervous now. He always needs to know where his children are and

32

remains overly fragile and emotional. *See id.* at 3–4. "These harms are consistent with those suffered by many parents of victims of terrorism." *Christie v. Islamic Repub. of Iran*, No. 19-1289 (BAH), 2020 WL 3606273, at \*26 (D.D.C. July 2, 2020). For his anguish at seeing the pain of his son, the Court will award Ronen the *Heiser* standard $2.5 million in solatium damages.[15] *See id.*

    *Josef Borochov.* Eli's brother Josef seeks $1.5 million in pain and suffering. *See* Proposed Order at 77. Once Josef heard a gunshot, he saw Eli on the ground screaming in pain. Strous Expert Report on Josef Borochov at 2. Josef thought Eli would die and knew that if the bullet had traveled on a different path it could have hit and killed Josef himself. *See id.* at 2. And the attack took a mental toll on Josef. In the months afterwards, he felt unable to walk around in public areas. *See id.* He felt depressed during that time and avoided interactions with others. *See id.* at 3. The attack has also changed his life plans—Josef had planned to emigrate to Israel, but after the shooting he does not think he could live there in a "relaxed manner." *Id.* He thus no longer intends to emigrate. *See id.* For the same reasons that the Court will award Ronen $1 million in pain and suffering, the Court will grant Josef the same amount.

    Josef also seeks solatium damages. He calls Eli his "best friend" and someone he "admired." Josef Decl. ¶ 14. Once medics evacuated Eli to a hospital, Josef feared for the worst

---

[15] This award is higher than Ronen's damages for his own pain and suffering. The Court acknowledges that solatium damages generally must be proportionate to pain and suffering damages awarded to direct victims. *See Spencer v. Islamic Repub. of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014). But Eli is the direct victim whose injuries matter for Plaintiffs' solatium claims. Thus, Ronen's solatium award for Eli's injuries can exceed Ronen's award for his own pain and suffering. In analogous situations when a parent is present for the attack that injures their child, courts typically award the parent more in solatium damages than for their own pain and suffering. *See, e.g.*, *Cohen*, 268 F. Supp. 3d at 25–26 (awarding mother of injured children $5 million for her own pain and $7.95 million for solatium); *Braun*, 228 F. Supp. 3d at 84–86 (awarding mother and father who were present at suicide bombing that killed their child $2.5 million each for their own pain and suffering and $6.25 million in solatium damages).

33

and thought that Eli was dead. Strous Expert Report on Josef Borochov at 2. Over the next hours and days, Josef could not think about anything else and "thought he was going crazy." *Id.* As already mentioned, the trauma of what happened to his brother caused depression in Josef. And whenever he discusses Eli's shooting, Josef cries and has heart palpitations. *See id.* at 3. These symptoms match the suffering of "many siblings of victims of terrorism." *Akins*, 332 F. Supp. 3d at 45. Thus, the Court will award Josef $1.25 million in keeping with a *Heiser* standard award for siblings. *See id.*

  *Shari Borochov.* Eli's wife Shari seeks solatium damages. She did not know Eli at the time of the shooting. The couple met in 2017 and married in 2019. *See* Strous Expert Report on Shari Borochov at 1, ECF No. 50-7. She asserts that Eli could not commit to a relationship with her until he could "recount the full story" of the attack. *Id.* at 2. Once Shari learned of his injuries, she feared that they would affect his fertility. *See* Declaration of Shari Borochov ¶ 20, ECF No. 36. The couple still do not know what effect those injuries will have on their life together. *See id.*

  Shari requests $2.5 million in solatium damages. The Court acknowledges her pain but cannot award her damages. Courts in this district consistently refuse damages to plaintiffs unassociated with the victim at the time of the attack. *See Bova v. Islamic Repub. of Iran*, No. 15-cv-1074 (RCL), 2020 WL 2838582 at *10 (D.D.C. May 31, 2020) (denying solatium damages to victim's sister who was born after attack). Those uncompensated plaintiffs include "[c]urrent spouses who were not yet married" to the victim. *Est. of Bland v. Islamic Repub. of Iran*, 831 F. Supp. 2d 150, 157 (D.D.C. 2011); *see Davis v. Islamic Repub. of Iran*, 882 F. Supp. 2d 7, 17 (D.D.C. 2012). This limitation makes sense. Without it, the class of future spouses able

34

to recover "could remain open for decades after a terrorist attack." *Davis*, 882 F. Supp. 2d at 15. Courts must draw a line to avoid "such an expansive and indefinite scope of liability."[16]  *Id.*

More, Shari, unlike other recipients of solatium damages, never feared that a loved one had died.  *See Christie*, 2020 WL 3606273, at *26 (awarding solatium in part for "panic upon learning about" an attack on a family member).  Nor did she "fear for her spouse's physical well-being in the immediate aftermath" of the attack.  *Id.*  Shari learned about the attack on Eli two years later and never saw the immediate effects of his wounds.  The Court recognizes her pain at seeing those effects now.  But her injuries, suffered years after the shooting, do not entitle her to solatium damages.

*The Rest of Eli's Family*.  Eli's mother Devora seeks solatium damages.  When she heard about the attack, Devora "quickly broke down, weeping and wailing."  Declaration of Devora Borochov ¶ 16, ECF No. 31.  That day "felt like it lasted forever" as she waited for news on Eli's condition.  *Id.* ¶ 26.  And when she told the other children about the attack, Devora had to comfort them in their shock.  *See id.* ¶¶ 31–33.  Devora fought back tears when she first saw Eli in his wheelchair, *see id.* ¶ 38, and during the early stages of his recovery she would often "go into the bathroom, look in the mirror, and just start crying," *id.* ¶ 46.  Devora also worried that the wounds would damage Eli's fertility.  *See id.* ¶ 44.  "Due to these worries, even after he returned, she struggled to sleep for days and weeks."  Strous Expert Report on Devora Borochov at 3, ECF No. 50-3.  As a result of the shooting, Devora became more anxious and has become "much more protective of her children."  *Id.*  For her grief after the shooting of her son, the Court will award Devora the *Heiser* standard of $2.5 million in solatium damages.

---

[16]  The D.C. Circuit relied on similar logic to exclude victims' nieces and nephews from solatium damages.  *See Bettis*, 315 F.3d at 337.

35

Eli's brother Avraham seeks solatium damages. He was in middle school when Eli was shot. *See* Declaration of Avraham Borochov ¶ 5, ECF No. 33. Avraham was "terrified and in shock" when he learned of the shooting, *id.* ¶ 10, and "cried for hours" into his pillow that night, *id.* ¶ 11. "For weeks after the attack, [Avraham] could not sleep or think normally." *Id.* ¶ 18. He found it hard to concentrate in school knowing that Eli was at home in pain. *See id.* ¶ 15. Avraham also grew fearful—he "no longer feel[s] safe the way that [he used] to." *Id.* ¶ 22. He has become a "worrier" and shows a fear of public places. Strous Expert Report on Avraham Borochov at 2–3, ECF No. 50-2. Because of this emotional suffering after his sibling's injuries, the Court will award Avraham $1.25 million in solatium damages.

Eli's sister, Shira, also requests solatium damages. When Shira heard about his shooting, she immediately began to cry. Declaration of Shira Borochov ¶ 7, ECF No. 37. Shira told Dr. Storus that she felt "agony" at seeing Eli in a wheelchair and in so much pain. Strous Expert Report on Shira Borochov at 2, ECF No. 50-8. At school, Shira's classmates pestered her with questions about her brother. "She felt overwhelmed" and left school for some time. *Id.* at 2. Thoughts about Eli and his condition "preoccupied her," affecting "her focus and concentration for many months." *Id.* at 3. Shira also felt that, because of the attention at school on her brother's shooting, she could not "develop her own persona and identity." *Id.* at 2. For her emotional suffering from the injury to a sibling, the Court will award Shira $1.25 million in solatium damages.

*Yoav Golan.* Yoav seeks $5 million in pain and suffering. *See* Proposed Order at 82. Recall that the impact with the car dislocated Yoav's shoulder, fractured it, and created a crush injury on his leg. *See* Yoav Decl. ¶¶ 16, 20. Yoav was in "a lot of pain" and remembers his entire body shaking after impact. *Id.* ¶ 21. Because of his injuries, Yoav could not walk and was

36

confined to a wheelchair for a month. *See id.* ¶ 23. This temporary disability prevented Yoav and Rotem from returning to their own home, which is "only accessible by stairs"; instead, they lived with Rotem's family for multiple months. *Id.* ¶ 26. Yoav needed help performing basic functions and often could not sleep because of the pain. *See id.* ¶¶ 24, 25. He experiences leg pain even now. *See id.* ¶ 30.

The attack also took a mental toll. Yoav "never feel[s] secure," especially when walking near the scene of the attack. *Id.* ¶ 41. He has troubling flashbacks of the crash and immediately tenses up when he sees a car drive too close to a sidewalk. *See id.* ¶¶ 45, 47. He and his wife no longer feel safe taking walks in the evening, and he refuses to drive his car at night. *See id.* ¶¶ 54, 57. Yoav's physical injuries resemble the "compound fractures, severe flesh wounds, and wounds and scars from shrapnel" that cause "severe psychological pain" in victims of terrorist attacks. *Valore*, 700 F. Supp. 2d at 84. The Court thus will award him the standard amount of $5 million in pain and suffering.

*Yoav's American Family.* Yoav's mother Yehudit and his brother Matan are American citizens. *See* Compl. ¶¶ 12, 13. They both seek solatium damages.

Yehudit received a call from Yoav shortly after the attack, but the call got disconnected. *See* Declaration of Yehudit Golan ¶¶ 6-7. She tried to reconnect with him for 30 minutes, but it "felt like many hours" because of her worry for her son. *Id.* ¶ 8. She was unable to sleep that night, both out of concern for Yoav but also because she took care of Yoav's baby, who would not eat. *See id.* ¶ 15. Over the next months, Yehudit took time off work to accompany Yoav to various appointments and to help him around the house. *See id.* ¶ 17. She also "frequently woke up at night with horrible nightmares," *id.* ¶ 23, and could not concentrate on her work, *see id.* ¶ 24. She reports being fearful and anxious "by the thought [Yoav and Rotem] could have died."

37

*Id.* ¶ 28. That thought "is in [her] mind all the time." *Id.* For her emotional suffering after the injury to her child, the Court will award her $2.5 million in solatium damages. *Accord Blank v. Islamic Repub. of Iran*, No. 19-cv-3645 (BAH), 2021 WL 3021450 at *12 (D.D.C. July 17, 2021).

Once Matan heard about the attack and injuries to Yoav, he traveled to Jerusalem and spent the night in the hospital with Yoav and Rotem. *See* Declaration of Matan Golan ¶¶ 10, 13, ECF No. 43. The "vision of [their] suffering" continues "to follow [Matan] until this day and appear[s] in [his] mind unbidden and for no apparent reason." *Id.* ¶ 13. Matan found it "very difficult" to see his brother traumatized and in a wheelchair. *Id.* ¶ 16. He also felt a personal impact from the attack. Now he is "suspicious of each passing car" and "examine[s] every person who walks behind" him. *Id.* ¶ 17. Matan had trouble sleeping "[f]or a long time after the attack." *Id.* ¶ 18. And as Matan told Dr. Strous, "[h]e is still bothered to see the extent to which his brother is still affected from his physical and emotional injuries." Strous Expert Report on Matan Golan at 3, ECF No. 51-3. For Matan's emotional pain and suffering consistent with seeing his brother's injuries, the Court will award him $1.25 million. *See Blank*, 2021 WL 3021450, at *13.

### 2. Israeli Plaintiffs

In their Proposed Order, Israeli Plaintiffs follow the U.S. Plaintiffs and request damages in line with *Heiser*. *See* Proposed Order at 114. This presents a conundrum—the *Heiser* figures apply to damages awards under the *federal* cause of action. Because Israeli Plaintiffs prevail under Israeli law, that law determines their damages. *See Thuneibat*, 167 F. Supp. 3d at 47 ("Normally, damages would be calculated pursuant to the law under which liability was found . . . ."); *Est. of Botvin*, 873 F. Supp. 2d at 243 (same). Indeed, they argued that Israeli—

38

not local—law applies.  Because Israeli Plaintiffs seemed to disregard Israeli damages law in their motion, the Court later asked them to specify "[w]hether and in what amounts Israeli law awards damages" for Rotem's physical injuries and the emotional injuries of the Israeli family members.  Order at 2.

Israeli Plaintiffs answered the first part of that question.  Israeli law does award damages for the suffered injuries.  *See* Show Cause Response at 18–20.  But beyond saying that Israeli damages "are typically lower than awards in the United States," Israeli Plaintiffs give no amounts.  *Id.* at 20.  Instead, they again urge the Court to award the same amounts as provided in the *Heiser* framework.[17]  *See id.* at 21.  This suggestion ignores the Court's instruction that Plaintiffs provide more information on *amounts* under *Israeli* law.

To be sure, some judges in this district have, when faced with imperfect information on foreign damages law, defaulted to the *Heiser* framework when doing so is "in the interests of justice."  *Thuneibat*, 167 F. Supp. 3d at 47.  Those precedents persuade the Court that the *Heiser* framework is appropriate for Rotem's pain and suffering, given that the Court is already applying American law to her situation.  Recall that impact with Hasouna's car threw her into a glass wall at the bus stop.  *See* Rotem Decl. ¶ 5.  Once the bystander had shot Hasouna, Rotem felt pain in her back and noticed a wound on her knee.  *See id.* ¶ 13.  Her knees felt like they "were burning."  *Id.*  At the hospital, Rotem received eight stitches in one knee and learned that she had sprained a ligament in her other knee.  *See id.* ¶ 20.  She was in shock and remembers vomiting while there.  *See id.* ¶ 22.  Once at her parents' house, Rotem needed assistance because of her pain to lift her baby from his crib and to nurse him while sitting down.  *See id.*

---

[17]  Indeed, Israeli Plaintiffs' requested figures, even in their Show Cause Response, are equal to awards in the United States, not lower as they suggest earlier in the Response.

¶ 27.  Rotem's pain also prevented her from driving for at least a month and she missed over two months of her internship as a drama teacher.  *See id.* ¶ 28.  Rotem did not return to her pre-attack physical shape until "at least ten months" later.  *See id.* ¶ 60.

Like the other victims, Rotem suffered emotionally after the attack.  She thought "constantly and obsessively" about it, *id.* ¶ 30, wondering what might have occurred if her baby had been there, *see id.* ¶ 35.  Rotem's feelings grew so intense that she attended "psychotherapy" sessions, *id.* ¶ 43, and she struggled to care for her child after the attack, *see id.* ¶ 47.  She suffers from nightmares in which she and her family are involved in a terrorist attack.  *See id.* ¶ 49.  She is afraid of the dark, *see id.* ¶ 51, and feels unsafe in her own home, *see id.* ¶ 52.  She "no longer feel[s] confident or safe" and does not know if she can overcome her post-attack anxiety.  *Id.* ¶ 63.

To compensate Rotem's injuries, the Court will consult the *Heiser* amounts.  Her physical injuries and severe emotional trauma both suggest that applying the *Heiser* standards serves the "interests of justice."  *Thuneibat*, 167 F. Supp. 3d at 47.

Rotem seeks $5 million in pain and suffering.  Courts typically award that amount, however, to victims who suffer *substantial* physical injuries from a terrorist attack.  *See Schertzman Cohen v. Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868 at *6 (D.D.C. July 11, 2019).  Victims suffering minor injuries "such as lacerations and contusions caused by shrapnel, accompanied by severe emotional damages" receive less.  *Id.* (cleaned up).  Rotem's physical injuries largely match that description; she had cuts on her knees and sprained a ligament.  For similar injuries, many courts award $2 million.  *See, e.g.*, *Bova*, 2020 WL 2838582, at *5 (awarding $2 million to victim of explosion for cuts on his head and forearms and for the formation of a mass on his leg).  The Court recognizes, however, Rotem's heightened emotional

40

trauma after the attack, including her worries about the safety of her child.  Dr. Strous says that

she suffers from "moderate to severe" post-traumatic stress disorder that will "affect her for a

long period of time."  Strous Expert Report on Rotem Golan at 8–9, ECF No. 51-8.  Based on

that diagnosis, the Court finds that Rotem was "minimally injured" in the attack but

"experienced some enduring physical and emotional pain."  *Bathiard*, 2020 WL 1975672, at *5.

The Court will award her $3 million in pain and suffering.

For the other Israeli Plaintiffs, however, the Court cannot award damages.  When faced

with a defaulting defendant, a plaintiff must prove the requested amount of damages "by a

reasonable estimate," *Abedini*, 422 F. Supp. 3d at 136, or to a "reasonable certainty," *Sanchez v.*

*Devashish Hop., LLC*, 322 F.R.D. 32, 37 (D.D.C. 2017).   And recall that when a sovereign

defaults, FSIA requires plaintiffs to establish their "right to relief by evidence satisfactory to the

court."  28 U.S.C. § 1608(e).  Under any of these formulations, the burden lies with Israeli

Plaintiffs to prove the amount of damages.

