# EXHIBIT 1

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 3, 2023                    Decided March 8, 2024
Reargued September 29, 2023

No. 22-7058

ELI M. BOROCHOV, ET AL.,
APPELLEES

SHARI MAYER BOROCHOV, ET AL.,
APPELLANTS

v.

ISLAMIC REPUBLIC OF IRAN AND SYRIAN ARAB REPUBLIC,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02855)

———

*Michael Radine* argued the cause for appellants. On the supplemental briefs was *Robert J. Tolchin.*

*Steven R. Perles* and *Peter Raven-Hansen* were on the supplemental brief for *amici curiae* Robert Canine, et al. in support of appellants.

*Ben Buell*, Student Counsel, argued the cause as *amicus curiae* in support of the District Court's judgment. With him on the supplemental brief was *Catherine E. Stetson*, appointed by the court.

*Brad Hinshelwood*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* United States. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Sharon Swingle*, Attorney.

Before: MILLETT, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: Rotem and Yoav Golan, a married couple, were among fourteen people injured when a member of the terrorist group Hamas rammed his car into a crowd at a bus stop in Jerusalem. The attack failed to kill any of its intended victims; only the perpetrator died. Rotem and Yoav, along with their relatives, who suffered emotional trauma in the wake of the incident, sued Iran and Syria for the injuries resulting from the car attack. The district court denied a default judgment and any relief to several of the plaintiffs, who then filed this appeal.

We hold that the district court lacked subject-matter jurisdiction over this case. Congress granted federal courts jurisdiction to hear personal-injury claims arising from, as relevant here, "extrajudicial killings" committed or materially supported by state sponsors of terrorism. But because the attacker in this case (fortunately) did not kill anyone, the attack that caused Rotem and Yoav's injuries was not an "extrajudicial *killing*" over which Congress has provided subject-matter jurisdiction. Nor have the plaintiffs identified any other basis for our jurisdiction against the foreign-

government defendants. We therefore vacate the judgment of the district court with respect to the plaintiffs before this court and remand for dismissal of those plaintiffs' claims.

**I**

**A**

The Foreign Sovereign Immunities Act of 1976 ("FSIA") codified a common-law rule that, for "more than a century and a half," had generally exempted foreign sovereigns from the reach of American courts. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983); *see* Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94–583, 90 Stat. 2891 (codified as amended at 28 U.S.C. § 1602 *et seq.*).

This case concerns a statutory exception to that immunity. In 1996, Congress withdrew foreign sovereign immunity for lawsuits that seek money damages for personal injury or death from a state sponsor of terrorism that has engaged in an "act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources * * * for such an act[.]" Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104–132, § 221, 110 Stat. 1214, 1241. This provision, which is commonly referred to as the "terrorism exception," is now codified at 28 U.S.C. § 1605A(a)(1).

Congress also created a cause of action for U.S. citizens, members of the U.S. armed forces, and U.S. government employees who have been injured by foreign states' acts or sponsorship of terrorism. 28 U.S.C. § 1605A(c). All others suing under the terrorism exception must rely on state- or foreign-law causes of action. *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018); *see Owens v. Republic of Sudan*, 864 F.3d 751, 809 (D.C. Cir. 2017), *vacated*

*on other grounds*, *Opati v. Republic of Sudan*, 590 U.S. 418 (2020).

Three additional preconditions generally must be met for the terrorism exception to apply. First, the foreign state was designated a "state sponsor of terrorism at the time [of] the act * * * or was so designated as a result of such act[.]" 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Second, "at the time [of] the act," either a victim of the act or the claimant in the suit was an American national, a member of the U.S. armed forces, or an employee or contractor for the U.S. government acting within the scope of their employment. *Id.* § 1605A(a)(2)(A)(ii). And third, if "the act occurred in the foreign state against which the claim has been brought," the claimant gave the foreign state a "reasonable opportunity" to arbitrate prior to filing a lawsuit. *Id.* § 1605A(a)(2)(A)(iii).

**B**

On December 14, 2015, Rotem Golan, an Israeli citizen, and her husband Yoav Golan, an American citizen, were waiting with others at a bus stop in Jerusalem when a terrorist deliberately rammed his car into the crowd. *Borochov v. Islamic Republic of Iran*, 589 F. Supp. 3d 15, 28–29 (D.D.C. 2022). The car's impact "hurled" Rotem and Yoav into the bus stop's glass wall. *Id.* at 29. The attacker had an axe in his car that he "likely intended to use" against those at the bus stop, but an onlooker shot him before he could inflict any further harm. *Id.* The attacker was the only person who died in the terrorist incident. *Id.*[1]

---

[1] For purposes of our jurisdictional analysis, we credit the district court's unchallenged factual findings. *See Fraenkel*, 892 F.3d at 351.