They have not met that burden—they provide no estimate for damages allowable under

the substantive law that they admit governs their claims.  *See* Proposed Order at 68–71.  The

Court gave Israeli Plaintiffs an opportunity to remedy that gap in their original filings and

reminded Israeli Plaintiffs that the Court can "insist on a complete presentation by counsel" on

the substance of foreign law.  *See* Order at 2 (quoting Fed. R. Civ. P. 44.1, advisory comm's note

to 1966 amendment).

The Show Cause Response makes clear that Israeli Plaintiffs understood that Order.

Indeed, their response clarified how far Israeli law "awards punitive damages" for their injuries.

*Id.*  But for compensatory damages, they simply reiterated their request for *Heiser* figures.  "This

Court is [ ] disinclined to conduct a detailed independent study of Israeli damages law" when the

41

Israeli Plaintiffs have not, even after prodding from the Court. *Est. of Botvin*, 873 F. Supp. 2d at 245.

No authority requires a different conclusion. Plaintiffs cite *Leibovitch v. Syrian Arab Republic*, 25 F. Supp. 3d 1071, 1087–88 (N.D. Ill. 2014), where the court awarded to Israeli plaintiffs amounts slightly below the *Heiser* figures. The court based this departure on the proposition—also stated by Israeli Plaintiffs here—that Israel awards fewer damages than the United States. *See id.* at 1087; Show Cause Response at 20. That proposition, however, originates from another out-of-district decision which dealt with a non-FSIA case and which noted simply that the defendant there had not contested the proposition about Israeli law. *See Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 423 (E.D.N.Y. 2009). The decision did not describe or explore in detail this facet of Israeli law. In short, Plaintiffs' arguments are based on non-precedential, largely untested and unsupported claims about Israeli law. This Court will not award millions of dollars in damages against a foreign sovereign based on such dubious out-of-circuit authority. *Accord Est. of Botvin*, 873 F. Supp. 2d at 245.

Israeli Plaintiffs also cite the D.C. Circuit's opinion in *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348 (D.C. Cir. 2018). There, the court overturned a damages award to an Israel plaintiff because the lower court had improperly limited his award based on assumption-of-risk principles. *See id.* at 361. In doing so, the Circuit noted that although Israeli law governed that plaintiff's damages calculation, "we default to the application of federal law when there is a lack of information regarding the proper calculation of damages under foreign law, as there is here." *Id.* at 358 (citing *Thuneibat*, 167 F. Supp. 3d at 47). Israeli Plaintiffs say that this line from the Circuit requires this Court to apply the *Heiser* framework.

42

The Court disagrees. *Fraenkel* teaches that, when facing a dearth of information about a substantive legal question like assumption of risk, lower courts should default to federal law. But that default does not apply to damages amounts in general or to the *Heiser* framework in particular. *Fraenkel* says so. After analyzing assumption of risk through the lens of federal law, the Circuit affirmatively denied that lower courts must adhere to the *Heiser* framework. *See id.* at 361 ("[T]he District Court in this case was not *required* to follow *Heiser* for the simple reason that *Heiser* is not controlling precedent."). And the FSIA requires that plaintiffs establish their right to relief "by evidence satisfactory to the court." *Id.* (quoting 28 U.S.C. § 1608(e)). Thus, district courts "invariably must exercise discretion in determining damages awards under the FSIA." *Id.*

So *Fraenkel* does not require the Court to default to the *Heiser* framework or any other damages amount. And Israeli Plaintiffs cannot rely on one sentence in that opinion to avoid their burden on default judgment. The *Fraenkel* court specifically reiterated that plaintiffs under the FSIA must establish their "right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Simply put, the Court in its discretion—also recognized in *Fraenkel*—asked Israeli Plaintiffs to provide satisfactory evidence to justify the damages they seek. They failed to do so. The Court will not independently remedy that failure and will therefore deny the Israeli Plaintiffs' request for compensatory damages.

\*     \*     \*

The Court pauses to note that, in distinguishing between Plaintiffs, it does not minimize or denigrate the pain and suffering each Plaintiff has endured. No one should experience the trauma that Plaintiffs undoubtedly experienced. The Court's awards are driven by a recognition that most—if not all—people eligible for damages from a terrorist attack have suffered the

43

unimaginable. *Accord Selig*, 2021 WL 5446870, at \*23.  Nor, for that matter, does the Court

doubt the suffering felt by those Plaintiffs not awarded damages here.  In the end, a court's

rulings must be grounded in the law, not sympathy or instinct.

### E.  Punitive Damages and Costs

Plaintiffs also seek punitive damages, which apply not to compensate victims but to

"punish outrageous behavior and deter such outrageous conduct in the future." *Kim v. Dem.*

*People's Repub. of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015) (cleaned up).  Four factors are

relevant in deciding the appropriate level of punitive damages:  "(1) the character of the

defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or

intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Est. of*

*Steinberg v. Islamic Repub. of Iran*, No. 17-cv-1910 (RCL) 2019 WL 6117722 at \*9 (D.D.C.

Nov. 18, 2019) (cleaned up).

These factors support an award of punitive damages here.  The States' acts were heinous.

Their acts were intended to—and did—cause unconscionable pain and suffering.  Deterrence is

necessary because, time and again, courts in this district have been confronted with families

shattered by Iran- and Syria-backed terrorists.  *See, e.g.*, *Wultz v. Islamic Repub. of Iran*, 864 F.

Supp. 2d 24, 42 (D.D.C. 2012) (awarding punitive damages based on "the extreme

reprehensibility of Iran and Syria's acts).  Plaintiffs ask for $150 million in punitive damages

each for the Borochov family and the Golan family.  *See* Proposed Order at 96.

Plaintiffs' request has some basis in precedent.  Courts in this district have awarded $150

million in punitive damages to the family of an attack victim.  *See, e.g.*, *Est. of Steinberg*, 2019

WL 6117722, at \*10; *Est. of Hirshfeld*, 330 F. Supp. 3d at 150; *Gates v. Syrian Arab Repub.*, 508

F. Supp. 2d 53, 75 (D.D.C. 2008).  This flat-award approach promotes consistency and

44

predictability in punitive damages, features that the Supreme Court has endorsed.  *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 502 (2008).  But a flat-award method also "limits a judge's discretion to tailor a punitive award appropriate to the magnitude of the underlying injury." *Abedini*, 422 F. Supp. 3d at 142.

The details of the attacks here do not support such an indiscriminate award of punitive damages.  In other cases in which courts awarded $150 million per family, the attacks killed members of the families.  *See Est. of Hirshfeld*, 330 F. Supp. 3d at 150 (Hamas attack killed eight Israeli students); *Thuneibat*, 167 F. Supp. 3d at 54 (suicide bombers killed 60 people); *Est. of Steinberg*, 2019 WL 6117722, at *10 (Hamas attack killed six Israeli soldiers).  In contrast, nobody died in these attacks.  The Court thus declines to award $150 million per family.

Instead, the Court will award punitive damages equal to compensatory damages—$27.5 million.[18]  Several judges in this district have employed the same approach to punitive damages for FSIA cases.  *See, e.g.*, *Hekmati v. Islamic Repub. of Iran*, 278 F. Supp. 3d 145, 167 (D.D.C. 2017); *Flanagan v. Islamic Repub. of Iran*, 87 F. Supp. 3d 93, 124-25 (D.D.C. 2015); *Moradi*, 77 F. Supp. 3d at 73.  This Court has awarded punitive damages equal to compensatory ones to accommodate the unique characteristics of a terrorist attack.  *See Selig*, 2021 WL 5446870, at *24–*25 ("This case is not like those involving hundreds of decedents murdered in a bombing. The deaths here, while no less tragic, were fewer in number." (cleaned up)).

---

[18]  The Court awards no punitive damages to the Israeli Plaintiffs besides Rotem.  Their Show Cause Response says that Israeli law awards punitive damages to the victims of terrorist attacks at an amount three times the award of compensatory damages.  *See* Show Cause Response at 21. Because the Court awards most Israeli Plaintiffs no compensatory damages, it has no figure to multiply by three and thus cannot award punitive damages.  As for Rotem, she received the benefit of federal standards for her compensatory damages.  Like other Plaintiffs subject to those standards, the Court will award her punitive damages in the same amount as her compensatory damages.

This approach accounts for the character of the States' acts, which though heinous did not lead to any victim's death. And a large award of $300 million "is not likely to have a meaningful deterrent effect" when both Syria and Iran face billions in punitive damages awards. *See Christie*, 2020 WL 3606273, at *29. The Court therefore sees no need for such a large award, especially when setting punitive damages equal to compensatory ones can more accurately account for Plaintiffs' suffering.

Thus, the Court awards punitive damages of $27.5 million, to be apportioned among Plaintiffs according to their compensatory damages, for the reasons more fully discussed in *Selig*, 2021 WL 5446870, at *23–*25 (apportioning punitive damages in this way).

*Prejudgment Interest*. Plaintiffs seek prejudgment interest. *See* Compl. ¶ 136(e). "[W]hether pre-judgment interest is to be awarded is subject to the discretion of the court and equitable considerations." *Motion Picture Ass'n of Am., Inc. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992). "[T]he overarching tide of persuasive precedent . . . plainly weighs against awarding prejudgment interest." *Akins v. Islamic Repub. of Iran*, No. CV 17-675 (BAH), 2021 WL 3021445, at *11 (D.D.C. July 16, 2021). This is because "[w]hen an award without pre-judgment interest fully compensates a plaintiff, an award of pre-judgment interest no longer has the intended compensatory purpose and should be denied." *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 135 (D.D.C. 2005). The Court has carefully considered the pain and suffering of the decedents and each Plaintiff, and its awards are intended to be fully compensatory. Prejudgment interest is therefore improper.

*Costs, Expenses, and Attorneys' Fees*. The last category of damages sought by Plaintiffs is their "costs and expenses" and their "attorneys' fees." Compl. ¶ 136(c) and (d). But Plaintiffs cite no basis for the award of these fees. *See Kinyua v. Repub. of Sudan*, 466 F. Supp. 3d 1, 13

46

(D.D.C. 2020) ("[T]he Court is not aware of any statutory or other basis for the award of attorney's fees[.]").  More, "plaintiffs have not provided any information regarding the fees and costs sought." *Aceto v. Islamic Repub. of Iran*, No. CV 19-464 (BAH), 2020 WL 619925, at *23 (D.D.C. Feb. 7, 2020) (denying plaintiffs' request for "reasonable costs and expenses" because "plaintiffs have not provided any information regarding the fees and costs sought") (cleaned up). The Court therefore declines to award any fees or expenses.

## V.  CONCLUSION

For these reasons, Plaintiffs' Motion for Default Judgment will be granted in part and denied in part.  A separate Order will issue.

2022.03.04
09:41:44 -05'00'

Dated: March 4, 2022                    TREVOR N. McFADDEN, U.S.D.J.

47

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ELI M. BOROCHOV,** *et al.*,

                Plaintiffs,

                v.

**ISLAMIC REPUBLIC OF IRAN,** *et al.*,

                Defendants.

Case No. 1:19-cv-02855 (TNM)

---

### ORDER

Upon consideration of the Plaintiffs' Motion for Default Judgment, the pleadings, and relevant law, for the reasons set forth in the accompanying Memorandum Opinion it is hereby

**ORDERED** that Plaintiffs' [55] Motion for Default Judgment is GRANTED IN PART and DENIED IN PART.  The motion is granted insofar as individual Plaintiffs are awarded the following damages:

- Eli Borochov is awarded $5,000,000 in pain and suffering damages and $5,000,000 in punitive damages for a total of $10,000,000;

- Ronen Borochov is awarded $1,000,000 in pain and suffering damages, $2,500,000 in solatium damages, and $3,500,000 in punitive damages for a total of $7,000,000;

- Josef Borochov is awarded $1,000,000 in pain and suffering damages, $1,250,000 in solatium damages, and $2,250,000 in punitive damages for a total of $4,500,000;

- Devora Borochov is awarded $2,500,000 in solatium damages and $2,500,000 in punitive damages for a total of $5,000,000;

- Avraham Borochov is awarded $1,250,000 in solatium damages and $1,250,000 in punitive damages for a total of $2,500,000;

- Shira Borochov is awarded $1,250,000 in solatium damages and $1,250,000 in punitive damages for a total of $2,500,000;

- Yoav Golan is awarded $5,000,000 in pain and suffering damages and $5,000,000 in punitive damages for a total of $10,000,000;

- Yehudit Golan is awarded $2,500,000 in solatium damages and $2,500,000 in punitive damages for a total of $5,000,000;

- Matan Golan is awarded $1,250,000 in solatium damages and $1,250,000 in punitive damages for a total of $2,500,000;

- Rotem Golan is awarded $3,000,000 in pain and suffering damages and $3,000,000 in punitive damages for a total of $6,000,000;

The motion is denied insofar as Plaintiffs seek damages for Shari Borochov, Raphael Golan, Nadav Golan, Yael Inbar, Shai Fishfeder, Efrat Fishfeder, Ohad Fishfeder, Omer Fishfeder, and Shiri Fishfeder.

The motion is also granted in part insofar as Plaintiffs seek punitive damages but denied in part insofar as Plaintiffs seek $300,000,000 in punitive damages.  The Court awards an amount in punitive damages equal to compensatory damages, $27,500,000, to be apportioned, as described above, according to Plaintiffs' compensatory damages.

The motion is denied insofar as Plaintiffs seek prejudgment interest, an inflationary adjustment to their damages, costs, disbursements, reimbursement of expenses, and allowance of reasonable fees for their counsel and experts.

**SO ORDERED**.

2

This is a final, appealable Order.  The Clerk of Court is requested to close the case.

2022.03.04
09:38:55 -05'00'

Dated: March 4, 2022

TREVOR N. McFADDEN
United States District Judge

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ELI M. BOROCHOV, *et al.*,**

Plaintiffs,

v.

**ISLAMIC REPUBLIC OF IRAN, *et al.*,**

Defendants.

Case No. 1:19-cv-02855 (TNM)

---

**<u>MEMORANDUM ORDER</u>**

Plaintiffs in this action against the governments of Iran and Syria are U.S. and Israeli citizens.  They claimed that the two nations sponsored terrorist attacks in Israel that injured them and their loved ones.  Last month, the Court partially granted their Motion for Default Judgment.  *See* Order, ECF No. 59.  That decision included an award of solatium damages to most U.S. Plaintiffs.[1]  *See id.*  For the Israeli Plaintiffs, the Court relied on expert declarations about Israeli law and held Defendants liable under that law.  *See* Mem. Opn. at 25–29.[2]

But Plaintiffs failed to carry their burden for damages to most Israeli Plaintiffs.[3]  Despite the Court asking Plaintiffs to explain "in what amount Israeli law awards damages," they provided no amounts.  Show Cause Order at 2, ECF No. 56.  Plaintiffs instead urged the Court to award amounts under the *Heiser* framework, which many federal courts consult for solatium

---

[1]  The Court denied compensatory damages to Shari Borochov because she had not known Eli, the attack victim, when the attack occurred.  *See* Mem. Opn. at 34–35, ECF No. 58.

[2]  All page citations refer to the pagination generated by the Court's CM/ECF filing system.

[3]  The Court awarded damages to Israeli citizen Rotem Golan, an attack victim, because unlike the other Israeli Plaintiffs she suffered physical injuries from the attack.  *See id.* at 39–41.  Because Plaintiffs do not seek reconsideration of that ruling, this Order deals only with the other Israeli citizen-plaintiffs, all of whom received no damage awards.

damages.  *See* Show Cause Response at 20–21.  The Court refused because the *Heiser*

framework applies to damages under a federal cause of action unavailable to foreign plaintiffs.

*See* Mem. Opn. at 38.  And Plaintiffs failed to adequately respond to the Show Cause Order,

which explicitly asked about amounts awarded under Israeli law.  *See id.* at 41.

Plaintiffs now move under Federal Civil Rule 52(b) to amend the Court's findings and

under Rule 59(e) to alter or amend the judgment.  *See* Mot. to Amend, ECF No. 60 (Mot.).  They

ask the Court to reconsider its denial of damages to Israeli Plaintiffs.[4]  According to Plaintiffs,

they met their burden when they provided the substance of Israeli law.  The Court then should

have made its own damages awards based on the evidence presented.  *See* Mot. at 3 ("Damages

awards are factual findings, not law.").

Under that logic, the Court needs no Israeli awards.  As factual findings, those awards

"are at most guideposts" and not binding.  *Id.*  More, Plaintiffs submit that no analogous Israeli

awards even exist because Israeli law does not allow suits against governments not in diplomatic

relationships with Israel.  *See id.* at 6.  All these arguments lead to the same request as before:

Plaintiffs want the Court to apply the *Heiser* standard and award damages to Israeli Plaintiffs,

ostensibly "for the sake of consistency and respect for the equality of humankind."  *Id.* at 8.

\*   \*   \*

"[R]econsideration and amendment of a previous order is an unusual measure."  *Bigwood*

*v. DIA*, 770 F. Supp. 2d 315, 317 (D.D.C. 2011).  For their motion under Rule 52(b), Plaintiffs

"bear[ ] a heavy burden" to show "clear error" or "manifest injustice" requiring an amendment of

the judgment.  *Ashraf-Hassan v. Emb. of France*, 185 F. Supp. 3d 94, 108 (D.D.C. 2016)

---

[4]  Plaintiffs also ask the Court to reconsider its denial of damages to Shari.  *See* Mot. at 2.  But
the motion never argues why the Court was wrong not to award her damages.  Because Plaintiffs
point to no error in that ruling, the Court summarily denies reconsideration of it.