Rotem and Yoav were both badly injured. *Borochov*, 589 F. Supp. 3d at 29. Rotem's legs were lacerated, requiring stitches, and she suffered a sprained knee ligament. *Id.* The injuries caused her to miss two months of her teaching internship. *Id.* The car crushed Yoav's leg and both dislocated and fractured his shoulder. *Id.* Yoav and Rotem also "suffered mental and emotional injuries" from the attack. *Id.* Several family members who witnessed their relatives' pain and suffering in the aftermath of the attack themselves sustained mental and emotional injuries.

The district court found that the attacker was acting on behalf of the terrorist organization Hamas, which praised him in the wake of the attack as a "son of the Hamas movement." *Borochov*, 589 F. Supp. 3d at 29. The court also found that Iran supported Hamas "for the past 30 years" through the provision of massive financial support, including weapons, training, and "suitcases of money." *Id.* at 27–28. The district court further found that Syria gave Hamas "operational freedom, political legitimacy, protection, and training[,]" without which "Hamas could not have undertaken" the attack. *Id.* at 26–27.

## C

On September 24, 2019, Rotem, Yoav, and their family members sued Iran and Syria, alleging tort claims of, among other things, battery, assault, intentional infliction of emotional distress, and aiding and abetting the terrorist attack. *See* Second Am. Compl. ¶¶ 89–135. Several of the plaintiffs are American citizens, and they invoked 28 U.S.C. § 1605A(c). Others are not. Those Israeli-citizen plaintiffs instead brought

common-law tort claims.  Second Am. Compl. ¶¶ 102, 107, 112, 119, 129.

Neither Iran nor Syria appeared to defend against the action, so the Clerk entered defaults against them.  *See* Dockets 20–24; *see also* FED. R. CIV. P. 55(a).

After entry of the defaults, each plaintiff was required to "establish[] his claim or right to relief by evidence satisfactory to the court" before the court could enter a default judgment. 28 U.S.C. § 1608(e); *see Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1113 (D.C. Cir. 2019).  Entry of default is critical for FSIA plaintiffs because foreign state sponsors of terrorism are typically "unlikely to pay," *Braun v. United States*, 31 F.4th 793, 795 (D.C. Cir. 2022), and a default judgment qualifies for payment through the U.S. Victims of State Sponsored Terrorism Fund, 34 U.S.C. §§ 20144(b)(2)(B), 20144(j)(4).

For the Israeli members of the Golan family bringing tort claims, District of Columbia choice-of-law rules required the application of Israeli law as to both liability and damages.  *See Borochov*, 589 F. Supp. 3d at 37–38; *see also Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 117 (2022) ("A foreign state or instrumentality in an FSIA suit is liable just as a private party would be.  That means the standard choice-of-law rule must apply.") (citation omitted).

After the plaintiffs submitted evidence and expert reports, the district court denied damage awards to all of the Israeli-citizen plaintiffs except Rotem.

The court began its decision by holding that it had subject-matter jurisdiction under the FSIA's terrorism exception for extrajudicial killings.  *Borochov*, 589 F. Supp. 3d at 34 (citing

28 U.S.C. § 1605A(a)(1)).  The court found that two victims of the attack were U.S. citizens and both Syria and Iran were designated state sponsors of terrorism.  *Id.* at 30.  It then found that Iran and Syria had provided material support for extrajudicial killings by Hamas members.  *Id.* at 32–33.  The court acknowledged that the terrorist attack against Rotem and Yoav was not an "extrajudicial killing," since nobody but the perpetrator died.  *Id.* at 31–32.  Nonetheless, the district court concluded that it had jurisdiction because Iran and Syria had provided material support *for the purpose* of conducting extrajudicial killing of Israelis.  *Id.* at 32–33.  Even though no killing resulted, the court held that jurisdiction attached so long as the material support was intended to cause an extrajudicial killing.  *Id.*

On the merits, the district court held that Iran and Syria were liable for the plaintiffs' injuries.  *Borochov*, 589 F. Supp. 3d at 35–40.  The court noted that the plaintiffs had filed declarations from Israeli law professors that discussed some of the relevant bases for liability under Israeli law.  *Id.* at 38–40.  But as to damages, the district court found that the plaintiffs "fail[ed] to detail how and in what amount Israeli law compensates the injuries allegedly suffered" by the Israeli-citizen plaintiffs.  Order to Show Cause at 1; *see Borochov*, 589 F. Supp. 3d at 45–46.  For that reason, the district court denied all the Israeli-citizen plaintiffs but Rotem any recovery.  *Borochov*, 589 F. Supp. 3d at 47.  The district court made an exception for Rotem because the court viewed "[h]er physical injuries and severe emotional trauma" as providing a sufficient basis for awarding damages.  *Id.* at 46–47.  The district court later denied the Israeli-citizen plaintiffs' motion to amend the judgment.  Order Denying Mot. Amend at 3–4.