(cleaned up). Rule 52(b) also does not provide "a second opportunity to litigate a point, to present evidence that was available but not previously offered, or to advance new theories." *Salazar v. Dist. of Columbia*, 685 F. Supp. 2d 72, 75 (D.D.C. 2010) (cleaned up).

Similar standards apply to granting motions under Rule 59(e). The Court must find "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004) (cleaned up). And a party "may not use a Rule 59 motion to raise new issues that could have been raised previously." *Kattan v. Dist. of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993).

Those standards doom Plaintiffs' motion. At no point before now did Plaintiffs suggest that Israeli courts have never issued damages awards. The Court will not allow them to do so now. *See Bigwood*, 770 F. Supp. 2d at 317–18 (noting that motions to reconsider are not "a vehicle for presenting theories or arguments that could have been advanced earlier"). Plaintiffs could have raised this fact before. Indeed, the Court's Show Cause Order specifically sought this type of information. Yet Plaintiffs asked for federal law amounts and cited only American courts. *See* Show Cause Response at 20–21. They never hinted at the absence of similar awards by Israeli courts.[5]

More, Plaintiffs nowhere address their failure to carry their burden on default judgment. Plaintiffs must establish a "right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The Court asked for that satisfactory evidence about Israeli law. Plaintiffs provided

---

[5] Plaintiffs now say that they explained the substance of Israeli law with the "intention" and "expectation" that the Court would "as a fact finder render a factual finding" for damages. Mot. at 6. The Court clearly asked, however, for amounts under Israeli law. Plaintiffs never submitted a proper response. Their good intentions or expectations for that response do not control its adequacy.

3

none, never mentioning Israeli courts.  They may not "take a second bite at the proverbial apple"

now to remedy that mistake.  *Ali v. Carnegie Inst. of Wash.*, 309 F.R.D. 77, 85 (D.D.C. 2015).

Plaintiffs' motion also seeks relief that the Court has already denied.  Plaintiffs again ask

the Court to "apply the *Heiser* framework to this case."  Mot. at 8.  The Court already denied the

applicability of *Heiser* to Israeli Plaintiffs.  *See* Mem. Opn. at 38.  The current motion does not

permit Plaintiffs "a second opportunity to litigate" that point.  *Salazar*, 685 F. Supp. 2d at 75.

Finally, Plaintiffs label the denial of damages to Israeli Plaintiffs "based only on

citizenship status" as "unseemly and unjust."  Mot. at 8.  This appears to argue that the Court's

Order perpetuates "manifest injustice."  *Ciralsky*, 355 F.3d at 671.  The Court disagrees.  For

starters, Israeli courts would be the natural forum for Israeli citizens and residents seeking relief

from injuries perpetrated by non-U.S. defendants in Israel.  There is nothing unseemly or unjust

in a result that denies Plaintiffs a chance to take advantage of a narrow exception to this general

rule.

More, the Israeli Plaintiffs are hardly the first not to receive solatium damages from a

terrorist attack that injured a loved one.  Of course, the Court does not "doubt the suffering felt

by those Plaintiffs not awarded damages here" nor attempts to minimize that pain.  Mem. Opn. at

43–44.  But court rulings "must be grounded in the law, not sympathy or instinct."  *Id.*  And the

law in this circuit is clear that "damages [are] calculated pursuant to the law under which liability

was found."  *Thuneibat v. Syrian Arab Repub.*, 167 F. Supp. 3d 22, 47 (D.D.C. 2016).  This

Court takes that precedent seriously and applies it here in good faith.  Plaintiffs failed to carry

their burden under the applicable law, despite direction on how they could have done so.  The

blame for any resulting injustice does not lie with this Court.

4

For these reasons, it is **ORDERED** that Plaintiffs' [60] Motion to Alter Judgment is

DENIED.

    **SO ORDERED**.

2022.04.13
10:37:20
-04'00'

Dated: April 13, 2022              TREVOR N. McFADDEN, U.S.D.J.

5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ELI M. BOROCHOV, *et al.*,

Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN, *et al.*,

Defendants.

Case No. 1:19-cv-02855 (TNM)

---

## <u>MEMORANDUM ORDER</u>

Plaintiffs in this action against the governments of Iran and Syria are U.S. and Israeli citizens.  They claimed that the two nations sponsored terrorist attacks in Israel that injured them and their loved ones.  Last month, the Court partially granted their Motion for Default Judgment.  *See* Order, ECF No. 59.  That decision included an award of solatium damages to most U.S. Plaintiffs.[1]  *See id.*  For the Israeli Plaintiffs, the Court relied on expert declarations about Israeli law and held Defendants liable under that law.  *See* Mem. Opn. at 25–29.[2]

But Plaintiffs failed to carry their burden for damages to most Israeli Plaintiffs.[3]  Despite the Court asking Plaintiffs to explain "in what amount Israeli law awards damages," they provided no amounts.  Show Cause Order at 2, ECF No. 56.  Plaintiffs instead urged the Court to award amounts under the *Heiser* framework, which many federal courts consult for solatium

---

[1]  The Court denied compensatory damages to Shari Borochov because she had not known Eli, the attack victim, when the attack occurred.  *See* Mem. Opn. at 34–35, ECF No. 58.

[2]  All page citations refer to the pagination generated by the Court's CM/ECF filing system.

[3]  The Court awarded damages to Israeli citizen Rotem Golan, an attack victim, because unlike the other Israeli Plaintiffs she suffered physical injuries from the attack.  *See id.* at 39–41.  Because Plaintiffs do not seek reconsideration of that ruling, this Order deals only with the other Israeli citizen-plaintiffs, all of whom received no damage awards.

damages.  *See* Show Cause Response at 20–21.  The Court refused because the *Heiser*

framework applies to damages under a federal cause of action unavailable to foreign plaintiffs.

*See* Mem. Opn. at 38.  And Plaintiffs failed to adequately respond to the Show Cause Order,

which explicitly asked about amounts awarded under Israeli law.  *See id.* at 41.

      Plaintiffs now move under Federal Civil Rule 52(b) to amend the Court's findings and

under Rule 59(e) to alter or amend the judgment.  *See* Mot. to Amend, ECF No. 60 (Mot.).  They

ask the Court to reconsider its denial of damages to Israeli Plaintiffs.[4]  According to Plaintiffs,

they met their burden when they provided the substance of Israeli law.  The Court then should

have made its own damages awards based on the evidence presented.  *See* Mot. at 3 ("Damages

awards are factual findings, not law.").

      Under that logic, the Court needs no Israeli awards.  As factual findings, those awards

"are at most guideposts" and not binding.  *Id.*  More, Plaintiffs submit that no analogous Israeli

awards even exist because Israeli law does not allow suits against governments not in diplomatic

relationships with Israel.  *See id.* at 6.  All these arguments lead to the same request as before:

Plaintiffs want the Court to apply the *Heiser* standard and award damages to Israeli Plaintiffs,

ostensibly "for the sake of consistency and respect for the equality of humankind."  *Id.* at 8.

*  *  *

      "[R]econsideration and amendment of a previous order is an unusual measure."  *Bigwood*

*v. DIA*, 770 F. Supp. 2d 315, 317 (D.D.C. 2011).  For their motion under Rule 52(b), Plaintiffs

"bear[ ] a heavy burden" to show "clear error" or "manifest injustice" requiring an amendment of

the judgment.  *Ashraf-Hassan v. Emb. of France*, 185 F. Supp. 3d 94, 108 (D.D.C. 2016)

---

[4]  Plaintiffs also ask the Court to reconsider its denial of damages to Shari.  *See* Mot. at 2.  But
the motion never argues why the Court was wrong not to award her damages.  Because Plaintiffs
point to no error in that ruling, the Court summarily denies reconsideration of it.

(cleaned up). Rule 52(b) also does not provide "a second opportunity to litigate a point, to present evidence that was available but not previously offered, or to advance new theories." *Salazar v. Dist. of Columbia*, 685 F. Supp. 2d 72, 75 (D.D.C. 2010) (cleaned up).

Similar standards apply to granting motions under Rule 59(e). The Court must find "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004) (cleaned up). And a party "may not use a Rule 59 motion to raise new issues that could have been raised previously." *Kattan v. Dist. of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993).

Those standards doom Plaintiffs' motion. At no point before now did Plaintiffs suggest that Israeli courts have never issued damages awards. The Court will not allow them to do so now. *See Bigwood*, 770 F. Supp. 2d at 317–18 (noting that motions to reconsider are not "a vehicle for presenting theories or arguments that could have been advanced earlier"). Plaintiffs could have raised this fact before. Indeed, the Court's Show Cause Order specifically sought this type of information. Yet Plaintiffs asked for federal law amounts and cited only American courts. *See* Show Cause Response at 20–21. They never hinted at the absence of similar awards by Israeli courts.[5]

More, Plaintiffs nowhere address their failure to carry their burden on default judgment. Plaintiffs must establish a "right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The Court asked for that satisfactory evidence about Israeli law. Plaintiffs provided

---

[5] Plaintiffs now say that they explained the substance of Israeli law with the "intention" and "expectation" that the Court would "as a fact finder render a factual finding" for damages. Mot. at 6. The Court clearly asked, however, for amounts under Israeli law. Plaintiffs never submitted a proper response. Their good intentions or expectations for that response do not control its adequacy.

3

none, never mentioning Israeli courts.  They may not "take a second bite at the proverbial apple" now to remedy that mistake.  *Ali v. Carnegie Inst. of Wash.*, 309 F.R.D. 77, 85 (D.D.C. 2015).

Plaintiffs' motion also seeks relief that the Court has already denied.  Plaintiffs again ask the Court to "apply the *Heiser* framework to this case."  Mot. at 8.  The Court already denied the applicability of *Heiser* to Israeli Plaintiffs.  *See* Mem. Opn. at 38.  The current motion does not permit Plaintiffs "a second opportunity to litigate" that point.  *Salazar*, 685 F. Supp. 2d at 75.

Finally, Plaintiffs label the denial of damages to Israeli Plaintiffs "based only on citizenship status" as "unseemly and unjust."  Mot. at 8.  This appears to argue that the Court's Order perpetuates "manifest injustice."  *Ciralsky*, 355 F.3d at 671.  The Court disagrees.  For starters, Israeli courts would be the natural forum for Israeli citizens and residents seeking relief from injuries perpetrated by non-U.S. defendants in Israel.  There is nothing unseemly or unjust in a result that denies Plaintiffs a chance to take advantage of a narrow exception to this general rule.

More, the Israeli Plaintiffs are hardly the first not to receive solatium damages from a terrorist attack that injured a loved one.  Of course, the Court does not "doubt the suffering felt by those Plaintiffs not awarded damages here" nor attempts to minimize that pain.  Mem. Opn. at 43–44.  But court rulings "must be grounded in the law, not sympathy or instinct."  *Id.*  And the law in this circuit is clear that "damages [are] calculated pursuant to the law under which liability was found."  *Thuneibat v. Syrian Arab Repub.*, 167 F. Supp. 3d 22, 47 (D.D.C. 2016).  This Court takes that precedent seriously and applies it here in good faith.  Plaintiffs failed to carry their burden under the applicable law, despite direction on how they could have done so.  The blame for any resulting injustice does not lie with this Court.

4

For these reasons, it is **ORDERED** that Plaintiffs' [60] Motion to Alter Judgment is

DENIED.

    **SO ORDERED**.

2022.04.13
10:37:20
-04'00'

Dated: April 13, 2022                       TREVOR N. McFADDEN, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ELI M. BOROCHOV,** *et al.*,

        Plaintiffs,

        v.

**ISLAMIC REPUBLIC OF IRAN,** *et al.*,

        Defendants.

Case No. 1:19-cv-02855 (TNM)

---

**ORDER**

Upon consideration of the Plaintiffs' Motion for Default Judgment, the pleadings, and relevant law, for the reasons set forth in the accompanying Memorandum Opinion it is hereby

**ORDERED** that Plaintiffs' [55] Motion for Default Judgment is GRANTED IN PART and DENIED IN PART. The motion is granted insofar as individual Plaintiffs are awarded the following damages:

- Eli Borochov is awarded $5,000,000 in pain and suffering damages and $5,000,000 in punitive damages for a total of $10,000,000;

- Ronen Borochov is awarded $1,000,000 in pain and suffering damages, $2,500,000 in solatium damages, and $3,500,000 in punitive damages for a total of $7,000,000;

- Josef Borochov is awarded $1,000,000 in pain and suffering damages, $1,250,000 in solatium damages, and $2,250,000 in punitive damages for a total of $4,500,000;

- Devora Borochov is awarded $2,500,000 in solatium damages and $2,500,000 in punitive damages for a total of $5,000,000;

- Avraham Borochov is awarded $1,250,000 in solatium damages and $1,250,000 in punitive damages for a total of $2,500,000;

- Shira Borochov is awarded $1,250,000 in solatium damages and $1,250,000 in punitive damages for a total of $2,500,000;

- Yoav Golan is awarded $5,000,000 in pain and suffering damages and $5,000,000 in punitive damages for a total of $10,000,000;

- Yehudit Golan is awarded $2,500,000 in solatium damages and $2,500,000 in punitive damages for a total of $5,000,000;

- Matan Golan is awarded $1,250,000 in solatium damages and $1,250,000 in punitive damages for a total of $2,500,000;

- Rotem Golan is awarded $3,000,000 in pain and suffering damages and $3,000,000 in punitive damages for a total of $6,000,000;

The motion is denied insofar as Plaintiffs seek damages for Shari Borochov, Raphael Golan, Nadav Golan, Yael Inbar, Shai Fishfeder, Efrat Fishfeder, Ohad Fishfeder, Omer Fishfeder, and Shiri Fishfeder.

The motion is also granted in part insofar as Plaintiffs seek punitive damages but denied in part insofar as Plaintiffs seek $300,000,000 in punitive damages. The Court awards an amount in punitive damages equal to compensatory damages, $27,500,000, to be apportioned, as described above, according to Plaintiffs' compensatory damages.

The motion is denied insofar as Plaintiffs seek prejudgment interest, an inflationary adjustment to their damages, costs, disbursements, reimbursement of expenses, and allowance of reasonable fees for their counsel and experts.

**SO ORDERED**.

This is a final, appealable Order.  The Clerk of Court is requested to close the case.

2022.03.04
09:38:55 -05'00'

Dated: March 4, 2022                    TREVOR N. McFADDEN
                                        United States District Judge

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ELI M. BOROCHOV,** *et al.*,

        Plaintiffs,

        v.

**ISLAMIC REPUBLIC OF IRAN,** *et al.*,

        Defendants.

Case No. 1:19-cv-02855 (TNM)

---

## MEMORANDUM OPINION

This action for compensatory and punitive damages arises under the terrorism exception to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605A. It concerns two 2015 terrorist attacks in Israel perpetrated by Hamas. Nineteen Plaintiffs—some U.S. citizens, some Israeli—sue the States of Iran and Syria (together, the States) for injuries suffered by the victims of the attacks and the emotional injuries suffered by the victims' immediate families. Plaintiffs allege that the States provided material support and resources to Hamas.

The States did not respond or appear, and Plaintiffs now move for default judgment. The Court finds that Plaintiffs successfully established personal and subject matter jurisdiction under 28 U.S.C. § 1605A. They have also proved that the States are liable under federal and Israeli law. The U.S. Plaintiffs have supported their request for compensatory and punitive damages. The Israeli Plaintiffs have not. The Court thus will grant in part and deny in part the motion for default judgment.

### I. BACKGROUND

The terrorist attacks at issue occurred in Israel in 2015. *See* Amended Compl. (Compl.) ¶¶ 53, 67, ECF No. 6. Plaintiffs allege that Hamas, an Islamic organization committed to the

"destruction of the State of Israel," *id.* ¶ 30, perpetrated the attacks with "material support and resources" from the States, *id.* ¶ 2.

The Foreign Sovereign Immunities Act (FSIA) generally immunizes foreign sovereigns from suits in federal courts, but "that grant of immunity is subject to a number of exceptions." *Mohammadi v. Islamic Repub. of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015).  Once an exception applies, the foreign state loses its immunity.  *See Bell Helicopter Textron, Inc. v. Islamic Repub. of Iran*, 734 F.3d 1175, 1182–83 (D.C. Cir. 2013).   One such exception, known as the "terrorism exception," waives sovereign immunity for countries providing material support to terrorist organizations.  *See* 28 U.S.C. § 1605A.  Plaintiffs bring their case under this exception.  *See* Compl. ¶¶ 28–29.

Because Iran and Syria did not respond, Plaintiffs move for default judgment.  *See* Plaintiffs' Mot. for Default J. (Pls.' Mot.), ECF No. 55-1.  Entry of default judgment is "not automatic."  *Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  Before the Court can enter default judgment, Plaintiffs must establish subject matter jurisdiction and personal jurisdiction. *See Jerez v. Repub. of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void.").  Section 1605A provides a mechanism for Plaintiffs to show both types of jurisdiction over a non-responsive sovereign.