Rotem and Yoav's Israeli-citizen relatives, to whom we refer collectively as the Golans, timely appealed the district court's denial of a default judgment for damages.

## II

We begin with our appellate jurisdiction. The Golans appeal the district court's denial of damages. Under 28 U.S.C. § 1291, we have jurisdiction to review "all final decisions" of the district courts. Finality is "to be given a practical rather than a technical construction." *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 152 (1964) (quotation marks omitted); *see Republic Nat. Gas Co. v. Oklahoma*, 334 U.S. 62, 67 (1948) (There is "[n]o self-enforcing formula defining when a judgment is 'final[.]'").

The most important feature of final orders is that they "end[] the litigation on the merits[.]" *Catlin v. United States*, 324 U.S. 229, 233 (1945); *see Republic Nat. Gas Co.*, 334 U.S. at 68 (An order is final when "nothing more than a ministerial act remains to be done[.]"). The "district court's intent is a significant factor" in determining whether the litigation before it is at an end. *Attias v. Carefirst, Inc.*, 865 F.3d 620, 624 (D.C. Cir. 2017). So when a district court's "order states the order of dismissal is final and appealable[,]" we take that as "[t]he clearest signal of finality[.]" *Wilcox v. Georgetown Univ.*, 987 F.3d 143, 147 (D.C. Cir. 2021).

Sometimes, the denial of default judgment "simply sets the stage for continued trial court proceedings[,]" as when a defendant is likely to appear for trial despite failing to respond at an earlier stage of the proceedings. *See* 15A C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 3914.5 (3d ed.) (April 2023 Update). In that situation, a denial of default judgment is not an appealable final order under Section 1291.

*See, e.g.*, *Prince v. Ethiopian Airlines*, 646 F. App'x 45, 47 (2d Cir. 2016) (summary order) (denial of default judgment not final where district court "did not adjudicate all remaining claims").

By contrast, in this case, there is every indication that the denial of default judgment marked the end of the district court litigation. To start, the district court called its order "final" and "appealable," and requested that the Clerk of the Court close the case. Judgment at 3. The court also entered judgment consistent with Federal Rule of Civil Procedure 58(a), which is a clear signal to the plaintiffs that the court had "reached a 'final decision' within the meaning of § 1291[,]" such that it was "time to notice an appeal[.]" *Wilcox*, 987 F.3d at 146; FED. R. CIV. P. 58(a) (requiring that a "judgment * * * be set out in a separate document"). Finally, the court entertained a post-judgment motion, which would be out of place if the proceeding were still ongoing. *See generally* Order Denying Mot. Amend.

Because this denial of default judgment bore clear indicia of finality, we have appellate jurisdiction under 28 U.S.C. § 1291 to review the district court's order. *See also Monk v. Secretary of Navy*, 793 F.2d 364, 370 (D.C. Cir. 1986) ("We have jurisdiction to decide [our appellate] jurisdiction" even when the district court lacked statutory jurisdiction.).

## III

In addition to verifying our appellate jurisdiction, we have an "independent obligation" to assure ourselves both that we have, and the district court had, subject-matter jurisdiction. *National R.R. Passenger Corp. v. Southeastern Pa. Transp. Auth.*, 56 F.4th 129, 134 (D.C. Cir. 2022). Here, subject-matter jurisdiction exists only if the Golans' claims fall within one of

the FSIA's exceptions to foreign sovereign immunity. These exceptions are the "sole bas[es] for obtaining jurisdiction over a foreign state in federal court" in a civil case. *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 197 (2007) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989)).

The Golans rely exclusively on the exception codified at 28 U.S.C. § 1605A, which, as relevant here, confers jurisdiction over a case

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act[.]