The Court's analysis thus focuses on whether Plaintiffs have properly pled all elements of a claim under § 1605A.  To do so, Plaintiffs must show that the States supported the terrorist groups responsible for the attacks at issue.  Plaintiffs have submitted expert declarations to make those showings.  *See* Expert Reports of Rael Strous, ECF Nos. 50, 51; Expert Declaration of Dr. Alan Friedman (Friedman Decl.), ECF No. 53; Expert Declaration of Arieh Spitzen (Spitzen Decl.), ECF No. 54.  Plaintiffs also rely on expert declarations from an earlier case in this

2

district.  *See* Declaration of Benedetta Berti (Berti Decl.), ECF No. 29, *Force v. Islamic Repub. of Iran*, No. 16-cv-1468 (D.D.C.); Declaration of Dr. Marius Deeb (Deeb Decl.), ECF No. 30, *Force v. Islamic Repub. of Iran*, No. 16-cv-1468 (D.D.C.); Declaration of Patrick Clawson (Clawson Decl.), ECF No. 32, *Force v. Islamic Repub. of Iran*, No. 16-cv-1468 (D.D.C.).[1]

The Court assesses this evidence and makes findings of fact before proceeding to findings of law.  *See Selig v. Islamic Repub. of Iran*, — F. Supp. 3d —, No. 19-cv-2889 (TNM), 2021 WL 5446870, at *1 (D.D.C. Nov. 22, 2021) (accepting expert declarations as sufficient to meet plaintiffs' evidentiary burden).

## II.  FINDINGS OF FACT

### A.  Hamas

Members of the Muslim Brotherhood founded Hamas in 1987–88.  *See* Berti Decl. ¶ 11.  Hamas intends to liberate Palestine through jihad and to "create an Islamic state" in Israel.  Deeb Decl. ¶ 11.  Hamas advocates "direct and indirect attacks" on Israeli civilians and military personnel to advance these goals.  Berti Decl. ¶ 11.  In the years since Hamas's founding, those attacks have come as kidnappings, rocket attacks, and other bombings.  *See generally id.* ¶¶ 15–16.

Hamas combines its military and terror activities with political and social efforts.  *See* Spietzen Decl. ¶ 25.  Hamas has even achieved political success, winning in 2006 a plurality of seats in the Palestinian parliament.  *See id.* ¶ 28.  One year later, Hamas seized power in the Gaza Strip, a Palestinian-majority area in the southwest of Israel.  *See id.*  Beyond that political

---

[1]  The Court can review evidence considered in a previous decision with no re-presentment of that evidence.  *See Lee v. Islamic Repub. of Iran*, 518 F. Supp. 3d 475, 480 (D.D.C. 2021).  The Court still must reach its "own[ ] independent findings of fact."  *Id.*  The Court here has independently reviewed these *Force* declarations.  The Court has also reviewed the qualifications of Plaintiffs' experts and is satisfied that each is qualified to offer the opinions discussed below.

3

influence, Hamas seeks to dominate Palestinian society through several social institutions and ostensibly charitable bodies.  *See id.* ¶ 29.  Dr. Spietzen testifies that these efforts allow Hamas to appear reliable to Palestinians, thereby encouraging more of them to support Hamas's activities, including ones focused on terrorism.  *See id.* ¶ 29–30.

### B.  Syrian Support for Hamas

Hamas's leadership resided in Syria from about 2000–2012.  *See* Deeb Decl. ¶ 22. Although that residency predates the attacks here, Plaintiffs' experts assert that Hamas would not have the capacity for such attacks without Syria's support.  *See* Berti Decl. ¶ 50 ("[W]ithout the support of a prominent Arab state like Syria to lend it legitimacy, [Hamas] would be more isolated and unable to grow, develop, expand, and solidify itself as a major player on the Palestinian political and military scene, as Hamas has done.").  The experts identify four ways in which Syria supported Hamas.

*First,* safe haven.  The organization moved its political headquarters to Damascus in 2000, *see id.* ¶ 25, and Syria's support gave Hamas a "public platform," *id.* ¶ 26.  Hamas's leaders, all designated as terrorists by the United States, could freely meet in Damascus.  *See id.* ¶ 34.  By hosting Hamas, Syria gave it "symbolic validation, political support, [and] legitimacy" through which Hamas could boost its credibility and stature.  *Id.* ¶ 37.

*Second*, an operational base.  Hamas used the friendly confines of Damascus to orchestrate military efforts on the ground in Israel.  Hamas carried out its most lethal suicide bombings through Syrian operatives, *see id.* ¶ 41, and Hamas's top military commander even moved to Damascus, *see id.* ¶ 42.  Dr. Berti confirms that Hamas's political leaders in Gaza needed approval from Damascus before they could ratify an Israeli offer for a prisoner exchange. *See id.* ¶ 43.  Instructions for various attacks in Israel also came directly from Damascus.  *See*

Deeb Decl. ¶ 15. The Syrian government did nothing to "forcefully or systematically" crack down on Hamas's military planning. Berti Decl. ¶ 44. Indeed, Syria once offered aid "as an incentive" for *more* suicide attacks in Israel. *Id.* ¶ 45.

*Third*, a political hub. Through Syria's generosity, Damascus became Hamas's "diplomatic and public relations base." *Id.* ¶ 47. Hamas used that base to organize political events and to influence Palestinian politics. *See id.* In Damascus, Hamas hosted strategic discussions with other Palestinian factions, and those discussions often allowed greater coordination between the groups' activities in Israel. *See id.* ¶ 48. This political visibility made Hamas more popular and influential. *See id.* ¶ 50.

*Fourth*, equipment, funding, and logistical support. Plaintiffs' experts provide less detail on this point but assert that Iran routed weapons shipments to Hamas through Syria. *See id.* ¶ 53. And the Jordanian government claimed that some Hamas weapons originated in Syria. *See id.* ¶ 54. Syria also provided training grounds where Hamas fighters learned "essential tactical skills" for future attacks. *Id.* ¶ 55; *see* Deeb Decl. ¶ 19. Plaintiffs' experts conclude that the "tactical know-how" learned during Syria's protection allowed Hamas to "transform itself into a leading terrorist group with solid infrastructure and the power" to disrupt the Israeli-Palestinian peace process. Deeb Decl. ¶ 23.

Based on the above unrebutted expert testimony, the Court finds that Syria provided material support in the form of operational freedom, political legitimacy, protection, and training to Hamas. Although that support apparently ended before the attacks at issue, the expert testimony confirms that without it, Hamas could not have undertaken these attacks. On identical evidence, Judge Moss reached the same conclusion. *See Force v. Islamic Repub. of Iran*, 464 F. Supp. 3d 323, 367–68 (D.D.C. 2020).

5

### C.  Iranian Support for Hamas

Plaintiffs rely on Dr. Patrick Clawson to make their case against Iran.  As he explains, the U.S. State Department has long known that Iran uses its intelligence services "to facilitate and conduct terrorist attacks."  Clawson Decl. ¶ 25.  Supporting terrorist groups "is an official policy of the Iranian government."  *Id.* ¶ 26.  Those groups include "anti-Israel terrorism of all sorts," and Iran has supported Hamas for the past 30 years.  *Id.* ¶¶ 28, 30.

Dr. Clawson discusses three specific ways Iran supports Hamas.  *First*, financially.  Starting in the 1990s, Iran paid Hamas "millions of dollars," allowing Hamas to establish front businesses.  *Id.* ¶ 38.  After Hamas won a plurality in the Palestinian parliament, Iran pledged $250 million to the group.  *See id.* ¶ 42.  Hamas publicly acknowledged this financial support when its political chairman in 2012 thanked Iran for "arms and funding."  *Id.* ¶ 56.  And even during low periods in the Iran-Hamas relationship, Iran gave suitcases of money directly to Hamas operatives in Gaza.  *See id.* ¶ 60.

*Second*, through weapons.  In 2008, Secretary of State Condoleeza Rice said that "Hamas is being armed and it's very clear that they are being armed, in part, by the Iranians."  *Id.* ¶ 45.  Earlier that year, Israeli investigators learned that a mortar shell fired by Hamas had been manufactured in Iran and that Iran had provided input into the design of other Hamas rockets.  *See id.* ¶ 47.  And according to Dr. Clawson, Iran smuggles weapons to Hamas through tunnels on the Egypt-Gaza border and sometimes via the Mediterranean Sea.  *See id.* ¶¶ 50–52.  Israel has intercepted some of those shipments.  *See id.* ¶ 53.  As with Iran's financial donations, Hamas has publicly acknowledged Iran's weapons support.  A representative for Hamas's military thanked Iran in 2014 for "providing it with rockets and anti-tank missiles."  *Id.* ¶ 59.

*Third*, by training Hamas soldiers over many years.  As early as 1996, Hamas operatives received training in Iran before they bombed a bus in Jerusalem.  *See id.* ¶ 35.  And since 2003, the State Department has annually reported to Congress that Hamas receives training from Iran.  *See id.* ¶ 27.  Dr. Clawson excerpts a British article claiming 150 members of Hamas's military wing had "passed through training in Tehran, where they stud[ied] for between 45 days and six months at a closed military base[ ]" under Iranian supervision.  *Id.* ¶ 46.

Based on this information, Dr. Clawson concludes that Iran provided material support to Hamas during the 2008–2017 timeframe.  After assessing his testimony, the Court agrees.  Iran provided money, weapons, and training to Hamas for decades.  And Iran gave support during the period when the attacks at issue took place.

### D.  The Attacks

On a November afternoon in 2015, Akram and Nasr Badawi nested a rifle in a window overlooking the courtyard of the Cave of the Patriarchs[2] in Hebron, Israel.  *See* Spietzen Decl. ¶ 71.  The brothers had been members of a four-man Hamas cell since 2015 and had specifically obtained a rifle for the ensuing attack.  *See id.* ¶ 94.  They admitted later that they intended to kill Jews.  *See id.* ¶ 73.  Nasr was the lookout, Akram was the sniper.[3]  *See id.* ¶ 71.  At around 4 p.m., Akram fired multiple shots.  *See id.* ¶ 71.

He hit two people.  *See* Friedman Decl., Ex. B at 1, ECF No. 53-2.[4]  One bullet struck Plaintiff Eli Borochov in the groin as he walked to the Cave.  *See id.*; Declaration of Eli

---

[2]  Tradition says the Cave holds the graves of many Old Testament figures, and thus many Jews and Muslims pray there.  *Id.* n.25.

[3]  Because this case involves multiple persons with shared family names, the Court will introduce individuals by first and last name and afterward refer to them by first name only.

[4]  All page citations refer to the pagination generated by the Court's CM/ECF system and all exhibit numbers refer to the numbered attachments to the CM/ECF filings.

Borochov ¶ 2 (Eli Decl.), ECF No. 32. Eli had traveled to Israel from his home in New York. *See* Eli Decl. ¶ 2. His father and brother accompanied him that day to the Cave. *See id*. Emergency personnel evacuated Eli to a nearby hospital, where he underwent immediate surgery. *See* Friedman Decl., Ex. B at 1. Surgery went well, and the hospital discharged him two days later. *Id.* But as a result of his injuries, Eli could not walk for two months. *See id.* According to the Complaint, nobody died in the attack.[5]

Law enforcement arrested Akram and Nasr at the scene. Once Israeli authorities publicized the arrest—something they did not do until almost a year later—an official Hamas website identified the brothers as members of Hamas's terrorist wing. *See* Spietzen Decl. ¶ 113. The Court thus agrees with Dr. Spietzen that Hamas conducted the attack.

One month after the attack in Hebron, on the anniversary of Hamas's founding, *see id.* ¶ 119, Abd al-Mushin Shaher Hasouna drove from Hebron to Jerusalem, *see id.* ¶ 121. The night before, he told his mother that he would "intercede for her in[ ] Paradise." *Id.* ¶ 124. Hasouna raced his car into a bus stop in central Jerusalem, ramming 14 people. *See id.* ¶¶ 119, 122. An onlooker saw the attack, drew his own firearm, and shot Hasouna before he could do more damage. *See id.* ¶ 119. That action probably saved lives; Hasouna had an axe in his car and likely intended to use it against the crowd. *See id.* ¶ 126.

Among the injured were Yoav Golan, a U.S. citizen living in Israel, and his wife, Rotem. *See* Compl. ¶ 9–10. The car's impact hurled them into the bus stop's glass wall. *See* Declaration of Yoav Golan ¶ 6 (Yoav Decl.), ECF No. 38. Yoav felt sharp pain in his shoulder and in his leg. *See id.* ¶¶ 12, 14. The fall had dislocated and fractured his shoulder, and he had a crush

---

[5] Israeli media reports of the attack similarly do not discuss any deaths. *See* Judah Ari Gross, *Hebron brothers get life in prison for sniper spree*, The Times of Israel (Nov. 12, 2017, 7:18 PM), https://www.timesofisrael.com/hebron-brothers-get-life-in-prison-for-sniper-spree.

injury on his leg from where the car had struck him.  *See id.* ¶¶ 16, 19.  Although released from

the hospital the next day, Yoav could not walk for a month and was confined to a wheelchair.

*See id.* ¶ 24.  Rotem suffered cuts on her legs, requiring stitches, and sprained a ligament in her

knee.  *See* Declaration of Rotem Golan ¶ 20 (Rotem Decl.), ECF No. 46.  Because of her

injuries, Rotem could neither drive for a month nor attend school for two months.  *See id.* ¶ 28.

Both Yoav and Rotem also suffered mental and emotional injuries from the attack.  *See id.*

¶¶ 29–64; Yoav Decl. ¶¶ 24, 42–54, 58, 60–63.  Plaintiffs suggest that only Hasouna died in the

incident.[6]

The next day, Hamas websites praised Hasouna.  *See* Spietzen Decl. ¶ 128.  Online

forums and radio stations connected to Hamas called him a "son of the Hamas movement."  *Id.*

Hamas's radio station published a poster calling Hasouna "one of the sons of the Islamic

resistance movement Hamas, whose heroic operation, carried out on the 28th anniversary of the

founding of the resistance movement, has ensured the continuation of resistance."  *Id.* ¶ 130.

Given these actions, the Court finds that Yoav and Rotem suffered their injuries at Hamas's

hands.

Eli and his family sue for physical and emotional injuries from the attack.  Ditto for

Yoav, Rotem, and their immediate families.[7]  The latter group contains both U.S. and Israeli

nationals.

---

[6]  Israeli news sources likewise mention no other deaths.  *See Fourteen injured in Jerusalem car-ramming attack*, i24 News (Dec. 14, 2015, 3:52 PM),
https://www.i24news.tv/en/news/israel/diplomacy-defense/95622-151214-at-least-9-people-injured-in-car-ramming-attack-in-jerusalem.

[7]  The Complaint lists as Plaintiffs Yoav's and Rotem's grandparents, *see* Compl. ¶¶ 20–27, but Plaintiffs' Proposed Order disclaims any pursuit of those claims, *see* Proposed Findings of Fact and Conclusion of Law (Proposed Order) at 1, ECF No. 55-4.  The identity of Plaintiffs matters not to the Court's analysis, but the Court assumes based on that proposed language that the grandparents have abandoned their claims.

### III. LEGAL STANDARDS

Under Federal Rule of Civil Procedure 55(b)(2), a court may enter default judgment when a party applies for it.  But entry of a default judgment "is not automatic."  *Mwani*, 417 F.3d at 6.  A court must assure itself of its subject matter jurisdiction, *see Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996), and of its personal jurisdiction over an absent defendant, *see Mwani*, 417 F.3d at 6–7.

Extra procedures govern entry of default when the defendant is a sovereign state.  The FSIA "affords the sole basis for obtaining jurisdiction over a foreign state in United States courts."  *Mohammadi*, 782 F.3d at 13.  The FSIA generally immunizes foreign states, but that grant of immunity "is subject to a number of exceptions."  *Id.* at 14.  Relevant here is the so-called terrorism exception found in 28 U.S.C. § 1605A.  Section 1605A confers subject matter jurisdiction, recognizes a federal cause of action against foreign states subject to the exception, and addresses personal jurisdiction by specifying procedures that a plaintiff must follow to effect service on a foreign state.  *See Schwartz v. Islamic Repub. of Iran*, No. 18-cv-1349 (RDM), 2020 WL 7042842 at *9 (D.D.C. Nov. 30, 2020).

Different standards of proof govern federal courts' personal jurisdiction and subject matter jurisdiction inquiries.  Plaintiffs need only make a "prima facie showing" of personal jurisdiction.  *Mwani*, 417 F.3d at 6–7.  But for a court to exercise subject matter jurisdiction, plaintiffs must "establish[] [their] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  The statute does not specify what constitutes "evidence satisfactory to the court," so courts determine "how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Dem. People's Repub. of Korea*, 774 F.3d 1044, 1046–51 (D.C. Cir. 2014).  The evidence must consist of "admissible testimony in accordance with the Federal Rules of

10

Evidence," *id.* at 1049 (cleaned up), and it must be sufficient for a court to come to the "logical

conclusion" that the defendant is responsible for the plaintiffs' injuries, *id.* at 1051.