28 U.S.C. § 1605A(a)(1).

The terrorist attack that caused the Golans' injuries did not involve torture, aircraft sabotage, or hostage taking. So to fall within the Section 1605A exception, their injuries must have been "caused by" either "an act of * * * extrajudicial killing" or "the provision of material support or resources for such an act[.]" *Id.* Because the perpetrator did not kill anyone in the attack that injured the Golans, no extrajudicial killing occurred, and neither could there have been material support for "such an act." As a result, Section 1605A does not provide jurisdiction and the Golans' claims must be dismissed.

## A

The Golans' injuries were not "caused by an act of * * * extrajudicial killing" because the terrorist attack that injured them did not kill anyone. 28 U.S.C. § 1605A(a)(1); *see*

*Borochov*, 589 F. Supp. 3d at 31. At most, the perpetrator attempted, but failed, to commit an extrajudicial killing. That is not enough to confer jurisdiction under Section 1605A.

Our analysis begins and ends with the plain meaning of the statutory text. The word "killing" refers to an action resulting in the death of another. *See, e.g.*, *Killing*, 6 THE OXFORD ENGLISH DICTIONARY 430 (2d ed. 1989) ("That kills or deprives of life."); *Kill*, BLACK'S LAW DICTIONARY 886 (8th ed. 2004) ("To end life; to cause physical death."); *Killing*, THE AMERICAN HERITAGE DICTIONARY 701 (2d ed. 1982) (def. 1) ("Murder; homicide."); *Kill*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 642 (10th ed. 1993) (def. 1a) ("to deprive of life"). The Golans have offered no example in which the word "killing" or the phrase "extrajudicial killing" is used to refer to an act that did not result in a death. Nor can we think of one.

Nothing else in the FSIA hints that Congress had something other than a completed killing in mind. To the contrary, Congress gave the phrase "extrajudicial killing" the same meaning in Section 1605A as it bears in the Torture Victim Protection Act of 1991. *See* 28 U.S.C. § 1605A(h)(7); *id.* § 1350 note; Pub. L. No. 102–256, § 3(a), 106 Stat. 73, 73 (1992). The Torture Victim Protection Act defines an extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court[.]" 28 U.S.C. § 1350 note. By requiring an actual "killing," Congress closed the door to attempted, but failed, killings.

The rest of the Torture Victim Protection Act confirms that "killing" carries its ordinary meaning. The only tort claim available on behalf of victims of extrajudicial killings is "an action for wrongful *death*." *See* 28 U.S.C. § 1350 note. The

Act does not allow any tort claim for injuries arising from an attempted killing. *See Mamani v. Sánchez Bustamante*, 968 F.3d 1216, 1233 (11th Cir. 2020) (The Torture Victim Protection Act's extrajudicial killing provision "requires, at a minimum, that there be a considered, purposeful act that takes another's life."). In this way, Congress specifically incorporated into the FSIA a definition of "extrajudicial killing" that requires a death.

Including the phrase "act of" before "extrajudicial killing" changes nothing. *Contra Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152, 169–170 (D.D.C. 2022). The primary meaning of an "act" is "something done voluntarily" or a "deed." *Act*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 11 (10th ed. 1993) (defs. 1a, b) (capitalization modified); *Act*, 1 THE OXFORD ENGLISH DICTIONARY 123 (2d ed. 1989) (def. 1a) ("A thing done; a deed[.]"). That too connotes completion.

True, the word "act" sometimes refers to the "process of doing[.]" *Act*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 20 (2002) (def. 4). When used in that sense, however, it typically appears as part of the phrase "the act," as in "in the act" or "the act of." *Id.* ("process of doing: action — now chiefly used in the phrase *in the act* <caught in the [act]>") (capitalization modified); *see* 1 THE OXFORD ENGLISH DICTIONARY 123 (2d ed. 1989) (def. 4a) (listing as "arch[aic]" the definition of act as "[t]he process of doing; acting; action," except as used in the phrase "Act of God") (emphases omitted); *see also* Mem. Op. & Order at 20, *Burks v. Islamic Republic of Iran*, No. 16-cv-1102 (D.D.C. Sept. 30, 2022), ECF No. 65 ("The primary, and most intuitive, understanding of the word 'act' is '[s]omething done or performed' or 'a deed.'") (alteration in original; quoting *Act*, BLACK'S LAW DICTIONARY (11th ed. 2019)); *Cabrera v. Islamic Republic of Iran*, Nos. 19-cv-3835, 18-cv-2065, 2023 WL 1975091, at *10 (D.D.C. Jan.

27, 2023) ("[I]n common parlance, one uses the construction 'in *the* act of' to connote the process of doing something, while '*an* act of' typically references an act or occurrence.").