## IV.  ANALYSIS

The Court's analysis proceeds as follows:  First, the Court will determine whether it has

subject matter jurisdiction.  Then the Court considers whether it has personal jurisdiction over

the States.  Next, the Court evaluates whether Plaintiffs have pled a federal cause of action and

whether they have proven a theory or theories of liability.  Finally, the Court assesses Plaintiffs'

claims for monetary damages.

### A.  Subject Matter Jurisdiction

To invoke the terrorism exception, Plaintiffs must make two threshold showings.  *First*,

the claimant or victim must be a U.S. national, a U.S. servicemember, or a U.S. government

employee.  *See* 28 U.S.C. § 1605A(a)(2)(A)(ii).  Plaintiffs easily meet the requirement because

two direct victims of the attacks, Eli and Yoav, are U.S. citizens.  *See* Compl. ¶¶ 4, 9.  True,

some Plaintiffs are not U.S. nationals.  But "this fact is non-consequential" for jurisdictional

purposes because some *victims* are U.S. nationals.  *Force*, 464 F. Supp. 3d at 369.

*Second*, the State Department must have designated the foreign government as a state

sponsor of terrorism at the time of the attack and when Plaintiffs filed their lawsuit.  *See* 28

U.S.C. § 1605A(a)(2)(A)(i).  Plaintiffs again easily clear this hurdle:  The State Department has

designated Syria and Iran as state sponsors of terrorism since 1979 and 1984, respectively.  *See*

Dep't of State, Bureau of Counterterrorism, *State Sponsors of Terrorism* (last accessed Feb. 4,

2022), https://www.state.gov/state-sponsors-of-terrorism.

Once past those thresholds, Plaintiffs must show that their claims fit within the terrorism

exception's narrow waiver of sovereign immunity.  The waiver contains five requirements:

11

> [1] money damages are sought against a foreign state [2] for personal injury or death [3] that was caused by [4] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [5] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). The Complaint establishes the first two requirements. Plaintiffs seek money damages, *see* Compl. ¶ 136(a)-(b), for suffering after the attacks in Israel, *see id.* ¶¶ 94–97. The Court's analysis thus focuses on the latter three requirements, though in a different sequence.

*The States provided Hamas with "material support" to carry out the attacks.* Recall the resources that Iran and Syria supplied to Hamas. *See supra* II.B, II.C. Syria gave Hamas a safe base from which to organize its terrorist and diplomatic activities. Iran gave Hamas money, weapons, and training for Hamas fighters. Plaintiffs have thus provided evidence "satisfactory to the court," 28 U.S.C. § 1608(e), that the States materially supported Hamas and that this support came from the States' officials and agents "while acting within the scope of [their] office, employment, or agency," *id.* § 1605A(a)(1).

*The States gave material support "for" an extrajudicial killing.* The definition of "extrajudicial killing" comes from the Torture Victim Protection Act of 1991 (TVPA), which defines the term as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *See* 28 U.S.C. § 1350 note.

Plaintiffs assume that the attacks were "an act of extrajudicial killing" because the attackers "deliberated" killing people, even though they ultimately failed to do so. *See* Pls.' Mot. at 15–16. They offer paltry support for this assertion, citing only one case in which terrorists *did* kill someone. *See id.* at 16 (citing *Campuzano v. Islamic Repub. of Iran*, 281 F. Supp. 2d 258,

270–71 (D.D.C. 2003)).  And Plaintiffs do not suggest that the attacks were acts of torture, aircraft sabotage, or hostage taking.  The Court therefore must decide (without briefing) whether support for an attack that killed nobody can still qualify as support for an extrajudicial killing.

The Court begins, as it must, with the text of the definition for an extrajudicial killing. *See Jackson v. Modly*, 949 F.3d 763, 768 (D.C. Cir. 2020).  The definition refers to a "killing." That word denotes a fatality.  *See Killing*, Black's Law Dictionary (11th ed. 2019) ("The act of causing the end of an animate thing's life.").  Other courts agree.  In *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 840 (D.C. Cir. 2009), the D.C. Circuit found that the assassination of an Iranian citizen in France "clearly qualifies as an extrajudicial killing."  The Eleventh Circuit likewise reads the TVPA to require, "at a minimum," some act "that takes another's life." *Mamani v. Sanchez Bustamante*, 968 F.3d 1216, 1233 (11th Cir. 2020).  Thus, an attack cannot be a "killing," deliberated or otherwise, if nobody dies.[8]

 Nor does the text suggest that the definition's limitation to a "deliberated killing" includes an "attempted killing."  That suggestion defies the usual meanings of "deliberated" and "attempted."[9]  A deliberated action is one in which the actor "consider[s] or discuss[es] [it] carefully."  *Deliberate*, Am. Heritage Dictionary 227 (3d ed. 1994).  An attempted action, on the other hand, is one where the actor "make[s] an effort to do" that action.  *Id.* at 54.  Thus, the adjectives "deliberated" and "attempted" speak to different aspects of an act.  Whether an act is

---

[8]  True, a bystander shot and killed Hasouna after he rammed into the bus stop.  That would constitute a "killing."  But Plaintiffs do not allege that Hasouna's death suffices, and it is hard to see how anyone "deliberated" his death.  In any event, Hasouna's actions, not his death, "cause[d]" the injuries to Yoav and Rotem.  28 U.S.C. § 1605A(a)(1).  Thus, a suit premised on Hasouna's death as an extrajudicial killing would fail to meet the exception's plain terms.

[9]  "Deliberated" and "attempted" are the past participle forms of the verbs "to deliberate" and "to attempt."  The Court therefore cites definitions for those verbs.

deliberated depends on the consideration given to it ahead of time.  *See Mamani v. Berzain*, 654 F.3d 1148, 1155 (11th Cir. 2011) (defining "deliberate" under the TVPA as "undertaken with studied consideration and purpose").  Whether an act is attempted turns on efforts made by the actor to accomplish the act.  *See United States v. Resendiz-Ponce*, 549 U.S. 102, 107 (2007) ("'[A]ttempt' as used in common parlance connote[s] action rather than mere intent . . . .").

A deliberated killing would appear to be a murder accomplished with what the common law described as "malice aforethought," while an attempted killing is an inchoate crime.  The Court therefore cannot include attempted killings in the phrase "deliberated killings" without being unfaithful to the statutory text.  This the Court will not do.  *See Star Athletica, LLC v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017) ("We thus begin and end our inquiry with the text, giving each word its ordinary, contemporary, [and] common meaning.") (cleaned up).[10] The Court must respectfully disagree with other judges in this district who have held that attempted killings fall within the TVPA's definition of an extrajudicial killing.  *See, e.g.*, *Lee*, 518 F. Supp. 3d at 491; *Gill v. Islamic Repub. of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017).

That said, those decisions also present another, more compelling textual argument that ultimately saves Plaintiffs.  *See, e.g.*, *Karcher v. Islamic Repub. of Iran*, 396 F. Supp. 3d 12, 57 (D.D.C. 2019).  The FSIA waives sovereign immunity for injuries caused by "material support

---

[10]  More, *Owens v. Republic of Sudan* militates against interpreting "deliberated killing" to include attempted killings.  864 F.3d 751, 770 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Repub. of Sudan*, 140 S. Ct. 1601 (2020).  There, the Circuit read the TVPA's definition to "contain[ ] three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court."  *Id.* at 770.  The Court has already explained why a "killing" requires a fatality.  Thus, an attempted killing that, by definition, causes no deaths would not meet the Circuit's first element, even if it were a "deliberated" action under the second element.

14

*for*" an extrajudicial killing.  28 U.S.C. § 1605A(a)(1) (emphasis added).  The word "for" matters.

As used in the provision, "for" "indicate[s] the object or purpose of an action or activity." *For,* Am. Heritage Dictionary 329 (3d ed. 1994).  One dresses "for" dinner or studies "for" an exam even if the dinner or exam never occurs.  Thus, a foreign state's support with the object or purpose of an extrajudicial killing constitutes support "for such an act" under the statute.  28 U.S.C. § 1605A(a)(1); *accord Force*, 464 F. Supp. 3d at 360–61.  And support with that intention or objective can therefore cause "personal injury," even if a resulting attack is not deadly.  28 U.S.C. § 1605A(a)(1).  This interpretation faithfully considers Congress's inclusion of "for" in the statute and abides by the D.C. Circuit's guidance to "interpret [the FSIA's] ambiguities flexibly and capaciously."  *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 (D.C. Cir. 2013).

Plaintiffs have sufficiently alleged that the States supported Hamas with that objective. Syria has long sought to "derail any [Israeli-Palestinian] peace process or negotiations that it considers unfavorably."  Berti Decl. ¶ 21.  Dr. Deeb testifies that Syria continued to give Hamas a base in Damascus even as Hamas kidnapped Israelis.  *See* Deeb Decl. ¶ 21a.  Israeli newspapers reported that Syria offered aid in 2002 for Hamas to resume suicide bombings against Israel.  *See* Berti Decl. ¶ 45.  And Syria facilitated advantageous political meetings between Hamas and foreign leaders, *see id.* ¶ 47 (the Iranian president), and granted Hamas a presence in Lebanon, where Syria held de facto control for years, *see id.* ¶ 46.  The Court finds that Syria supplied this aid with the objective of furthering Hamas's activities, which included "deliberated killings" not sanctioned by applicable law.  28 U.S.C. 1350 note.  Syria could not have provided its support without that awareness.

15

As to Iran, Plaintiffs' evidence is even stronger. An Iranian ambassador publicly promised to compensate families of those who died attacking Israelis. *See* Clawson Decl. ¶ 28. According to Dr. Clawson, Iran also "paid generously for results" in the form of bombings in Israel. *Id.* ¶ 38. And Iran manufactured weapons for Hamas, with Hamas leadership's public thanks. *See id.* ¶¶ 47, 56. Finally, Iran publicly supported Hamas during a rash of kidnappings and bombings that it conducted in 2014. *See id.* ¶ 58. Plaintiffs' evidence thus shows that Iran knew of Hamas's violent activities, yet still provided support.

And the evidence shows that the Hamas operatives intended the attacks here to be deadly. In Nasr's statement to Israeli police, he said that "the purpose of the gunfire was to kill a Jew." Spietzen Decl. ¶ 73. Akram likewise told police that the shooting's purpose "was to murder and injure Israelis as revenge for the deaths of" Palestinian martyrs. *Id.* The two brothers clearly contemplated a killing when they entered that room overlooking the Cave.

So too for Hasouna. Israeli investigators found no sign that Hasouna braked before barreling into the bus stop. *See* Spietzen Decl. ¶ 122. He sped into a crowd, an action that any driver knows could be lethal. *Accord Sines v. Kessler*, 324 F. Supp. 3d 765, 796 (W.D. Va. 2018) (reviewing statements from alleged coconspirators discussing the possibility that a car could run over and kill counterprotestors at the 2017 Unite the Right rally in Charlottesville). That Hasouna's car only injured others was luck, not intentional. And even if he planned only to injure with his car, Hasouna brought an axe for use afterwards, *see id.* ¶ 120, probably to imitate the "ramming and stabbing" attacks that occurred widely across Israel in 2014–15, *id.* ¶ 120 n.82. These facts, particularly when combined with Hasouna's pre-attack promise to intercede for his mother in Paradise, *see id.* ¶ 124, show that Hasouna planned to kill those gathered at the bus stop. And he was willing to die doing so.

16

In sum, Hamas undertook both attacks with an intent to kill and with material support from the States.  Thus, the States gave material support for an extrajudicial killing.

*The States' support to Hamas caused Plaintiffs' injuries.*  The FSIA requires Plaintiffs to show proximate cause, meaning "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered."  *Owens*, 864 F.3d at 794 (cleaned up).  To establish a "reasonable connection," Plaintiffs must show both that "the defendant's actions [were] a substantial factor in the sequence of events that led to [their] injury" and that their injury "must have been reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct."  *Id.* (cleaned up).

As to Syria, Dr. Deeb concludes that Syrian support "enabled [Hamas] to transform itself" from a fledgling cell to a terror group "with a solid infrastructure and the power to wreak devastation against Israel."  Deeb Decl. ¶ 23.  He also concludes that Syrian support "is directly responsible for the Hamas terrorist attacks we see today."  *Id.* ¶ 24.  Dr. Berti likewise testifies that "without the support of a prominent Arab state like Syria to lend it legitimacy, [Hamas] would be more isolated and unable to" solidify itself as a major player.  Berti Decl. ¶ 50.  Plaintiffs have thus persuaded the Court that Syrian support was key to the attacks at issue.

As for Iran, Dr. Clawson discusses the "substantial financial and military support" given to Hamas.  Clawson Decl. ¶ 34.  This included "advanced weapons" for attacks in Israel, *id.* ¶ 50, and direct infusions of cash, *see id.* ¶ 48.  Hamas has publicly acknowledged Iran's assistance to Hamas's efforts.  *See id.* ¶ 59.  The Court is persuaded that Iranian support was instrumental to the attacks in Hebron and Jerusalem.

The Court also finds that these attacks caused reasonably foreseeable suffering.  Hamas has a long history of planning and conducting attacks in Israel.  Dr. Spietzen describes a wave of

17

such attacks in 2015–16, which corresponded to the two attacks. *See* Spietzen Decl. ¶¶ 52–69. Although Syria's support predates these attacks, Syria gave Hamas safe haven during previous years of similar attacks. Syria knew then about Hamas's efforts. *See, e.g.*, Deeb Decl. ¶ 21a. Iran likewise supported Hamas during 2008–2017, *see* Clawson Decl. ¶ 61, and it did so with full awareness of how Hamas used that support.

For these reasons, the Court finds that the terrorism exception applies and that the States have no sovereign immunity. This case falls therefore within the Court's subject matter jurisdiction. *See* 28 U.S.C. §§ 1330(a), 1605A(a)(1).

### B. Personal Jurisdiction

A court has personal jurisdiction over a foreign state when it has subject matter jurisdiction and the plaintiff has made service as required in 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b).

Section 1608 "provides four methods of service in descending order of preference." *Barot v. Emb. of the Repub. of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015). The first is "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision." 28 U.S.C. § 1608(a)(1). The second is "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2). Next, a plaintiff can effect service "by sending a copy of the summons and complaint and a notice of suit . . . by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). And finally, if none of the first three methods works, a plaintiff can serve the documents through the Department of State. *Id.* § 1608(a)(4).

Here, neither Iran nor Syria made a special arrangement, nor are they party to an international convention on the service of judicial documents. *See Braun v. Islamic Repub. of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017). Plaintiffs next attempted an international mailing by the Clerk of Court, but the Clerk was unable to effect service. *See* Status Report at 2–3, ECF No. 12. So Plaintiffs requested the State Department to complete service under § 1608(a)(4). *See id.* at 3. This last route was ultimately successful. According to letters from the Department, it served Iran, *see* ECF No. 15, and Syria, *see* ECF No. 18, by diplomatic note.

Because the Court has subject matter jurisdiction and Plaintiffs made proper service, the Court has personal jurisdiction over the States.

### C.  Causes of Action

The FSIA creates a private cause of action against foreign state sponsors of terrorism liable for "personal injury or death." *See* 28 U.S.C. § 1605A(c). The elements of this cause of action overlap with the terrorism exception to sovereign immunity, so the Court's subject matter jurisdiction analysis shows that the exception's cause of action is available here. *See Foley v. Syrian Arab Repub.*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017).

But that availability does not extend to all Plaintiffs. Only U.S. nationals, U.S. servicemembers, employees of the U.S. Government, or their legal representative may bring claims under the federal cause of action. *See* 28 U.S.C. § 1605A(c)(1)-(3). Ten Plaintiffs are U.S. citizens—Eli and his family; Yoav; Yoav's mother, Yehudit Golan; and Yoav's brother, Matan Golan (collectively, U.S. Plaintiffs). *See* Compl. ¶¶ 4–9. 12–13. Based on their citizenship, these Plaintiffs may use the cause of action found in § 1605A(c).

The other nine Plaintiffs (collectively, Israeli Plaintiffs) are Israeli citizens. *See id.* ¶¶ 10–11, 13–19. Recall that the presence of foreign plaintiffs does not deprive the Court of

19

jurisdiction over their claims because the victims of the attacks were U.S. nationals, as required by § 1605A(a)(2)(A)(ii)(I).  *Accord Thuneibat v. Syrian Arab Repub.*, 167 F. Supp. 3d 22, 35 (D.D.C. 2016).  But Israeli Plaintiffs cannot proceed under § 1605A's cause of action.  Instead, they may "pursue claims under applicable state or foreign law."  *Fraenkel v. Islamic Repub. of Iran, et al.*, 892 F.3d 348, 353 (D.C. Cir. 2018) (cleaned up).  For their claims, the Court must conduct a choice-of-law analysis.  *See Oveissi*, 573 F.3d at 841.

The Court will analyze the States' liability first to U.S. Plaintiffs and then to Israeli Plaintiffs.