That the perpetrator died does not suffice. An onlooker shot the perpetrator in self-defense, *Borochov*, 589 F. Supp. 3d at 28–29, a killing that was not undertaken, much less "deliberated," by Syria, Iran, or their confederates. Nor did the shooting cause Yoav and Rotem's injuries. *See id.*; *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (proximate causation required).

To be sure, in applying the FSIA's terrorism exception, this court gives significant weight to Congress's purpose "to bring state sponsors of terrorism * * * to account for their repressive practices" by preventing them "from escaping liability for their sins." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014); *id*. (Congress's goal was "punish[ing] foreign states who have committed or sponsored [terrorist] acts and deter[ring] them from doing so in the future.") (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88 (D.C. Cir. 2002)). Because of the terrorism exception's broad purpose, we have interpreted ambiguities in its statute of limitations "flexibly and capaciously." *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 (D.C. Cir. 2013).

Here, though, there is no relevant ambiguity that would allow us to hold that "killing" means "no killing." While the attack on Rotem and Yoav was indisputably heinous, it was not an "extrajudicial killing" within the meaning of Section 1605A(a)(1).

Given that plain text, we must hew to the terrorism exception's ordinary meaning. "[E]xplicit waivers of

14

sovereign immunity are narrowly construed 'in favor of the sovereign' and are not enlarged 'beyond what the [statutory] language requires.'" *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) (quoting *Library of Congress v. Shaw*, 478 U.S. 310, 318 (1986)); *see McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012) ("The FSIA established a broad grant of immunity for foreign sovereigns that can only be abrogated by one of the statute's narrowly drawn exceptions."). Faithful adherence to the text is critical because waivers of foreign sovereign immunity involve complex and delicate foreign-policy judgments—decisions that fall outside the judicial wheelhouse. *See Opati*, 590 U.S. at 421 (citing *Republic of Austria v. Altmann*, 541 U.S. 677, 689 (2004)). The courts, in other words, should not open the door to litigation against foreign governments that the Political Branches have not clearly authorized. *Cf. Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115–116 (2013) (interpreting the Alien Tort Statute to avoid "adopt[ing] an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches").

## B

In exercising jurisdiction, the district court relied on Section 1605A's waiver of sovereign immunity for designated foreign governments that provide "material support or resources for" an extrajudicial killing. 28 U.S.C. § 1605A(a)(1); *see Borochov*, 589 F. Supp. 3d 32–34. The court reasoned that, even if no killing ultimately results, a foreign state could still be held responsible if it provided material resources intended for an attempted killing. That

reading is foreclosed by a full reading of the statutory text and context.

**1**

Section 1605A's text does not support expanding the material-support provision to cover attempted but uncompleted extrajudicial killings. Remember that Section 1605A(a)(1) waives immunity from suit for injuries resulting from "the provision of material support or resources *for such an act*[.]" 28 U.S.C. § 1605A(a)(1) (emphasis added). In that way, the provision creates secondary liability for governments that aid "such an act" listed earlier in the sentence—that is, a completed act of torture, extrajudicial killing, aircraft sabotage, or hostage taking.

After all, "support" just means "assist[ance]" or "help" in an action; it does not change what the baseline action is. *Support*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1184 (def. 2b) (10th ed. 1997) (capitalization modified); *see Support*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2297 (def. 2a) (2002) ("[t]o uphold by aid or countenance"); 17 THE OXFORD ENGLISH DICTIONARY 258 (def. 1a) (2d ed. 1989) ("assistance, countenance, backing").

The provision of "resources" means the same thing: A resource is a "source of supply or *support*[.]" *Resource*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1934 (def. 1a) (2002) (emphasis added); *see Resource*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 997 (def. 1a) (10th ed. 1997) ("a source of supply or support"); *Resource*, 13 THE OXFORD ENGLISH DICTIONARY 731 (def. 2a) (2d ed. 1989) ("Possibility of aid or assistance.").

The law has long held persons liable for assisting or supporting another's unlawful act under the rubric of aiding-and-abetting liability. And when, as here, Congress draws on a common-law concept like aiding-and-abetting liability, we presume that the statutory term "share[s] fundamental attributes of common law torts" absent an indication to the contrary. *United States v. Honeywell Int'l, Inc.*, 47 F.4th 805, 814 (D.C. Cir. 2022).