### 1.  U.S. Plaintiffs

Although the FSIA provides a private cause of action, it does not provide the substantive basis for Plaintiffs' claims.  *See Selig*, 2021 WL 5446870, at *12.  Plaintiffs must instead "prove a theory of liability" to justify holding the States liable.  *Roth v. Islamic Repub. of Iran*, 78 F. Supp. 3d 379, 399 (D.D.C. 2015).  When adjudicating those theories, the Court cannot "fashion a complete body of law."  *Bettis v. Islamic Repub. of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003).  Instead, the Court relies "on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises."  *Fraenkel*, 892 F.3d at 353.

### a.  Battery

As survivors of the attacks, Eli and Yoav allege that the States committed battery.  The States are liable for battery if they (1) acted "intending to cause a harmful or offensive contact with . . ., or an imminent apprehension of such a contact" by those attacked and (2) "a harmful contact" with those attacked "directly or indirectly result[ed]."  Restatement (Second) of Torts § 13; *see Roth*, 78 F. Supp. 3d at 400.  Harmful contact occurs when "any physical impairment" or "physical pain or illness" results from an incident.  Restatement (Second) of Torts § 15.

20

Iran and Syria supported Hamas with the intent to cause harmful contact; "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear." *Valore v. Islamic Repub. of Iran*, 700 F. Supp. 2d 52, 77 (D.D.C. 2010). And Eli and Yoav suffered physical harm. Eli suffered a gunshot wound that required immediate surgery, *see* Friedman Decl., Ex. B at 1, and he testified to the "excruciating pain" that the wound caused him, *see* Eli Decl. ¶ 7. Yoav suffered a fractured shoulder and a crushed leg. *See* Yoav Decl. ¶¶ 16–19. So Eli and Yoav have shown the States' liability under the FSIA for battery and for the physical injuries resulting from that battery.

### b. Assault

Eli's father, Ronen, and brother, Josef, were also present for the Hebron shooting. *See* Declaration of Josef Barachov (Josef Decl.) ¶ 5, ECF No. 34; Declaration of Ronen Barachov (Ronen Decl.) ¶¶ 4–5, ECF No. 35. They assert that Iran and Syria committed an assault, causing them "fear and apprehension of death." Compl. ¶ 112. The States are liable for assault if, when they provided material support and resources for the attack, (1) they acted "intending to cause a harmful or offensive contact with" or an imminent apprehension of such a contact by Ronen and Josef; and (2) Ronen and Josef were "put in such imminent apprehension." *Akins v. Islamic Repub. of Iran*, 332 F. Supp. 3d 1, 35–36 (D.D.C. 2018) (quoting Restatement (Second) of Torts § 21(1)).

As discussed above, the States supported Hamas with the intent to cause harmful contact and the immediate apprehension of that contact. Acts of terrorism are "intended to harm and to terrify by instilling fear of further harm." *Murphy v. Islamic Repub. of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010). And both men feared further harm after the attack. Josef told Dr. Strous that the entire attack was "extremely frightening" and that, for the next months, he grew scared

21

whenever he saw workers in buildings.  Strous Expert Report on Josef Borochov at 2, ECF No.

50-5.  "He thought they were snipers in windows waiting to target him."  *Id.*  Ronen similarly

"freaked out" from shock and felt "immense fear, terror, agitation, dread, and distress"

immediately following the shooting.  Strous Expert Report on Ronen Borochov at 2, ECF No.

50-6.  For months afterwards, Ronen would think "about what could have happened" and

suffered severe anxiety as a result.  *Id.* at 3.

Plaintiffs have accordingly shown that the States are liable to Rotem and Josef for

assault.

### c. Solatium/Intentional Infliction of Emotional Distress

All U.S. family members sue for "loss of solatium," *see* Compl. ¶¶ 95, 97, which is "the

mental anguish, bereavement, and grief" experienced by those with a close relationship to the

victim.  *Est. of Hirshfeld v. Islamic Repub. of Iran*, 330 F. Supp. 3d 107, 140 (D.D.C. 2018)

(cleaned up).  Under the FSIA, a solatium claim "is indistinguishable" from an intentional

infliction of emotional distress (IIED) claim.  *Id.*  Courts apply the Restatement (Second) of

Torts to these claims.  *See, e.g.*, *Abedini*, 422 F. Supp. 3d at 133.

The States are liable for IIED if they "by extreme and outrageous conduct intentionally or

recklessly cause[ ] severe emotional distress to another."  Restatement (Second) of Torts § 46(1).

The Restatement permits recovery by (1) members of the victim's immediate family (2) who

were present at the time of the conduct.  *See id.* § 46(2); *Est. of Hirshfeld*, 330 F. Supp. 3d at

141.

Here, the States provided material support to Hamas with the understanding and intent

that Hamas would carry out attacks in Israel.  Those acts of terrorism "are inherently extreme

and outrageous."  *Abedini*, 422 F. Supp. 3d at 135.  And because of the outrageousness of an act

22

of terrorism, courts have waived the Restatement's presence requirement for family members so long as they "suffer[ ] mental anguish and trauma as a result of" the attack. *Cohen v. Islamic Repub. of* Iran, 238 F. Supp. 3d 71, 85 (D.D.C. 2017); *see also Est. of Hirshfeld*, 330 F. Supp. 3d at 141. Thus, all family members can recover for IIED regardless of their presence at the attack.[11] *Accord Akins*, 332 F. Supp. 3d at 37–38. The Court has reviewed the declarations submitted by each U.S. family member and is persuaded that all of them suffered "severe emotional distress" from the injuries suffered by Eli and Yoav. Restatement (Second) of Torts § 46(2).

The U.S. Plaintiffs have thus established Iran's and Syria's liability under the federal private right of action for their solatium claims.

## 2. Israeli Plaintiffs

Now consider the nine Israeli Plaintiffs—all family members of Yoav and Rotem. They bring various state-law claims against the States.[12] Recall that they can rely only on state tort law to supply the requisite cause of action. That approach requires the Court to first determine "which jurisdiction's substantive law to apply." *Oveissi*, 573 F.3d at 841. For that

---

[11] This includes Ronen and Josef, despite their successful assault allegation. They suffered psychological injuries from being present for the shooting that wounded Eli. The Court's assault analysis above accounts for those injuries. Solatium damages, on the other hand, compensates Ronen and Josef for their grief at seeing Eli shot and at seeing him struggle over the next months. *See Braun*, 228 F. Supp. 3d at 85–86 (awarding damages for assault and solatium to parents who were present for terrorist attack that killed their child).

[12] According to the Complaint, the U.S. Plaintiffs also bring these claims. But U.S. Plaintiffs have already shown liability for their injuries under the federal cause of action. These state law claims thus provide no "additional right to recover." *Force*, 464 F. Supp. 3d at 371; *see also Barry v. Islamic Repub. of Iran*, 410 F. Supp. 3d 161, 178 n.8 (D.D.C. 2019) (declining to consider a state-law claim arising from same predicate acts when plaintiff had shown liability under the federal cause of action).

23

determination, the Court applies choice-of-law rules from its forum, the District of Columbia. *See id.*[13]

### a. Choice of Law

The District combines a "governmental interest analysis" with a "most significant relationship test." *W.A. v. Islamic Repub. of Iran*, 427 F. Supp. 3d 117, 139 (D.D.C. 2019). Under the first analysis, "the Court evaluates the governmental policies underlying the applicable laws and determines which jurisdiction's policy would be most advanced by having its law applied" to the case. *Id.* (cleaned up). Under the second portion—the most significant relationship test—the Court must consider four factors from the Restatement (Second) of Conflict of Laws: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the parties' domicile, residence, and nationality; and (4) "the place where the relationship, if any, between the parties is centered." *Id.* (quoting Restatement (Second) of Conflict of Laws § 145(2)).

Here, two sources of law could apply: D.C. law as law of the forum state, or Israeli law as law of Plaintiffs' domiciles and law where the attacks occurred. Plaintiffs contend that Israeli law is the better fit. *See* Proposed Order at 69. The Court agrees.

Israel has a strong interest in "both deterring attacks within its sovereign borders and ensuring compensation for injuries to its domiciliaries." *Oveissi*, 573 F.3d at 842. Here, both attacks occurred in Israel, and all nine Israeli Plaintiffs live there. The interest of the United States is slight by comparison. No evidence suggests that any victim "was targeted because of

---

[13]  Recently, the Supreme Court heard arguments in *Cassirer v. Thyssen-Bornemisza Collection Foundation*, No. 20-1566 (U.S., *cert. granted* Sep. 30, 2021), to decide what choice-of-law rules govern in FSIA cases. Because no opinion in that case has been yet issued, this Court abides by current D.C. Circuit precedent and applies the forum's choice-of-law rules.

[their] relationship to the United States government." *W.A.*, 427 F. Supp. 3d at 139; *see also Est. of Doe v. Islamic Repub. of Iran*, 808 F. Supp. 2d 1, 22 (D.D.C. 2011) (applying domestic law to claims arising from terrorist attack "on a United States embassy and diplomatic personnel"). The governmental interest analysis favors application of Israeli law.

So does the most significant relationship test. The injury occurred in Israel; the conduct causing the injury occurred in Israel, the Palestinian territories, Iran, and Syria; all Israeli Plaintiffs are Israeli citizens; and no legal relationship exists between them and either the States or Hamas. *Accord Force*, 464 F. Supp. 3d at 373–74 (applying Israeli law for claims by non-U.S. plaintiffs arising from attacks in Israel). The Court will accordingly apply Israeli law to the claims of Israeli Plaintiffs.

### b. Liability Under Israeli Law

When applying foreign law, the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. Plaintiffs here rely on declarations from two professors of Israeli law: (1) Dr. Boaz Shnoor, *see* Declaration of Boaz Shnoor (Shnoor Decl.), ECF No. 34, *Force v. Islamic Repub. of Iran*, No. 16-cv-1468 (D.D.C.); and (2) Israel Gilead, *see* Declaration of Prof. Israel Gilead (Gilead Decl.), ECF No. 56-2, *Henkin v. Islamic Repub. of Iran*, No. 19-cv-1184 (D.D.C.). The Court considers physical injuries and then emotional injuries.

### i. Physical Injuries

Among the Israeli Plaintiffs, only Rotem suffered physical injuries. But the Complaint does not explain her theory of liability. Counts II and III allege battery and assault, *see* Compl. ¶¶ 103–15, but under Israeli law those torts require *direct* harm or attempted harm by a defendant, *see* Shnoor Decl. ¶¶ 26, 28. Dr. Shnoor himself analyzes assault and battery as

25

applied to Hasouna, the direct tortfeasor, not to Iran and Syria. *See id.* ¶ 31 ("[T]here is not a doubt in my mind that any Israeli court would have found *the Hamas terrorists*, sponsored and supported by the Defendants, liable for . . . battery and assault under Article 23 of the CWO.") (emphasis added). So Rotem could not succeed against *the States* for those torts.

To remedy this and other deficiencies, the Court asked Plaintiffs to provide more information about their theory of liability. *See* Show Cause Order, ECF No. 56. Plaintiffs responded that they had shown that the States "aided and abetted Hamas's tortious acts" under Israeli law. *See* Show Cause Response at 12, ECF No. 57. This theory follows the Complaint: Count VII alleges that the States aided and abetted Hamas's "acts of international terrorism, extrajudicial killing[,] and personal injury." *See* Compl. ¶ 129.

According to Plaintiffs' experts, Article 12 of Israel's Civil Wrongs Ordinance (CWO) holds liable "anyone who helps another or encourages him to perform a civil wrong" as if the helper had "committed the wrong himself." Shnoor Decl. ¶ 45; *see also* Gilead Decl. ¶ 36 (noting that the "first requirement" for aiding and abetting liability is a primary tortfeasor). Dr. Shnoor reports that Israeli courts impose aiding and abetting liability if a defendant's actions "significantly contributed to the tortious actions of the direct tortfeasor." *Id.* ¶ 46. The Court has already determined that the States' actions significantly contributed to the attackers' efforts. *See supra* IV.A. The only remaining question is whether those efforts were "tortious." Shnoor Decl. ¶ 46.

They were for Rotem's physical injuries. Battery under Israeli law requires that a defendant (1) knowingly (2) use force (3) against the body of another (4) without that person's consent. *See* Shnoor Decl. ¶ 28. Hasouna drove his car into Rotem's body, throwing her against a glass wall at the bus stop. *See* Rotem Decl. ¶ 5. He thus used force against her body without

26

her consent.  And he did so knowingly.  He chose the anniversary of Hamas's founding as the date for the attack and brought with him an axe painted in a green shade associated with Hamas.  *See id.* ¶¶ 125–26.  These actions show planning of the attack and support an inference that Hasouna knowingly rammed Rotem with his car.

Thus, Hasouna committed a battery against Rotem.  And the States, through their material support to Hamas, significantly contributed to that battery.  The States are thus liable under Israeli law for aiding and abetting a battery.[14]  *See* Shnoor Decl. ¶ 46.  Rotem may recover for her physical injuries.

### ii. Emotional Injuries

All other Israeli Plaintiffs seek recovery for their emotional damages (essentially, for solatium) resulting from the attack on Yoav and Rotem.  Based on Plaintiffs' aiding and abetting theory in their Show Cause Response, the Court follows a similar approach as for Rotem's battery.  The Court will first analyze whether Hamas committed an underlying tort and then whether the States aided and abetted that tort.

First, the underlying tort.  Plaintiffs insist that the Court should analyze Hamas's actions under the Israeli tort of negligence.  But the word negligence never appears in the Complaint.  Even so, Plaintiffs' experts have established that Israeli negligence covers both negligent and intentional acts.  *See* Shnoor Decl. ¶ 13; Gilead Decl. ¶ 25.  And the Complaint includes allegations of multiple intentional actions, including intentional infliction of emotional distress and civil conspiracy.  *See* Compl. ¶¶ 116–20; 125–27.  The Court also notes Judge Lamberth's

---

[14]  The Court need not analyze whether Rotem has successfully alleged aiding and abetting of an assault.  Her successful battery pleading assures her of recovery for her injuries.  *See Braun*, 228 F. Supp. 3d at 80 ("[R]ecovery for the same injury under more than one theory of liability is forbidden.") (citing *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976)).

27

opinion in *Henkin v. Islamic Republic of Iran*, no. 10-cv-1184 (RCL), 2021 WL 2914036 (D.D.C. Jul. 12, 2021). The plaintiffs there likewise did not separately allege negligence but included many of the same claims as Plaintiffs here. *See id.* at *3. Yet Judge Lamberth analyzed whether Israeli negligence law applied. *See id.* at *8. The Court will follow his example. *See also Est. of Botvin v. Islamic Repub. of Iran*, 873 F. Supp. 2d 232, 242–43 (D.D.C. 2012) (determining that terrorists committed negligence and that foreign state sponsors aided and abetted that negligence).

Articles 35–36 of the CWO set forth the tort of negligence. *See* Shnoor Decl. ¶ 13. It consists of four elements: (1) duty of care; (2) breach of that duty; (3) causation; and (4) harm. *See id.* ¶ 15.

The Court has little difficulty concluding that Hamas's actions amounted to negligence. A duty of care under Israeli law arises "whenever a reasonable person could have foreseen" that their conduct "could cause the harm alleged." *Id.* ¶ 17. Hasouna could have reasonably foreseen that driving a car into a crowded bus stop would physically harm those bystanders and emotionally damage their family members. So a duty arose. And Hasouna breached that duty. A breach occurs when the party with the duty fails to take "reasonable precautionary measures." *Id.* Far from taking precautionary measures, Hasouna never braked as he drove into the bus stop. *See* Spietzen Decl. ¶ 122. Under Israeli law, he breached his duty.

The causation element requires "both causation in fact and legal causation (proximate cause)." Shnoor Decl. ¶ 20. "Cause in fact is generally determined in Israel according to the 'but for' test." *Id.* ¶ 21. And legal causation is met "[i]f a reasonable person could have foreseen that harm of the kind that happened might happen." *Id.* ¶ 22. Hasouna's actions fulfill both types of causation. His vehicular rampage was the but for cause of Rotem and Yoav's injuries.

28

Without his choice to ram into the bus stop, they would not be hurt, and their families would not have suffered.  And as discussed in the duty element, Hasouna could have reasonably foreseen that driving a car into a crowded bus stop would cause those injuries.

Finally, the CWO defines harm as "loss of life, or loss of, or detriment to, any property, comfort, bodily welfare, reputation, or other similar loss or detriment."  Shnoor Decl. ¶ 23.  That definition of harm includes emotional and psychological damages.  Israeli Plaintiffs' own declarations and Dr. Strous's reports attest to the mental and emotional harms suffered because of Yoav's and Rotem's injuries.  The Court thus concludes that Israeli Plaintiffs have adequately alleged harm and that Hamas committed Israeli negligence.

Plaintiffs also show that the States aided and abetted that negligence.  That analysis is largely set forth above.  The Court has already determined that the States' actions significantly contributed to Hamas's efforts, which in turn caused Hasouna's attack.  *See supra* IV.A.  The States knew of Hamas's violent intentions and "nonetheless provided support in spite of them." *Est. of Botvin*, 873 F. Supp. 2d at 242.  And the States' funding and support coincided with and allowed Hamas to conduct terrorist attacks, "including the [bus stop attack] at issue here."  *Id.* The material support from the States thus "significantly contributed" to Hamas's negligence. Shnoor Decl. ¶ 46.  The States are therefore liable for aiding and abetting that tort.  Israeli Plaintiffs may recover for their emotional injuries from the attack on Yoav and Rotem.