"[A]iding and abetting is an ancient criminal law doctrine that has substantially influenced its analog in tort." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 488 (2023) (quotation marks omitted). "[T]he basic 'view of culpability' that animates the doctrine is straightforward: 'A person may be responsible for a crime he has not personally carried out if he helps another to complete its commission.'" *Id.* (quoting *Rosemond v. United States*, 572 U.S. 65, 70 (2014)).

As *Taamneh* and *Rosemond* established, a *completed* crime is necessary for aiding-and-abetting liability to attach. *Taamneh*, 598 U.S. at 488; *Rosemond*, 572 U.S. at 70; *accord United States v. Hansen*, 599 U.S. 762, 771 (2023) ("[L]iability for aiding and abetting requires that a wrongful act be carried out[.]"). That is, a defendant can be found guilty of aiding and abetting a crime only if someone else actually committed the underlying crime. *See* W. LaFave, Substantive Criminal Law § 13.3(c) (Oct. 2023 Update) ("[T]he guilt of the principal must be established at the trial of the accomplice as a part of the proof on the charge against the accomplice. If the acts of the principal of the first degree are found not to be criminal, then the accomplice may not be convicted."); *Gray v. United States*, 260 F.2d 483, 484 (D.C. Cir. 1958) (holding that, in an aiding-and-abetting trial, it must "be established that the act constituting the offense was in fact committed by someone").

The requirement of a completed crime dates back centuries to the common law, which provided that "an accessory could not be convicted without the prior conviction of the principal offender." *Standefer v. United States*, 447 U.S. 10, 15 (1980) (citing 1 M. HALE, PLEAS OF THE CROWN *623–624); W. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 13.1(d)(3) ("[A]t common law, * * * conviction of the principal was an absolute prerequisite[.]").

Civil aiding-and-abetting liability follows the same rule: an accomplice is liable only if the principal actually completes the tort. *See Taamneh*, 598 U.S. at 494 ("[T]ort law imposes liability only when someone commits an actual tort; merely agreeing to commit a tort or suggesting a tortious act is not, without more, tortious."); *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983) (Liability arises only if the defendant "knowingly gave substantial assistance to someone who performed wrongful conduct[.]") (quotation marks omitted); *id.* at 487–488 ("[T]he party the defendant aids must perform a wrongful act that causes an injury[.]"); *see also* Restatement (Second) of Torts § 876 (AMERICAN LAW INST. 1976). For instance, we have held that aiding-and-abetting liability for civil violations of securities laws requires that "another party has committed a securities law violation." *Investors Res. Corp. v. Securities & Exchange Comm'n*, 628 F.2d 168, 178 (D.C. Cir. 1980). There is no established aiding-and-abetting liability for uncompleted torts at common law. Nor is there liability for attempted but failed torts. *See* DOBBS' LAW OF TORTS § 4 (May 2023 Update) ("Tort law * * * would impose liability only if harm results."); *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 457 (7th Cir. 1982) (Posner, J.) ("[T]here is no concept of an inchoate tort[.]").

Throughout the history of this Nation, the common law has been settled that liability attaches only if a defendant "aided

and abetted * * * another * * * in the commission of the actionable wrong—here, an act of * * * terrorism." *Taamneh*, 598 U.S. at 495. And Section 1605A is explicit that the only actionable wrongs are completed instances of the four enumerated terrorist acts. 28 U.S.C. § 1605A(a)(1).

So understood, the words "material support and resources for such an act" predicate the sovereign immunity waiver on one of the four principal acts having occurred. But none did in this case. Therefore, Section 1605A(a)(1)'s material-support provision does not apply.

**2**

To bolster their broader reading of Section 1605A(a)(1), the Golans, like the district court below, rely entirely on the word "for." *See* Golan Supp. Br. 3–4; *Borochov*, 589 F. Supp. 3d at 32. They claim that providing "material support or resources *for* such an act[,]" 28 U.S.C. § 1605A(a)(1) (emphasis added), refers to the "intent" behind the provision of resources, rather than the result, Golan Supp. Br. 4.

The word "for," by itself, cannot bear the weight the Golans place on it. That is because "for" does not necessarily refer to intent; it can instead refer to the cause or instigation of an act, or something contributing to the act's occurrence. *See For*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 886 (2002) (def. 8a) ("because of" or "on account of"); *For*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 454 (10th ed. 1993) (second entry) (similar); *For*, 2 THE OXFORD ENGLISH DICTIONARY 23–24 (2d ed. 1989) (def. 9a) (similar). That causal understanding applies equally when speaking of material support for *an act* of terrorism. Remember, an "act" is "[a] thing done." *Act*, 1 OXFORD ENGLISH DICTIONARY 123 (2d ed. 1989) (def. 1a). Because the word "act" commonly

indicates a deed that is complete, the word "for" naturally refers to support that causes or facilitates that terrorist act, rather than just the intent behind a monetary or resource contribution.