### D.  Individual Damages

The Court moves next to damages.  To obtain damages in an FSIA suit, "a plaintiff must prove that the consequences of the defendants' acts were reasonably certain to occur, and he must prove the amount of damages by a reasonable estimate."  *Abedini*, 422 F. Supp. 3d at 136 (cleaned up).  Recall that physical injuries and emotional suffering were a foreseeable result of

29

the States' actions. *See supra* IV.A. So the Court must determine whether each Plaintiff's claim

for damages is supported by a "reasonable estimate." *Abedini*, 422 F. Supp. 3d at 136.

### 1. U.S. Plaintiffs

Assessing damages "is an imperfect science." *Goldstein v. Islamic Repub. of Iran*, 383 F.

Supp. 3d 15, 19 (D.D.C. 2019). No amount of money can compensate a victim and his family

for suffering after a terrorist attack. "In the interest of fairness, however, courts strive to

maintain consistency of awards" between plaintiffs in comparable situations. *Id.* To achieve

consistency, courts in this district have adopted standard amounts for each type of plaintiff.

Those figures originate from *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229

(D.D.C. 2006). *Heiser* is a useful reference point, "not binding precedent." *Fraenkel*, 892 F.3d

at 351. Courts vary from these standards depending on the facts of each case. *See Selig*, 2021

WL 5446870, at *13 (collecting cases); *see also Fraenkel*, 892 F.3d at 361 ("District Court

judges invariably must exercise discretion in determining damages awards under the FSIA.").

Thus, the Court will treat them as a guide only.

The relevant standards for damages are as follows. For pain and suffering, courts

generally assume that "persons suffering substantial injuries in terrorist attacks" should receive

$5 million in damages. *Barry*, 410 F. Supp. 3d at 180; *see Cohen v. Islamic Repub. of Iran*, 268

F. Supp. 3d 19, 24 (D.D.C. 2017). Substantial injuries include "compound fractures, severe flesh

wounds, and wounds and scars from shrapnel, as well as lasting and severe psychological pain."

*Valore*, 700 F. Supp. 2d at 84 (cleaned up). Victims who suffer "severe emotional injury

accompanied by relatively minor physical injuries" receive $1.5–$3 million. *Barry*, 410 F. Supp.

3d at 180 (cleaned up). Awarding damages for physical injuries "assumes severe psychological

injuries." *Id.* (cleaned up).

30

For solatium damages, the standard amount "depends in part on the nature of the relationship between the family member and the victim, and the severity of the pain suffered by the family member." *Bathiard v. Islamic Repub. of Iran*, 2020 WL 1975672 at *5 (D.D.C. Apr. 24, 2020) (cleaned up). When the victim suffers a nonfatal injury, courts have applied a framework under which "[s]pouses receive $4 million, parents receive $2.5 million, and siblings receive $1.25 million." *Moradi v. Islamic Repub. of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015); *see Cohen*, 268 F. Supp. 3d at 26.

The Court will apply this framework to the U.S. Plaintiffs, starting with Eli's family and then moving to Yoav's.

*Eli Borochov.* Eli seeks $5 million in pain and suffering. *See* Proposed Order at 76. The Court has already referenced Eli's injuries. After striking his thigh, the bullet traveled into his genital area before exiting his body. *See* Friedman Decl. Ex. B at 1. As a "serious flesh wound," the damage to Eli's leg and genitals constitutes a "substantial" physical injury. *Braun*, 228 F. Supp. 3d at 84. The wound caused "excruciating pain" that did not dissipate as medics transported Eli to the hospital. Eli Decl. ¶ 7. And the months after surgery were not easy. Eli's stitches often came apart, requiring replacements and more pain. *See id.* ¶ 32. Eli developed a limp, which caused him back pain. *See id.* ¶ 35. Adding to his discomfort, the area around Eli's wound is often sensitive, making it hard to sit down or sleep. *See id.* ¶ 40–42. Eli missed three months of college because of his injuries, *see id.* ¶ 45, and he feels anxious in large crowds, *see id.* ¶ 47. Because Eli suffered "substantial injuries" in the shooting, the Court will award him $5 million in keeping with the *Heiser* framework.

*Ronen Borochov.* Ronen seeks $1.5 million in pain and suffering. *See* Proposed Order at 76. Once he saw Eli shot on the ground, Ronen went into a "state of shock." Ronen Decl. ¶ 15.

He reported to Dr. Strous that he felt "immense fear, terror, agitation, dread, and distress." Strous Expert Report on Ronen Borochov at 2. He felt "helpless" as emergency responders transported Eli to the hospital, Ronen Decl. ¶ 22, and Ronen was "shaking and agitated" from the stress of seeing his son in an ambulance, Strous Expert Report on Ronen Borochov at 2. After the attack, Ronen could not sleep for months and calmed himself by eating. *See id.* at 3. Dr. Strous diagnosed Ronen as suffering from post-traumatic stress disorder because of the shooting. Strous Expert Report on Ronen Borochov at 6.

The Court will award Ronen $1 million for his pain and suffering. To be clear, Ronen experienced no physical injury. True, some cases grant $1.5 million for those who, like him, suffer only emotional injuries. *See Valore*, 700 F. Supp. 2d at 84–85. But those cases are not binding on this Court, and they compensate emotional experiences more traumatic than Ronen's. *See id.* (awarding $1.5 million to victim who saw up close the back of a man's head shot off and had the leg of a dead body detach in his arms). Ronen's experience, while painful, does not merit the same damage award. *See Fraenkel*, 892 F.3d at 362 ("[D]ifferent plaintiffs (even under [the] FSIA) will prove different facts that may well (and should) result in different damage awards.") (cleaned up).

Ronen also seeks solatium damages. *See* Proposed Order at 92. Once he and Eli returned to the United States, Ronen "was consumed with thoughts of Eli's physical and emotional injuries." Ronen Decl. ¶ 36. Ronen's sleep woes during that time stemmed from nightmares about losing a child. *See id.* ¶ 40. He cut his work hours considerably so that he could take Eli to various doctors' appointments. Strous Expert Report on Ronen Borochov at 3. According to Dr. Strous, Ronen needed about a year to return to his pre-attack level of activity and function. *See id.* Ronen is much more nervous now. He always needs to know where his children are and

32

remains overly fragile and emotional. *See id.* at 3–4. "These harms are consistent with those suffered by many parents of victims of terrorism." *Christie v. Islamic Repub. of Iran*, No. 19-1289 (BAH), 2020 WL 3606273, at *26 (D.D.C. July 2, 2020). For his anguish at seeing the pain of his son, the Court will award Ronen the *Heiser* standard $2.5 million in solatium damages.[15] *See id.*

    *Josef Borochov.* Eli's brother Josef seeks $1.5 million in pain and suffering. *See* Proposed Order at 77. Once Josef heard a gunshot, he saw Eli on the ground screaming in pain. Strous Expert Report on Josef Borochov at 2. Josef thought Eli would die and knew that if the bullet had traveled on a different path it could have hit and killed Josef himself. *See id.* at 2. And the attack took a mental toll on Josef. In the months afterwards, he felt unable to walk around in public areas. *See id.* He felt depressed during that time and avoided interactions with others. *See id.* at 3. The attack has also changed his life plans—Josef had planned to emigrate to Israel, but after the shooting he does not think he could live there in a "relaxed manner." *Id.* He thus no longer intends to emigrate. *See id.* For the same reasons that the Court will award Ronen $1 million in pain and suffering, the Court will grant Josef the same amount.

    Josef also seeks solatium damages. He calls Eli his "best friend" and someone he "admired." Josef Decl. ¶ 14. Once medics evacuated Eli to a hospital, Josef feared for the worst

---

[15] This award is higher than Ronen's damages for his own pain and suffering. The Court acknowledges that solatium damages generally must be proportionate to pain and suffering damages awarded to direct victims. *See Spencer v. Islamic Repub. of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014). But Eli is the direct victim whose injuries matter for Plaintiffs' solatium claims. Thus, Ronen's solatium award for Eli's injuries can exceed Ronen's award for his own pain and suffering. In analogous situations when a parent is present for the attack that injures their child, courts typically award the parent more in solatium damages than for their own pain and suffering. *See, e.g.*, *Cohen*, 268 F. Supp. 3d at 25–26 (awarding mother of injured children $5 million for her own pain and $7.95 million for solatium); *Braun*, 228 F. Supp. 3d at 84–86 (awarding mother and father who were present at suicide bombing that killed their child $2.5 million each for their own pain and suffering and $6.25 million in solatium damages).

and thought that Eli was dead.  Strous Expert Report on Josef Borochov at 2.  Over the next

hours and days, Josef could not think about anything else and "thought he was going crazy."  *Id.*

As already mentioned, the trauma of what happened to his brother caused depression in Josef.

And whenever he discusses Eli's shooting, Josef cries and has heart palpitations.  *See id.* at 3.

These symptoms match the suffering of "many siblings of victims of terrorism."  *Akins*, 332 F.

Supp. 3d at 45.  Thus, the Court will award Josef $1.25 million in keeping with a *Heiser* standard

award for siblings.  *See id.*

  *Shari Borochov.*  Eli's wife Shari seeks solatium damages.  She did not know Eli at the

time of the shooting.  The couple met in 2017 and married in 2019.  *See* Strous Expert Report on

Shari Borochov at 1, ECF No. 50-7.  She asserts that Eli could not commit to a relationship with

her until he could "recount the full story" of the attack.  *Id.* at 2.  Once Shari learned of his

injuries, she feared that they would affect his fertility.  *See* Declaration of Shari Borochov ¶ 20,

ECF No. 36.  The couple still do not know what effect those injuries will have on their life

together.  *See id.*

  Shari requests $2.5 million in solatium damages.  The Court acknowledges her pain but

cannot award her damages.  Courts in this district consistently refuse damages to plaintiffs

unassociated with the victim at the time of the attack.  *See Bova v. Islamic Repub. of Iran*, No.

15-cv-1074 (RCL), 2020 WL 2838582 at *10 (D.D.C. May 31, 2020) (denying solatium

damages to victim's sister who was born after attack).  Those uncompensated plaintiffs include

"[c]urrent spouses who were not yet married" to the victim.  *Est. of Bland v. Islamic Repub. of

Iran*, 831 F. Supp. 2d 150, 157 (D.D.C. 2011); *see Davis v. Islamic Repub. of Iran*, 882 F. Supp.

2d 7, 17 (D.D.C. 2012).  This limitation makes sense.  Without it, the class of future spouses able

to recover "could remain open for decades after a terrorist attack." *Davis*, 882 F. Supp. 2d at 15. Courts must draw a line to avoid "such an expansive and indefinite scope of liability."[16]  *Id.*

More, Shari, unlike other recipients of solatium damages, never feared that a loved one had died.  *See Christie*, 2020 WL 3606273, at *26 (awarding solatium in part for "panic upon learning about" an attack on a family member).  Nor did she "fear for her spouse's physical well-being in the immediate aftermath" of the attack.  *Id.*  Shari learned about the attack on Eli two years later and never saw the immediate effects of his wounds.  The Court recognizes her pain at seeing those effects now.  But her injuries, suffered years after the shooting, do not entitle her to solatium damages.

*The Rest of Eli's Family*.  Eli's mother Devora seeks solatium damages.  When she heard about the attack, Devora "quickly broke down, weeping and wailing."  Declaration of Devora Borochov ¶ 16, ECF No. 31.  That day "felt like it lasted forever" as she waited for news on Eli's condition.  *Id.* ¶ 26.  And when she told the other children about the attack, Devora had to comfort them in their shock.  *See id.* ¶¶ 31–33.  Devora fought back tears when she first saw Eli in his wheelchair, *see id.* ¶ 38, and during the early stages of his recovery she would often "go into the bathroom, look in the mirror, and just start crying," *id.* ¶ 46.  Devora also worried that the wounds would damage Eli's fertility.  *See id.* ¶ 44.  "Due to these worries, even after he returned, she struggled to sleep for days and weeks."  Strous Expert Report on Devora Borochov at 3, ECF No. 50-3.  As a result of the shooting, Devora became more anxious and has become "much more protective of her children."  *Id.*  For her grief after the shooting of her son, the Court will award Devora the *Heiser* standard of $2.5 million in solatium damages.

---

[16]  The D.C. Circuit relied on similar logic to exclude victims' nieces and nephews from solatium damages.  *See Bettis*, 315 F.3d at 337.

Eli's brother Avraham seeks solatium damages.  He was in middle school when Eli was shot.  *See* Declaration of Avraham Borochov ¶ 5, ECF No. 33.  Avraham was "terrified and in shock" when he learned of the shooting, *id.* ¶ 10, and "cried for hours" into his pillow that night, *id.* ¶ 11.  "For weeks after the attack, [Avraham] could not sleep or think normally."  *Id.* ¶ 18.  He found it hard to concentrate in school knowing that Eli was at home in pain.  *See id.* ¶ 15.  Avraham also grew fearful—he "no longer feel[s] safe the way that [he used] to."  *Id.* ¶ 22.  He has become a "worrier" and shows a fear of public places.  Strous Expert Report on Avraham Borochov at 2–3, ECF No. 50-2.  Because of this emotional suffering after his sibling's injuries, the Court will award Avraham $1.25 million in solatium damages.

Eli's sister, Shira, also requests solatium damages.  When Shira heard about his shooting, she immediately began to cry.  Declaration of Shira Borochov ¶ 7, ECF No. 37.  Shira told Dr. Storus that she felt "agony" at seeing Eli in a wheelchair and in so much pain.  Strous Expert Report on Shira Borochov at 2, ECF No. 50-8.  At school, Shira's classmates pestered her with questions about her brother.  "She felt overwhelmed" and left school for some time.  *Id.* at 2.  Thoughts about Eli and his condition "preoccupied her," affecting "her focus and concentration for many months."  *Id.* at 3.  Shira also felt that, because of the attention at school on her brother's shooting, she could not "develop her own persona and identity."  *Id.* at 2.  For her emotional suffering from the injury to a sibling, the Court will award Shira $1.25 million in solatium damages.

*Yoav Golan*.  Yoav seeks $5 million in pain and suffering.  *See* Proposed Order at 82.  Recall that the impact with the car dislocated Yoav's shoulder, fractured it, and created a crush injury on his leg.  *See* Yoav Decl. ¶¶ 16, 20.  Yoav was in "a lot of pain" and remembers his entire body shaking after impact.  *Id.* ¶ 21.  Because of his injuries, Yoav could not walk and was

36

confined to a wheelchair for a month.  *See id.* ¶ 23.  This temporary disability prevented Yoav

and Rotem from returning to their own home, which is "only accessible by stairs"; instead, they

lived with Rotem's family for multiple months.  *Id.* ¶ 26.  Yoav needed help performing basic

functions and often could not sleep because of the pain.  *See id.* ¶¶ 24, 25.  He experiences leg

pain even now.  *See id.* ¶ 30.

The attack also took a mental toll.  Yoav "never feel[s] secure," especially when walking

near the scene of the attack.  *Id.* ¶ 41.  He has troubling flashbacks of the crash and immediately

tenses up when he sees a car drive too close to a sidewalk.  *See id.* ¶¶ 45, 47.  He and his wife no

longer feel safe taking walks in the evening, and he refuses to drive his car at night.  *See id.*

¶¶ 54, 57.  Yoav's physical injuries resemble the "compound fractures, severe flesh wounds, and

wounds and scars from shrapnel" that cause "severe psychological pain" in victims of terrorist

attacks.  *Valore*, 700 F. Supp. 2d at 84.  The Court thus will award him the standard amount of

$5 million in pain and suffering.

*Yoav's American Family*.  Yoav's mother Yehudit and his brother Matan are American

citizens.  *See* Compl. ¶¶ 12, 13.  They both seek solatium damages.

Yehudit received a call from Yoav shortly after the attack, but the call got disconnected.

*See* Declaration of Yehudit Golan ¶¶ 6-7.  She tried to reconnect with him for 30 minutes, but it

"felt like many hours" because of her worry for her son.  *Id.* ¶ 8.  She was unable to sleep that

night, both out of concern for Yoav but also because she took care of Yoav's baby, who would

not eat.  *See id.* ¶ 15.  Over the next months, Yehudit took time off work to accompany Yoav to

various appointments and to help him around the house.  *See id.* ¶ 17.  She also "frequently woke

up at night with horrible nightmares," *id.* ¶ 23, and could not concentrate on her work, *see id.*

¶ 24.  She reports being fearful and anxious "by the thought [Yoav and Rotem] could have died."

37

*Id.* ¶ 28.  That thought "is in [her] mind all the time." *Id.*  For her emotional suffering after the injury to her child, the Court will award her $2.5 million in solatium damages.  *Accord Blank v. Islamic Repub. of Iran*, No. 19-cv-3645 (BAH), 2021 WL 3021450 at *12 (D.D.C. July 17, 2021).