To be sure, "for" can denote an "intended goal," as in saving for college. *For*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 454 (10th ed. 1993) (defs. 1a, 1b); *see For*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 886 (2002) (defs. 2a, 2e) ("as a preparation toward" or "with the purpose or object of"); *For*, 2 THE OXFORD ENGLISH DICTIONARY 23–24 (2d ed. 1989) (def. 8a) ("With a view to; with the object or purpose of; as preparatory to.").

Some district courts, including the district court in this case, have recognized this ambiguity and relied on *Van Beneden* to construe it in favor of plaintiffs. *See, e.g.*, *Borochov*, 589 F. Supp. 3d at 32; *Cabrera v. Islamic Republic of Iran*, No. 18-cv-2065-JDB, 2023 WL 1975091, at *7 (D.D.C. Jan. 27, 2023).

But *Van Beneden* concerned Section 1605A(b), a non-jurisdictional statute of limitations. *See* 709 F.3d at 1166–1177; *Owens*, 864 F.3d at 804 ("We therefore hold that the limitation period in § 1605A(b) is not jurisdictional."); *Maalouf*, 923 F.3d at 1108 (same). We have never interpreted the FSIA's jurisdictional requirements so flexibly. *See World Wide Minerals*, 296 F.3d at 1162 ("In general, explicit waivers of sovereign immunity are narrowly construed[.]"); *see also Federal Republic of Germany v. Philipp*, 592 U.S. 169, 184 (2021) ("We interpret the FSIA as we do other statutes affecting international relations:  to avoid, where possible, producing friction in our relations with [other] nations[.]") (quotation marks omitted).

In that regard, the district court's reading would broadly expand Congress's waiver of sovereign immunity to include not just attempted-but-failed killings, but also providing advance funding for attacks that never occur at all. *See* Oral Arg. Tr. 26:10–27:2 (the court noting that a state could give money to a terrorist for a particular attack, yet the terrorist could use it for something else). Whatever the ambiguities of "for," the tiebreaker for any ambiguity in an FSIA jurisdictional requirement is "in favor of the sovereign[.]" *World Wide Minerals*, 296 F.3d at 1162.

Statutory context also forecloses finding jurisdiction based on material support provided for an attempted, but failed, extrajudicial killing.

To start, the Golans' reading would write an illogical asymmetry into Section 1605A. A foreign sovereign could be sued if it supported someone else's attempted extrajudicial killing. But it would be immune from suit if it directly attempted the extrajudicial killing itself. The Golans offer no reason why Congress would have wanted to encourage terrorist states to keep their extrajudicial killings in-house. Neither have they identified any other reason Congress would have desired such a lopsided liability regime.

Furthermore, the Golans' reading of Section 1605A would place challenging factual inquiries at the threshold of every material support case. For example, if "for" requires proof of intent, then district courts would have to determine a foreign government's subjective intent in providing weapons or money to terrorist groups. That is a step our cases have repeatedly eschewed. *See Owens*, 864 F.3d at 799; *Kilburn*, 376 F.3d at 1130. Money is fungible, and "material support 'is difficult to trace.'" *Owens*, 864 F.3d at 799 (quoting *Kilburn*, 376 F.3d at 1128). Making our jurisdiction contingent on the intent behind

a particular payment, shipment, or transfer "would as a practical matter eliminate * * * liability except in cases in which the [defendant] was foolish enough to admit [its] true intent" or specifically tie its support to a single pre-planned terrorist act. *Id*. (quoting *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698–699 (7th Cir. 2008)).

By contrast, if "for" speaks to causation of the completed act, district courts need only determine whether a foreign government's material support was a proximate cause of a completed killing. *See Owens*, 864 F.3d at 799.

In addition, Section 1605A requires a district court to hear a claim if it finds that:

- The foreign state was designated as a state sponsor of terrorism "at the time the act described in paragraph (1) occurred," or that the government was so designated "as a result of such act," 28 U.S.C. § 1605A(a)(2)(A)(i);

- "[T]he claimant or the victim was, at the time the act described in paragraph (1) occurred," a U.S. national, a member of the U.S. armed forces, or an employee of the U.S. government, *id.* § 1605A(a)(2)(A)(ii); and

- If "the act occurred in the foreign state against which the claim has been brought," the claimant gave the foreign government a chance to arbitrate before filing suit, *id.* § 1605A(a)(2)(A)(iii).