Once Matan heard about the attack and injuries to Yoav, he traveled to Jerusalem and spent the night in the hospital with Yoav and Rotem.  *See* Declaration of Matan Golan ¶¶ 10, 13, ECF No. 43.  The "vision of [their] suffering" continues "to follow [Matan] until this day and appear[s] in [his] mind unbidden and for no apparent reason." *Id.* ¶ 13.  Matan found it "very difficult" to see his brother traumatized and in a wheelchair. *Id.* ¶ 16.  He also felt a personal impact from the attack.  Now he is "suspicious of each passing car" and "examine[s] every person who walks behind" him. *Id.* ¶ 17.  Matan had trouble sleeping "[f]or a long time after the attack." *Id.* ¶ 18.  And as Matan told Dr. Strous, "[h]e is still bothered to see the extent to which his brother is still affected from his physical and emotional injuries."  Strous Expert Report on Matan Golan at 3, ECF No. 51-3.  For Matan's emotional pain and suffering consistent with seeing his brother's injuries, the Court will award him $1.25 million.  *See Blank*, 2021 WL 3021450, at *13.

### 2.  Israeli Plaintiffs

In their Proposed Order, Israeli Plaintiffs follow the U.S. Plaintiffs and request damages in line with *Heiser*.  *See* Proposed Order at 114.  This presents a conundrum—the *Heiser* figures apply to damages awards under the *federal* cause of action.  Because Israeli Plaintiffs prevail under Israeli law, that law determines their damages.  *See Thuneibat*, 167 F. Supp. 3d at 47 ("Normally, damages would be calculated pursuant to the law under which liability was found . . . ."); *Est. of Botvin*, 873 F. Supp. 2d at 243 (same).  Indeed, they argued that Israeli—

not local—law applies. Because Israeli Plaintiffs seemed to disregard Israeli damages law in their motion, the Court later asked them to specify "[w]hether and in what amounts Israeli law awards damages" for Rotem's physical injuries and the emotional injuries of the Israeli family members. Order at 2.

Israeli Plaintiffs answered the first part of that question. Israeli law does award damages for the suffered injuries. *See* Show Cause Response at 18–20. But beyond saying that Israeli damages "are typically lower than awards in the United States," Israeli Plaintiffs give no amounts. *Id.* at 20. Instead, they again urge the Court to award the same amounts as provided in the *Heiser* framework.[17] *See id.* at 21. This suggestion ignores the Court's instruction that Plaintiffs provide more information on *amounts* under *Israeli* law.

To be sure, some judges in this district have, when faced with imperfect information on foreign damages law, defaulted to the *Heiser* framework when doing so is "in the interests of justice." *Thuneibat*, 167 F. Supp. 3d at 47. Those precedents persuade the Court that the *Heiser* framework is appropriate for Rotem's pain and suffering, given that the Court is already applying American law to her situation. Recall that impact with Hasouna's car threw her into a glass wall at the bus stop. *See* Rotem Decl. ¶ 5. Once the bystander had shot Hasouna, Rotem felt pain in her back and noticed a wound on her knee. *See id.* ¶ 13. Her knees felt like they "were burning." *Id.* At the hospital, Rotem received eight stitches in one knee and learned that she had sprained a ligament in her other knee. *See id.* ¶ 20. She was in shock and remembers vomiting while there. *See id.* ¶ 22. Once at her parents' house, Rotem needed assistance because of her pain to lift her baby from his crib and to nurse him while sitting down. *See id.*

---

[17]  Indeed, Israeli Plaintiffs' requested figures, even in their Show Cause Response, are equal to awards in the United States, not lower as they suggest earlier in the Response.

¶ 27.  Rotem's pain also prevented her from driving for at least a month and she missed over two months of her internship as a drama teacher.  *See id.* ¶ 28.  Rotem did not return to her pre-attack physical shape until "at least ten months" later.  *See id.* ¶ 60.

Like the other victims, Rotem suffered emotionally after the attack.  She thought "constantly and obsessively" about it, *id.* ¶ 30, wondering what might have occurred if her baby had been there, *see id.* ¶ 35.  Rotem's feelings grew so intense that she attended "psychotherapy" sessions, *id.* ¶ 43, and she struggled to care for her child after the attack, *see id.* ¶ 47.  She suffers from nightmares in which she and her family are involved in a terrorist attack.  *See id.* ¶ 49.  She is afraid of the dark, *see id.* ¶ 51, and feels unsafe in her own home, *see id.* ¶ 52.  She "no longer feel[s] confident or safe" and does not know if she can overcome her post-attack anxiety.  *Id.* ¶ 63.

To compensate Rotem's injuries, the Court will consult the *Heiser* amounts.  Her physical injuries and severe emotional trauma both suggest that applying the *Heiser* standards serves the "interests of justice."  *Thuneibat*, 167 F. Supp. 3d at 47.

Rotem seeks $5 million in pain and suffering.  Courts typically award that amount, however, to victims who suffer *substantial* physical injuries from a terrorist attack.  *See Schertzman Cohen v. Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868 at *6 (D.D.C. July 11, 2019).  Victims suffering minor injuries "such as lacerations and contusions caused by shrapnel, accompanied by severe emotional damages" receive less.  *Id.* (cleaned up).  Rotem's physical injuries largely match that description; she had cuts on her knees and sprained a ligament.  For similar injuries, many courts award $2 million.  *See, e.g.*, *Bova*, 2020 WL 2838582, at *5 (awarding $2 million to victim of explosion for cuts on his head and forearms and for the formation of a mass on his leg).  The Court recognizes, however, Rotem's heightened emotional

40

trauma after the attack, including her worries about the safety of her child.  Dr. Strous says that

she suffers from "moderate to severe" post-traumatic stress disorder that will "affect her for a

long period of time."  Strous Expert Report on Rotem Golan at 8–9, ECF No. 51-8.  Based on

that diagnosis, the Court finds that Rotem was "minimally injured" in the attack but

"experienced some enduring physical and emotional pain."  *Bathiard*, 2020 WL 1975672, at *5.

The Court will award her $3 million in pain and suffering.

      For the other Israeli Plaintiffs, however, the Court cannot award damages.  When faced

with a defaulting defendant, a plaintiff must prove the requested amount of damages "by a

reasonable estimate," *Abedini*, 422 F. Supp. 3d at 136, or to a "reasonable certainty," *Sanchez v.

Devashish Hop., LLC*, 322 F.R.D. 32, 37 (D.D.C. 2017).   And recall that when a sovereign

defaults, FSIA requires plaintiffs to establish their "right to relief by evidence satisfactory to the

court."  28 U.S.C. § 1608(e).  Under any of these formulations, the burden lies with Israeli

Plaintiffs to prove the amount of damages.

      They have not met that burden—they provide no estimate for damages allowable under

the substantive law that they admit governs their claims.  *See* Proposed Order at 68–71.  The

Court gave Israeli Plaintiffs an opportunity to remedy that gap in their original filings and

reminded Israeli Plaintiffs that the Court can "insist on a complete presentation by counsel" on

the substance of foreign law.  *See* Order at 2 (quoting Fed. R. Civ. P. 44.1, advisory comm's note

to 1966 amendment).

      The Show Cause Response makes clear that Israeli Plaintiffs understood that Order.

Indeed, their response clarified how far Israeli law "awards punitive damages" for their injuries.

*Id.*  But for compensatory damages, they simply reiterated their request for *Heiser* figures.  "This

Court is [ ] disinclined to conduct a detailed independent study of Israeli damages law" when the

41

Israeli Plaintiffs have not, even after prodding from the Court. *Est. of Botvin*, 873 F. Supp. 2d at 245.

No authority requires a different conclusion. Plaintiffs cite *Leibovitch v. Syrian Arab Republic*, 25 F. Supp. 3d 1071, 1087–88 (N.D. Ill. 2014), where the court awarded to Israeli plaintiffs amounts slightly below the *Heiser* figures. The court based this departure on the proposition—also stated by Israeli Plaintiffs here—that Israel awards fewer damages than the United States. *See id.* at 1087; Show Cause Response at 20. That proposition, however, originates from another out-of-district decision which dealt with a non-FSIA case and which noted simply that the defendant there had not contested the proposition about Israeli law. *See Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 423 (E.D.N.Y. 2009). The decision did not describe or explore in detail this facet of Israeli law. In short, Plaintiffs' arguments are based on non-precedential, largely untested and unsupported claims about Israeli law. This Court will not award millions of dollars in damages against a foreign sovereign based on such dubious out-of-circuit authority. *Accord Est. of Botvin*, 873 F. Supp. 2d at 245.

Israeli Plaintiffs also cite the D.C. Circuit's opinion in *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348 (D.C. Cir. 2018). There, the court overturned a damages award to an Israel plaintiff because the lower court had improperly limited his award based on assumption-of-risk principles. *See id.* at 361. In doing so, the Circuit noted that although Israeli law governed that plaintiff's damages calculation, "we default to the application of federal law when there is a lack of information regarding the proper calculation of damages under foreign law, as there is here." *Id.* at 358 (citing *Thuneibat*, 167 F. Supp. 3d at 47). Israeli Plaintiffs say that this line from the Circuit requires this Court to apply the *Heiser* framework.

42

The Court disagrees. *Fraenkel* teaches that, when facing a dearth of information about a substantive legal question like assumption of risk, lower courts should default to federal law. But that default does not apply to damages amounts in general or to the *Heiser* framework in particular. *Fraenkel* says so. After analyzing assumption of risk through the lens of federal law, the Circuit affirmatively denied that lower courts must adhere to the *Heiser* framework. *See id.* at 361 ("[T]he District Court in this case was not *required* to follow *Heiser* for the simple reason that *Heiser* is not controlling precedent."). And the FSIA requires that plaintiffs establish their right to relief "by evidence satisfactory to the court." *Id.* (quoting 28 U.S.C. § 1608(e)). Thus, district courts "invariably must exercise discretion in determining damages awards under the FSIA." *Id.*

So *Fraenkel* does not require the Court to default to the *Heiser* framework or any other damages amount. And Israeli Plaintiffs cannot rely on one sentence in that opinion to avoid their burden on default judgment. The *Fraenkel* court specifically reiterated that plaintiffs under the FSIA must establish their "right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Simply put, the Court in its discretion—also recognized in *Fraenkel*—asked Israeli Plaintiffs to provide satisfactory evidence to justify the damages they seek. They failed to do so. The Court will not independently remedy that failure and will therefore deny the Israeli Plaintiffs' request for compensatory damages.

\*   \*   \*

The Court pauses to note that, in distinguishing between Plaintiffs, it does not minimize or denigrate the pain and suffering each Plaintiff has endured. No one should experience the trauma that Plaintiffs undoubtedly experienced. The Court's awards are driven by a recognition that most—if not all—people eligible for damages from a terrorist attack have suffered the

43

unimaginable.  *Accord Selig*, 2021 WL 5446870, at *23.  Nor, for that matter, does the Court

doubt the suffering felt by those Plaintiffs not awarded damages here.  In the end, a court's

rulings must be grounded in the law, not sympathy or instinct.

### E.  Punitive Damages and Costs

Plaintiffs also seek punitive damages, which apply not to compensate victims but to

"punish outrageous behavior and deter such outrageous conduct in the future."  *Kim v. Dem.*

*People's Repub. of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015) (cleaned up).  Four factors are

relevant in deciding the appropriate level of punitive damages:  "(1) the character of the

defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or

intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Est. of*

*Steinberg v. Islamic Repub. of Iran*, No. 17-cv-1910 (RCL) 2019 WL 6117722 at *9 (D.D.C.

Nov. 18, 2019) (cleaned up).

These factors support an award of punitive damages here.  The States' acts were heinous.

Their acts were intended to—and did—cause unconscionable pain and suffering.  Deterrence is

necessary because, time and again, courts in this district have been confronted with families

shattered by Iran- and Syria-backed terrorists.  *See, e.g.*, *Wultz v. Islamic Repub. of Iran*, 864 F.

Supp. 2d 24, 42 (D.D.C. 2012) (awarding punitive damages based on "the extreme

reprehensibility of Iran and Syria's acts).  Plaintiffs ask for $150 million in punitive damages

each for the Borochov family and the Golan family.  *See* Proposed Order at 96.

Plaintiffs' request has some basis in precedent.  Courts in this district have awarded $150

million in punitive damages to the family of an attack victim.  *See, e.g.*, *Est. of Steinberg*, 2019

WL 6117722, at *10; *Est. of Hirshfeld*, 330 F. Supp. 3d at 150; *Gates v. Syrian Arab Repub.*, 508

F. Supp. 2d 53, 75 (D.D.C. 2008).  This flat-award approach promotes consistency and

44

predictability in punitive damages, features that the Supreme Court has endorsed. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 502 (2008). But a flat-award method also "limits a judge's discretion to tailor a punitive award appropriate to the magnitude of the underlying injury." *Abedini*, 422 F. Supp. 3d at 142.

The details of the attacks here do not support such an indiscriminate award of punitive damages. In other cases in which courts awarded $150 million per family, the attacks killed members of the families. *See Est. of Hirshfeld*, 330 F. Supp. 3d at 150 (Hamas attack killed eight Israeli students); *Thuneibat*, 167 F. Supp. 3d at 54 (suicide bombers killed 60 people); *Est. of Steinberg*, 2019 WL 6117722, at *10 (Hamas attack killed six Israeli soldiers). In contrast, nobody died in these attacks. The Court thus declines to award $150 million per family.

Instead, the Court will award punitive damages equal to compensatory damages—$27.5 million.[18] Several judges in this district have employed the same approach to punitive damages for FSIA cases. *See, e.g.*, *Hekmati v. Islamic Repub. of Iran*, 278 F. Supp. 3d 145, 167 (D.D.C. 2017); *Flanagan v. Islamic Repub. of Iran*, 87 F. Supp. 3d 93, 124-25 (D.D.C. 2015); *Moradi*, 77 F. Supp. 3d at 73. This Court has awarded punitive damages equal to compensatory ones to accommodate the unique characteristics of a terrorist attack. *See Selig*, 2021 WL 5446870, at *24–*25 ("This case is not like those involving hundreds of decedents murdered in a bombing. The deaths here, while no less tragic, were fewer in number." (cleaned up)).

---

[18]  The Court awards no punitive damages to the Israeli Plaintiffs besides Rotem. Their Show Cause Response says that Israeli law awards punitive damages to the victims of terrorist attacks at an amount three times the award of compensatory damages. *See* Show Cause Response at 21. Because the Court awards most Israeli Plaintiffs no compensatory damages, it has no figure to multiply by three and thus cannot award punitive damages. As for Rotem, she received the benefit of federal standards for her compensatory damages. Like other Plaintiffs subject to those standards, the Court will award her punitive damages in the same amount as her compensatory damages.

This approach accounts for the character of the States' acts, which though heinous did not lead to any victim's death. And a large award of $300 million "is not likely to have a meaningful deterrent effect" when both Syria and Iran face billions in punitive damages awards. *See Christie*, 2020 WL 3606273, at *29. The Court therefore sees no need for such a large award, especially when setting punitive damages equal to compensatory ones can more accurately account for Plaintiffs' suffering.

Thus, the Court awards punitive damages of $27.5 million, to be apportioned among Plaintiffs according to their compensatory damages, for the reasons more fully discussed in *Selig*, 2021 WL 5446870, at *23–*25 (apportioning punitive damages in this way).

*Prejudgment Interest*. Plaintiffs seek prejudgment interest. *See* Compl. ¶ 136(e). "[W]hether pre-judgment interest is to be awarded is subject to the discretion of the court and equitable considerations." *Motion Picture Ass'n of Am., Inc. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992). "[T]he overarching tide of persuasive precedent . . . plainly weighs against awarding prejudgment interest." *Akins v. Islamic Repub. of Iran*, No. CV 17-675 (BAH), 2021 WL 3021445, at *11 (D.D.C. July 16, 2021). This is because "[w]hen an award without pre-judgment interest fully compensates a plaintiff, an award of pre-judgment interest no longer has the intended compensatory purpose and should be denied." *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 135 (D.D.C. 2005). The Court has carefully considered the pain and suffering of the decedents and each Plaintiff, and its awards are intended to be fully compensatory. Prejudgment interest is therefore improper.

*Costs, Expenses, and Attorneys' Fees*. The last category of damages sought by Plaintiffs is their "costs and expenses" and their "attorneys' fees." Compl. ¶ 136(c) and (d). But Plaintiffs cite no basis for the award of these fees. *See Kinyua v. Repub. of Sudan*, 466 F. Supp. 3d 1, 13

46

(D.D.C. 2020) ("[T]he Court is not aware of any statutory or other basis for the award of attorney's fees[.]").  More, "plaintiffs have not provided any information regarding the fees and costs sought."  *Aceto v. Islamic Repub. of Iran*, No. CV 19-464 (BAH), 2020 WL 619925, at *23 (D.D.C. Feb. 7, 2020) (denying plaintiffs' request for "reasonable costs and expenses" because "plaintiffs have not provided any information regarding the fees and costs sought") (cleaned up). The Court therefore declines to award any fees or expenses.

## V.  CONCLUSION

For these reasons, Plaintiffs' Motion for Default Judgment will be granted in part and denied in part.  A separate Order will issue.

2022.03.04
09:41:44 -05'00'

Dated: March 4, 2022              TREVOR N. McFADDEN, U.S.D.J.

47