Each of these findings requires a threshold factual determination as of the time an "act described in paragraph (1) occurred[.]" 28 U.S.C. § 1605A(a)(2)(A)(i)–(iii); *see*

*Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015) (factual findings are jurisdictional).

But what counts as an "act described in paragraph (1)"?  If the immunity exception in paragraph (1) is triggered only by completed "act[s] of torture, extrajudicial killing, aircraft sabotage, [or] hostage-taking," then even when a plaintiff's claim is based on a state's "material support" for such a completed act, the plaintiff will ordinarily have to identify only the time and location of the completed terrorist activity.  And it will not be hard for the plaintiff to specify her own nationality at that time, whether the defendant state was designated as a state sponsor of terrorism, and so on.

But if Section 1605A(a)(1)'s immunity waiver can be triggered not just by completed "acts" of killing, torture, aircraft sabotage, or hostage taking, but also by a foreign state's material support for such acts even when those acts never occur, then that "material support" would by itself have to constitute the relevant "act" for purposes of Section 1605A(a)(2)(A).  In that case, the district court would need to focus at the outset of the case on the "material support" for terrorist acts, rather than the acts themselves.  Yet proving the time and place at which money, weapons, or other forms of support changed hands, perhaps over the course of years or decades, would be an onerous and unwieldy task.  The plaintiffs' proposed reading, in other words, would ensure that "few suits like this could ever proceed[.]"  *Han Kim*, 774 F.3d at 1048.

Treating material support itself as the relevant "act" for waiving sovereign immunity would be especially knotty when it comes to the requirement that a plaintiff "afford[] the foreign state a reasonable opportunity to arbitrate the claim" in "a case in which the act occurred in the foreign state against which the

claim has been brought[.]" 28 U.S.C. § 1605A(a)(2)(A)(iii). If "act" refers to a completed act of terrorism, then all this requirement means is that a plaintiff must first seek to arbitrate with a foreign state before suing based on terrorist acts committed within its own territory. That is a plausible accommodation by Congress of foreign states' interests in territorial integrity that are not implicated if the act of terrorism occurs in another state (as in this case).

But if "act" includes that foreign state's "material support," then plaintiffs suing under Section 1605A would have to go to the foreign state they seek to sue and ask to arbitrate. That is because *some* of that state's material support would almost inevitably occur within the state's own territory. For example, the district court found in this case that Syria "host[ed]" Hamas in its capital of Damascus, giving it "an operational base" from which Hamas "carried out its most lethal suicide bombings through Syrian operatives[.]" *Borochov*, 589 F. Supp. 2d at 26. The district court also found that Hamas operatives "received training in Iran[,]" and that Iran sent Hamas "arms and funding[,]" including some weapons that were manufactured in Iran. *Id.* at 27–28. As a result, under the Golans' reading, the statute required them to seek to arbitrate their claims with Syria and Iran. Yet we see nothing in Section 1605A's text, structure, or purpose that remotely suggests that Congress intended to compel terrorism victims like the Golans to seek arbitration with foreign states that footed the bill for attacks outside those states' borders.

## IV

No one can deny the pain and suffering that the terrorist attack visited on Rotem, Yoav, and their family members, or the depravity of the terrorist act itself. But Congress and the President—those whom the Constitution charges with the

conduct of foreign relations—chose to extend the power of the federal courts to claims against the perpetrators of just four terrorist acts, and to foreign governments that aided the execution of those acts. None of those four acts occurred here. As a matter of text and context, the Golans' claims fall outside of Section 1605A's scope. When it comes to waivers of foreign sovereign immunity, courts can go only where the Political Branches have trod. If Congress wishes more expansive coverage for acts of terrorism, it can amend the statute to permit it. But we cannot make that call.

Because there has been no waiver of sovereign immunity in this context, we lack jurisdiction. We therefore vacate the judgment of the district court with respect to the Golans and remand for dismissal of the Golans' claims.[2]

*So ordered.*

---

[2] This court appointed Catherine E. Stetson as *amicus curiae* to defend the district court's judgment. She was assisted by student counsel Samuel Gerstemeier, Riley Segars, and Walker Fortenberry in briefing the case, and by Andrew Nell and Ben Buell in briefing and arguing it. Ms. Stetson has ably discharged her duty, and the court greatly appreciates Ms. Stetson's and the student counsel's service.